UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SPV OSUS Ltd.

                        Plaintiff,

              - against -

HSBC HOLDINGS PLC, HSBC BANK
PLC, HSBC BANK USA, NA, HSBC USA
INC., HSBC SECURITIES SERVICES
(BERMUDA) LIMITED, HSBC
INSTITUTIONAL TRUST SERVICES
(BERMUDA) LIMITED, HSBC BANK
BERMUDA LIMITED, HSBC SECURITIES
SERVICES (LUXEMBOURG) S.A., HSBC
BANK (CAYMAN) LIMITED, HSBC
PRIVATE BANKING HOLDINGS
(SUISSE) S.A., HSBC PRIVATE BANK
(SUISSE) S.A., HSBC FUND SERVICES
(LUXEMBOURG) S.A., SONIA KOHN,
MARIO BENBASSAT, ALBERTO
BENBASSAT, STEPHANIE BENBASSAT,
20:20 MEDICI AG, UNICREDIT BANK
AUSTRIA AG, BA WORLDWIDE FUND
MANAGEMENT LTD., UNICREDIT
S.P.A., HERALD ASSET MANAGEMENT
LIMITED, EUROVALEUR, INC.,
PIONEER ALTERNATIVE  INVESTMENT
MANAGEMENT LIMITED, ALPHA
PRIME ASSET MANAGEMENT LTD.,
REGULUS ASSET MANAGEMENT
LIMITED, CARRUBA ASSET
MANAGEMENT LIMITED, TEREO
TRUST COMPANY LIMITED,
GENEVALOR,  BENBASSAT ET CIE,
HERMES ASSET MANAGEMENT
LIMITED, THEMA ASSET
MANAGEMENT (BERMUDA) LTD.,
THEMA ASSET MANAGEMENT
LIMITED, EQUUS ASSET
MANAGEMENT LIMITED, EQUUS
ASSET MANAGEMENT PARTNERS, L.P.,
AURELIA FUND MANAGEMENT

               :

               :

               :

               :

No. 1:18-cv-03497-AJN

**AMENDED COMPLAINT**

LIMITED, INTER ASSET MANAGEMENT
INC., T+M TRUSTEESHIP &
MANAGEMENT SERVICES S.A., GTM
MANAGEMENT SERVICES CORP. N.V.,
AURELIA ASSET MANAGEMENT
PARTNERS, CAPE INVESTMENT
ADVISORS LIMITED and ERWIN KOHN,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SPV Optimal SUS Ltd. ("SPV"), by its undersigned counsel, for its Amended Complaint

("Complaint") states:

## I.   NATURE OF THE ACTION

1.      Bernard L. Madoff could not have perpetrated the largest financial fraud in history

without the assistance of others. For more than a decade, HSBC Holdings plc, HSBC Bank plc,

and their affiliates (collectively "HSBC") enabled Madoff's Ponzi scheme by encouraging

investment into an international network of feeder funds, including several non-party feeder funds

referenced herein (the "HSBC-Related Feeder Funds"). Ultimately, the HSBC Defendants directed

over $8.9 billion into BLMIS's fraudulent investment advisory business (the "IA Business").

HSBC's own September 2008 report estimated that at least 33% of all moneys turned over to

Madoff were funneled by and through the HSBC Defendants. The HSBC Defendants aided,

enabled, and sustained the massive Ponzi scheme masterminded by Madoff because they received

an extraordinary financial windfall. The HSBC Defendants are liable for the damage they caused,

in an amount to be proven at trial.

2.      For years, Madoff attracted investors through a mix of staggering results and

secrecy.  Madoff's legendary secrecy did not decrease his popularity among the investors blinded

by his unmatched performance. Madoff expanded the fortunes of prominent New Yorkers and his

reputation spread to other areas, such as Palm Beach, Florida, and Hollywood, California. But his

reputation was based on a lie: Madoff was not the smartest guy in the room; rather, he used the investments of new customers to satisfy withdrawals by earlier investors. Madoff's scheme required the constant infusion of new funds from newly duped investors.  As his pool of domestic investors diminished, Madoff turned his attention to potential investors abroad.

3.      Foreign investors were a vast resource to fuel Madoff's Ponzi scheme. The Defendants rescued Madoff by introducing him to European- and American-investors, many of whom thought they were investing in diverse and thoroughly vetted European funds when, in fact, they were simply depositing their money into the greatest fraud in history.

4.      To lure these investors, the Defendants created a labyrinth of hedge funds, management companies, and service providers that seemed to compose a formidable system of checks and balances. Yet this complex architecture provided no security and was merely a means for directing money to Madoff while avoiding scrutiny and maximizing fees. At the core of this architecture was a remarkably small group of individuals and the bank on which they all relied to help project an air of credibility and respectability, HSBC.

5.      Beginning in the 1980s, Sonja Kohn ("Kohn") became one of Madoff's top ambassadors, introducing him to a wide array of potential investors. In the early 1990s, Kohn introduced Madoff to the Benbassat Family, which began in earnest the foreign feeder fund business that ultimately would fuel and sustain Madoff's Ponzi scheme. Beginning in 1992, the Benbassat Family set up a variety of feeder funds, including Hermes International Fund Limited ("Hermes") and its subsidiary, Lagoon Investment Limited ("Lagoon"), Lagoon Investment Trust ("Lagoon Trust"), Geo Currencies Ltd. S.A. ("Geo Currencies"), Thema Fund Ltd. ("Thema Fund") and its subsidiary, Thema Wise Investments Ltd. ("Thema Wise"), and Thema

International Fund plc ("Thema International") (collectively, the "Benbassat Funds"). The Benbassat Funds invested more than $1.9 billion with BLMIS.

6.     In the early 1990s, Kohn moved back to Austria and, along with defendant UniCredit Bank Austria AG ("Bank Austria"), set up a series of funds, associated with defendant 20:20 Medici AG ("Bank Medici"). These included Primeo Fund ("Primeo"), Alpha Prime Fund Limited ("Alpha Prime"), Herald Fund SPC ("Herald"), Herald (Lux) SICAV ("Herald (Lux)"), and Senator Fund SPC ("Senator") (collectively, the "Medici Funds"). The Medici Funds invested more than $2.8 billion with BLMIS.

7.     The Benbassat Funds and the Medici Funds and their managers relied on one financial institution to act as their marketer, custodian, and administrator: HSBC. All of these funds bore HSBC's imprimatur. The HSBC imprimatur was the perfect endorsement to convince foreign (and, ultimately, other American) investors to pour money into BLMIS. To unknowing investors, the funds appeared to be sound, legitimate investment vehicles because the documents describing those investments were emblazoned with HSBC's brand.

8.     But HSBC's imprimatur was not based on its reasonable due diligence. Indeed, the HSBC Defendants were well aware of the many indicia of fraud surrounding BLMIS. In yearly due diligence reports, certain of the HSBC Defendants identified numerous badges of fraud, including: Madoff's secrecy, his insistency on retaining custody of all assets under management, his seemingly supernatural trading performance, BLMIS's untraditional fee structure, and the lack of a qualified auditor.

9.     Despite knowing of the serious risks of fraud that Madoff posed, the HSBC Defendants delegated many of their most critical roles and responsibilities to BLMIS. For example, certain HSBC Defendants purported to serve as custodian of the assets of the Medici Funds and

the Benbassat Funds, as well as others, but without any public disclosure to investors, they surrendered all custodial duties to BLMIS. The HSBC Defendants helped Madoff create a system without checks and balances and ripe for fraud. Remarkably, when conducting due diligence on other Madoff feeder funds, HSBC explicitly noted that BLMIS's role as custodian of assets created a serious risk of theft.

10.     Madoff could not have perpetuated his fraud unless the HSBC Defendants turned a blind eye and pretended to ensure the existence of assets and trades when, in fact, they did not. As a matter of fact, the HSBC Defendants merely delegated their responsibilities to BLMIS. The fees they received for their various roles were simply kickbacks paid for looking the other way and legitimizing BLMIS through the HSBC name and brand.

11.     The HSBC Defendants twice retained KPMG to perform due diligence on BLMIS, and KPMG twice reported serious fraud risks and deficiencies, many of which were already known to the HSBC Defendants. Despite knowing of numerous "red-flags" showing that BLMIS was a fraud, the HSBC Defendants continued to facilitate Madoff's fraud for their own gain. The HSBC Defendants eventually became more than a mere marketing tool and developed derivative structured financial products that delivered even more money into BLMIS's IA Business, providing Madoff with the substantial assistance he needed to keep the Ponzi scheme going.

12.     The remaining defendants named in this lawsuit are the management companies and service providers of the Medici Funds and the Benbassat Funds.  Because Madoff did all of the "managing," these other defendants provided no services at all. Their overlapping ownership, and their receipt of fees for doing nothing, establish that they were merely profit vehicles for Kohn, the Benbassats, and their associates.

13.     These Defendants are financial institutions, hedge funds, investment advisers, managers, and/or promoters whose financial sophistication gave them insight into Madoff's fraud long before his confession and arrest on December 11, 2008. Each had strong financial incentives to participate in, perpetuate, and remain silent about Madoff's fraudulent scheme. The Defendants received management, administrative, performance, advisory, distribution, custodial, and/or other fees for driving new investors into BLMIS's IA Business.

14.     These Defendants recklessly disregarded the numerous indicia of fraud that surrounded BLMIS. The Defendants' financial incentives led them to turn a blind eye to numerous indicia of illegitimate trading activity and fraud, including:

(i)     Madoff refused to meet with HSBC despite the billions of dollars HSBC helped funnel into BLMIS's IA Business;

(ii)     BLMIS purported to trade equities and options in volumes so implausibly high that they often exceeded the entire daily reported volume of such options and equities traded on the world's exchanges;

(iii)     BLMIS account statements sometimes showed securities trades executed outside of the daily price range;

(iv)     BLMIS served as custodian of its customers' funds, i.e., there was no independent third-party that could verify either that BLMIS's assets existed or that customer funds were maintained in segregated accounts;

(v)     BLMIS was too good of a deal; Madoff walked away from hundreds of millions of dollars by not charging industry standard management and performance fees. BLMIS also purported to execute trades in a manner that would have required the IA Business to front at

least hundreds of millions of dollars to its customers, yet Madoff never charged the Defendants for this remarkable accommodation;

(vi)     BLMIS, which had domestic and international operations with tens of billions of dollars under management, was audited by an unknown and unsophisticated auditor;

(vii)     BLMIS was insulated from performance volatility even in the most volatile markets. Madoff seemed to possess a near-perfect ability to time purchases and sales of stocks and options, so that BLMIS always managed to enter and exit the markets at the precise right time on the precise right day to maximize returns and avoid losses;

(viii)     BLMIS refused to allow its customers real-time access to their accounts, instead transmitting paper trade confirmations days after trades were purportedly made, which is a significant departure from industry practice;

(ix)     BLMIS's billions of dollars in purported trades never caused observable price displacement or liquidity disruptions in the market;

(x)     Madoff refused to identify any of BLMIS' s options trading counterparties to any of the Defendants and their customers who, collectively, risked billions of dollars in exposure to such counterparties;

(xi)     BLMIS's reported trading activity frequently deviated from the purported investment strategy of the IA Business;

(xii)     From the end of 2005 until Madoff's arrest, BLMIS's account statements showed transactions with the "Fidelity Spartan U.S. Treasury Money Market Fund" even though that fund changed its name in August 2005; and

(xiii)     BLMIS's trade confirmations did not comport with industry standards and often used improper or incorrect terminology to describe trades.

15.     The Defendants observed the indicia of fraud and others, but ignored them. In a 2001 due diligence report, HSBC noted that the investment community was "baffled" by Madoff and did not believe that Madoff's split-strike conversion strategy (the "SSC Strategy") could generate the returns he claimed. Upon information and belief, the Defendants suspected that Madoff might be illegally front-running the market using information he gleaned from his market-making operations or the "potentially greater risk" that Madoff was not, in fact, implementing the SSC Strategy. But the HSBC Defendants ignored all of this because of the returns BLMIS "produced" and the profits it "created." Instead of reacting with suspicion, skepticism, or candor, the Defendants reacted with sarcasm, referring to "the magic of Madoff" to explain his unexplainable performance.

16.     Ultimately, as custodians and administrators, the HSBC Defendants oversaw the infusion of no less than $8.9 billion into BLMIS's IA Business through a network of feeder funds. The HSBC Defendants delivered even more money to BLMIS through derivative structured financial products that they issued and sold to their customers.

17.     As a result, the Defendants received billions of dollars. Many of these Defendants received many millions of dollars by selling, marketing, lending to, and investing in financial instruments intended to substantially assist Madoff by funneling money into BLMIS and facilitating and prolonging the Ponzi scheme.

18.     Through this Amended Complaint, the Plaintiff seeks to recover compensatory and punitive damages caused by the Defendants' misconduct.

## II.   JURISDICTION AND VENUE

19.     This Court has personal jurisdiction over those defendants that are domiciled in New York State under CPLR §301 and, as to all defendants, under CPLR §302 in as much as the causes of action asserted herein arise from defendants' (1) transacting business within New York

State or contracting to supply services in New York State; (2) having committed a tortious act within New York State;  and/or (3) having committed a tortious act without New York State causing injury to property within New York State.  Additional jurisdictional facts with respect to each Defendant are pleaded in more detail below.

20.     Venue is proper pursuant to CPLR §503 as one or more parties reside in New York County, and Plaintiff designates New York County as the place of trial.

### III.   THE PLAINTIFF SPV

21.     Plaintiff SPV Optimal SUS Ltd. ("SPV") is a Bahamian corporation incorporated under the Bahamas International Business Companies Act, 2000.  It is the assignee of Optimal Strategic US Equity Ltd. ("OSUS"), an investment fund that invested assets with Bernard L. Madoff Investment Securities, LLC ("BLMIS"), and thus a creditor of BLMIS. Optimal Multiadvisors ("OML") was the sole owner of OSUS.

22.     In May 2011, OML and OSUS agreed to assign the entirety of its claim and all rights arising out of or in connection with the claim against the BLMIS estate to SPV.  The primary purpose of SPV was to be the holder of the claim, and the transfer to SPV would also include any rights related to the claim and OSUS's investment in BLMIS.  To effectuate that agreement, on May 11, 2011, SPV and OSUS entered into the Assignment of Claim whereby SPV acquired:

> all rights and benefits of Assignor [OSUS] related to the Purchased Claim, including (i) any right to receive cash, securities, instruments, interest, penalties, fees or other property that may be paid or distributed with respect to the Purchased Claim, (ii) any action or claim (including any "claim" as defined in 11 U.S.C. §101(5)) of any nature whatsoever, whether against the [BLMIS] or any other party, arising out of or in connection with the Purchased Claim . . . (d) any other rights, action or claim arising out of the Assignor's investment in [BLMIS], including but not limited to, any claim the Assignor may have with respect to any current or future victim remission proceedings . . . and (e) any and all proceeds of any of the foregoing . . . (the "Transferred Rights").

23.     SPV, as assignee of OSUS, asserts those Transferred Rights herein and thus stands in the shoes of OSUS as a creditor of BLMIS. In subsequent litigation between SPV and OSUS related to the scope of the Transferred Rights, OSUS has conceded that the common law "aiding and abetting" claims asserted herein are within the scope of those rights and were therefore transferred to SPV. According to OSUS, "[T]here is no dispute that Aiding and Abetting Madoff Claims, which are claims for breach of common law duties allegedly owed by those defendants to *all* BLMIS investors for facilitating Madoff's breach of his duties to accountholders, are covered by Section 1(d) of the Assignment." *See* Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, filed by Plaintiff Optimal Strategic U.S. Equity Ltd., No. 653693/2014 (N.Y. Sup. Ct.).

24.     Beginning in January 1997, OSUS was a BLMIS customer and invested virtually all of its assets in BLMIS.  OSUS remained continuously invested in BLMIS from January 1997 through the time, in or after December 2008, the BLMIS Ponzi scheme collapsed.  Through a series of investments, beginning in January 1997 and continuing through 2008, OSUS deposited over $1.6 billion into BLMIS.  From January 1997 through early December 2008, OSUS remained invested in BLMIS, including by virtue of the cash OSUS had deposited and left in its BLMIS account and by retaining purported gains in its BLMIS account.  Each day during the period from when OSUS began investing in January 1997 up to, at least, December 11, 2008, OSUS could have decided to withdraw its money from BLMIS but instead decided to remain invested in BLMIS.

25.     The final customer statement issued by BLMIS to OSUS, dated November 30, 2008, reported $2,919,934,627.70 in net investments, purported gains, and option positions in OSUS's account.  Thus, as of December 10, 2008, OSUS could have demanded and withdrawn

over $2.9 billion from BLMIS.  That is, because of the nature of the BLMIS Ponzi scheme, which perpetuated itself by satisfying customer demands for withdrawals with funds misappropriated and diverted from the accounts of other customers, OSUS could have demanded and received its money back at least up until the Ponzi scheme collapsed, which occurred upon or after Madoff's arrest and the public revelation of the BLMIS Ponzi scheme on December 11, 2008.  After the BLMIS Ponzi scheme collapsed, the SIPA Trustee for the BLMIS estate recognized and allowed a claim by OSUS for net cash losses in the amount of $1,540,141,277.60.  To date, only a negligible portion of that allowed claim has been distributed.

## IV.    THE PONZI SCHEME AND VICTIMIZATION OF OSUS

26.     BLMIS was founded in 1959 by Madoff and, for most of its existence, operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder, chairman, chief executive officer, and sole owner, operated BLMIS together with several of his friends and family members. BLMIS had three business units: the IA Business, market-making, and proprietary trading.

27.     Madoff solicited billions of dollars from investors including OSUS, plaintiff SPV's assignor, for his fraudulent IA Business.  Madoff represented to OSUS and other IA Business customers that he was employing the "SSC Strategy." Madoff represented that his strategy was to invest customer funds in a subset or "basket" of the common stocks that comprised the Standard & Poor's 100 Index ("S&P 100"). Madoff represented to OSUS and other customers that this basket of stocks would mimic the movement of the S&P 100 Index. He also asserted that he would carefully time purchases and sales to maximize value.  Correspondingly, he represented to OSUS and other IA Business customers that their funds would be out of the market intermittently, although in fact those customer funds were always out of the market.  According to the representations by Madoff and/or BLMIS, while out of the market, OSUS's and other customers'

funds were purportedly invested in United States Treasury bills or in funds holding Treasury bills. The second part of the SSC Strategy was the use of option contracts as a hedge. Those option contracts functioned as a "collar" limiting both the potential gains and the potential losses on the baskets of stocks. Madoff represented to OSUS and other IA Business customers that he would use proceeds from the sale of S&P 100 Index call options to finance the cost of purchasing S&P 100 Index put options. Madoff also told IA Business customers, including the Defendants named herein, that he would enter and exit the market between eight and twelve times each year.

28.    BLMIS's IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts. Each such customer statement constituted a misrepresentation because the purchases and sales shown in those statements never occurred, and the reported profits were entirely fictitious.

29.    Plaintiff SPV's assignor OSUS, like other BLMIS IA Business customers, received monthly customer statements that constituted misrepresentations. Each month from when it began investing in BLMIS in 1997 through November 30, 2008, OSUS received a fabricated account statement from BLMIS, misrepresenting, *inter alia*, the existence of gains from trades that in fact never took place and equity and option positions that were similarly fictitious. By way of specific example, the final account statement issued by BLMIS to OSUS on November 30, 2008, misrepresented that OSUS's account balance was $2,919,934,627.70, a sum that included fictitious gains, equity positions, and option positions.

30.    Similarly, each payment to OSUS or other BLMIS IA Business customers constituted an intentional misrepresentation of fact regarding the underlying account and was an integral and essential part of the fraud. To stay afloat, BLMIS had to honor requests for payments in accordance with the falsely inflated account statements for as long as it could. If it failed to

make those payments, demands, investigation, the filing of claims, and exposure of the fraud would have followed swiftly.   The payments were necessary to validate the false account statements, and were made to avoid detection of the fraud, to retain existing investors, and to lure other investors into the Ponzi scheme.  A payment constituted a misrepresentation to the effect that a customer's fictitious gains were real and/or that the customer's capital had not been misappropriated and diverted to make payments to other customers.

31.     As of December 11, 2008, the most recent—and, as it turned out, final—customer statements, issued by BLMIS as of November 30, 2008, falsely recorded nearly $65 billion of net investments and related fictitious gains from customers' investments with BLMIS.

32.     BLMIS and Madoff knew that the representations in each and every account statement sent to OSUS and other BLMIS IA Business customers were false at the time those representations were made.  At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorneys' Office for the Southern District of New York.  Madoff admitted that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts, stating: "I never made the investments I promised clients, who believed they were invested with me in the split strike conversion strategy." At the plea hearing, Madoff further admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."  Additionally, Madoff admitted that "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal."  Madoff was sentenced on June 29, 2009 to 150 years in prison.

33.     Two other former BLMIS employees have made similarly candid admissions, further establishing that the false statements made by BLMIS to OSUS and other customers were

made knowingly.  On August 11, 2009, a former BLMIS employee, Frank DiPascali, pleaded

guilty to participating in and conspiring to perpetuate the Ponzi scheme.  At a Plea Hearing on

August 11, 2009, in the case entitled *United States v. DiPascali*, Case No. 09-CR-764(RJS),

DiPascali pleaded guilty to a ten-count criminal information.  Among other things, DiPascali

admitted that the Ponzi scheme had begun at BLMIS since at least the 1980's.  (Plea Allocution

of Frank DiPascali at 46, *United States v. DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11,

2009) (Dkt. No. 11).)  In addition, at a plea hearing on November 21, 2011, in the case captioned

*United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and

manager, pleaded guilty to a six-count criminal information charging him with securities fraud,

falsifying records of BLMIS, conspiracy, and fraud.  Kugel admitted to helping create false,

backdated trades in BLMIS customer accounts beginning in the late 1970s.

34.     Other former BLMIS employees have been convicted of criminal wrongdoing. On

March 24, 2014, Daniel Bonventre, Annette Bongiorno, Jo Ann Crupi, George Perez, and Jerome

O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi

scheme perpetrated in BLMIS's IA Business.

35.      There is no record of BLMIS having cleared a single purchase or sale of securities

in connection with the SSC Strategy on any trading platform. Madoff's SSC Strategy was a total

fraud.

36.     Madoff and BLMIS intended to induce reliance on their misrepresentations by

OSUS and other IA Business customers.  Madoff's misrepresentations about his strategy were

integral to inducing investors like OSUS to invest billions of dollars into BLMIS, and maintaining

a steady flow of cash into the Ponzi scheme was essential to keeping that operation going.  The

misrepresentations in the account statements, like those OSUS received each month, up to and

including the final November 30, 2008 account statement, were calculated to induce OSUS and other customers to retain their investment in BLMIS.  Similarly, the misrepresentations in the form of payments to customers demanding withdrawals were intended to induce customers to retain their BLMIS accounts by perpetuating the fiction that their money was legitimately invested and producing legitimate gains.

37.     At times prior to his arrest, Madoff explained to customers and regulators that he purchased and sold the put and call options over-the-counter. But like the underlying securities, there is no evidence that Madoff ever purchased or sold any of the options described in customer statements. Likewise, no options clearinghouse has any record of the IA Business having bought or sold any options on behalf of any IA Business customers.

38.     Quite simply, the IA Business was operated as a Ponzi scheme. The money received from investors, including OSUS, was never invested; rather BLMIS used its IA Business customers' deposits to pay other customers' redemptions.

39.     Although the falsified monthly account statements reported that the accounts of OSUS and other IA Business customers had made substantial gains, BLMIS did not have the funds to pay investors because it was a Ponzi scheme. By providing billions in capital, the Defendants assisted Madoff and BLMIS in extending the life of the Ponzi scheme.  Madoff's scheme continued until December 2008, when the requests for redemptions overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

40.     As detailed further below, beginning in the 1980s and early 1990s, various of the Defendants undertook conduct that substantially assisted Madoff's and/or BLMIS's breaches of duties owed to OSUS and other IA Business customers.   The conduct by which Defendants substantially assisted the BLMIS scheme to continue to operate and to victimize customers

including OSUS continued through, at least, the collapse of BLMIS on or about December 11, 2008. Thus, from before OSUS began investing in BLMIS in 1997, conduct by Defendants was propping up the Ponzi scheme, helping to facilitate its operation, and cloaking BLMIS with an air of legitimacy. Such conduct was thus a proximate cause of OSUS's being induced to invest in BLMIS in the first instance. Defendants' continuing conduct further perpetuated the Ponzi scheme throughout the entire period that OSUS maintained and increased its investment in BLMIS. A continuous flow of billions of dollars into BLMIS was necessary to keep the scheme afloat. Defendants provided and facilitated that cash flow in various ways, including by directly paying into BLMIS, inducing others to invest in BLMIS, and lending their imprimatur to the operation and thus attracting additional investors. In particular, Defendants built the infrastructure that would lead to an explosion of European and other foreign investment into BLMIS's IA Business beginning in the 1990s. Because Defendants' substantial assistance kept BLMIS going and directly contributed to BLMIS's ongoing facade of legitimacy, that substantial assistance proximately caused OSUS's decisions to remain invested in BLMIS and increase its investment in BLMIS and thus proximately caused the injuries of which Plaintiff complains.

## V. THE DEFENDANTS AND OTHER RELEVANT NON-PARTIES AND THEIR RESPECTIVE ROLES IN THE FRAUD

### A. Non-Party HSBC-Related Feeder Funds

41. <u>Primeo Fund</u> ("Primeo") is an investment fund organized under the laws of the Cayman Islands that invested, directly and indirectly, with BLMIS. Upon information and belief, Kohn and defendants Bank Medici, and UniCredit Bank Austria AG created and controlled Primeo. Primeo is currently in liquidation in the Cayman Islands.

42. <u>Herald Fund SPC</u> ("Herald") is an investment fund organized under the laws of the Cayman Islands that invested directly with BLMIS. Upon information and belief, Kohn and

defendant Bank Medici created and controlled Herald for the purpose of investing assets with BLMIS.

43.     Herald (Lux) SICA V ("Herald (Lux)") is an investment fund organized under the laws of the Grand Duchy of Luxembourg. Upon information and belief, since its inception, Herald (Lux) was qualified as an Undertaking for Collective Investment in Transferable Securities ("UCITS") fund within the meaning of the UCITS regulations in Luxembourg. Herald (Lux) invested directly with BLMIS. Upon information and belief, Kohn and defendant Bank Medici created and controlled Herald (Lux) for the purpose of investing assets with BLMIS. Herald (Lux) is currently in liquidation in Luxembourg.

44.     Alpha Prime Fund Limited ("Alpha Prime") is an investment fund organized under the laws of Bermuda that invested directly with BLMIS. Upon information and belief, defendant UniCredit Bank Austria AG, and Ursula Radel-Leszczynski, with the help of Kohn, created and controlled Alpha Prime for the purpose of investing assets with BLMIS. On February 9, 2018, Alpha Prime entered into a partial settlement agreement with the SIPA Trustee, in which Alpha Prime agreed to pay to the SIPA Trustee $76,450,000 in satisfaction of certain avoidance, disallowance, and subordination claims asserted by the SIPA Trustee pursuant to the U.S. Bankruptcy Code and New York state law, and the SIPA Trustee agreed to allow a customer claim by Alpha Prime for purposes of the SIPA Proceeding in the amount of $238,137,450. As a further term of that settlement agreement, Alpha Prime Management (as defined below) and Ursula Radel-Leszczynski, Peter Fischer, and Stefan Zapotocky, all of whom are individuals associated with Alpha Prime, agreed to participate in discovery requests by the SIPA Trustee, including giving depositions.

45.     <u>Senator Fund SPC</u> ("Senator") is an investment fund organized under the laws of the Cayman Islands that invested directly with BLMIS. Upon information and belief, defendant UniCredit Bank Austria AG and its subsidiary, BA Worldwide Fund Management Limited, as well as Ursula Radel-Leszczynski—whom Kohn introduced to Madoff—created and controlled Senator for the purpose of investing assets with BLMIS.

46.     <u>Hermes International Fund Limited</u> ("Hermes") is an investment fund organized under the laws of Bermuda and later redomiciled under the laws of the British Virgin Islands that invested with BLMIS through its wholly-owned subsidiary, Lagoon Investment Limited, in whose name accounts were held at BLMIS. Upon information and belief, Hermes was created and run by the Benbassat Family and related individuals and entities, identified below.

47.     <u>Lagoon Investment Limited</u> ("Lagoon") is a company organized under the laws of the British Virgin Islands that is a wholly-owned subsidiary of Hermes. Upon information and belief, Lagoon was created by the Benbassat Family and related entities and individuals, identified below, for the purpose of investing assets with BLMIS. On June 27, 2017, Lagoon, together with Hermes, entered into a settlement agreement with the SIPA Trustee, in which Lagoon agreed to pay to the SIPA Trustee $240,743,808 in satisfaction of certain avoidance, disallowance, and subordination claims asserted by the SIPA Trustee pursuant to the U.S. Bankruptcy Code and New York state law, and the SIPA Trustee agreed to allow a customer claim by Lagoon for purposes of the SIPA Proceeding in the amount of $553,384,510.

48.     <u>Thema Fund Ltd.</u> ("Thema Fund") is an investment fund organized under the laws of the British Virgin Islands that invested with BLMIS through its wholly-owned subsidiary, Thema Wise Investments Ltd., in whose name an account was held at BLMIS. Upon information

and belief, Thema Fund was created and controlled by the Benbassat Family and their related entities for the purpose of investing a substantial portion of its assets with BLMIS.

49.   Thema Wise Investments Ltd. ("Thema Wise") is a company organized under the laws of the British Virgin Islands. Thema Wise is a wholly-owned subsidiary of Thema Fund that, upon information and belief, was created and controlled by the Benbassat Family and their related entities for the purpose of investing assets of Thema Fund with BLMIS. On June 27, 2017, Thema Wise, together with Thema Fund, entered into a settlement agreement with the SIPA Trustee, in which Thema Wise agreed to pay to the SIPA Trustee $130,135,000 in satisfaction of certain avoidance, disallowance, and subordination claims asserted by the SIPA Trustee pursuant to the U.S. Bankruptcy Code and New York state law, and the SIPA Trustee agreed to allow a customer claim by Thema Wise for purposes of the SIPA Proceeding in the amount of $248,217,000.

50.   Thema International Fund plc ("Thema International") is an investment fund organized under the laws of Ireland. Upon information and belief, since at least December 31, 2006, Thema International has been authorized to operate as a UCITS fund within the meaning of the UCITS regulations in Ireland. Upon information and belief, the Benbassat Family and their related entities created and controlled Thema International for the purpose of investing assets with BLMIS. On August 31, 2017, Thema International entered into a settlement agreement with the SIPA Trustee, in which Thema International agreed to pay to the SIPA Trustee $687,000,000 in satisfaction of certain avoidance, disallowance, and subordination claims asserted by the SIPA Trustee pursuant to the U.S. Bankruptcy Code and New York state law, and the SIPA Trustee agreed to allow a customer claim by Thema International for purposes of the SIPA Proceeding in the amount of $998,160,517.

51.     Geo Currencies Ltd. S.A. ("Geo Currencies") is an investment fund organized under the laws of Panama.

52.     Lagoon Investment Trust ("Lagoon Trust") was created pursuant to a trust deed between defendants Lagoon and Hermes Asset Management Limited, and is a professional fund recognized in the British Virgin Islands. Upon information and belief, defendant Aurelia Fund Management Limited, along with the Benbassat Family and their related entities, created and controlled Lagoon Trust for the purpose of investing with BLMIS.

53.     Collectively, Primeo, Herald, Herald (Lux), Alpha Prime, Senator, Hermes, Lagoon, Thema Fund, Thema Wise, Thema International, Geo Currencies, and Lagoon Trust, all of whom are non-parties to this action, are referred to herein as the "HSBC-Related Feeder Funds."

**B.     Non-Party Non-HSBC-Related Feeder Funds**

54.     Kingate Global is registered as an international business company organized under the laws of the British Virgin Islands with a registered address at Bison Court, P.O. Box 3460, Road Town, Tortola, British Virgin Islands.

55.     Kingate Euro is registered as an international business company organized under the laws of the British Virgin Islands with a registered address at Bison Court, P.O. Box 3460, Road Town, Tortola, British Virgin Islands.

**C.     Management Defendants Primarily Associated With Medici Funds**

56.     20:20 Medici AG ("Bank Medici") is a company organized under the laws of Austria, with a registered address at Hegelgasse l7/17, 1010 Vienna, Austria. Defendant UniCredit Bank Austria AG founded Bank Medici in 1994. Later that year, Kohn purchased a majority interest in Bank Medici. In 2003, Bank Medici was granted a banking license and was renamed Bank Medici AG. Also upon information and belief, Bank Medici helped create and control two of the HSBC-Related Feeder Funds, Herald and Herald (Lux), and helped create and market

Primeo. In addition, at various times, Bank Medici acted as the investment manager to Herald, Thema International, and Herald (Lux), and marketed Herald and Herald (Lux) to investors across the globe. Upon information and belief, Bank Medici received at least $12 million in fees and/or distributions to which it is not entitled.

57. <u>UniCredit Bank Austria AG</u> ("Bank Austria") is a company organized under the laws of Austria, with a registered address at Schottengasse 6-8, 1010 Vienna, Austria. Upon information and belief, during a portion of the relevant period, Bank Austria maintained a branch office at 15O E. 42nd Street, New York, New York. Bank Austria is a subsidiary of defendant UniCredit S.p.A. Upon information and belief, Bank Austria helped create, control, and/or market Primeo, Alpha Prime, and Senatorand received fees and/or distributions to which it is not entitled. Annual reports of UniCredit and Bank Austria and historical records of and filings with the Federal Reserve Board, the SEC, FINRA and the Department of State of the State of New York list numerous Bank Austria-controlled and -directed subsidiaries and affiliates incorporated in New York, having principal executive offices at 150 E. 42nd Street, New York, New York, and/or doing business in New York, including Bank Austria America, Inc., Bank Austria Holdings, Inc., Bank Austria Commercial Paper, Inc., Bank Austria Mortgage Corp., Bank Austria Finance, Inc., Bank Austria Securities, Inc. ("BASI"), BA Alpine Holdings, Inc., Bank Austria Creditanstalt American Corporation, Bank Austria Creditanstalt Trade Finance Services, Inc., Bank Austria Creditanstalt Community Development, Inc. CA IB Securities (New York) Inc. and others. In addition, as early as 1993 and again in 2001, Bank Austria registered with the SEC and sponsored through BASI's offices in New York depositary slips (with tickers including "BAAXY" and "BAAGY") for shares of its common stock to actively trade on exchanges in New York. As such, Bank Austria is present in New York, and this Court may exercise personal jurisdiction over it.

58.     BA Worldwide Fund Management Ltd. ("BA Worldwide") was a company organized under the laws of the British Virgin Islands with a registered address at Craigmuir Chambers, P.O. Box 71, Road Town, Tortola, British Virgin Islands. BA Worldwide was a subsidiary of defendant Bank Austria and was voluntarily liquidated on or about February 22, 2008. At various times, BA Worldwide served as the investment adviser to Primeo, Alpha Prime, and Thema International. Upon information and belief, BA Worldwide received at least $11 million in fees and/or distributions to which it is not entitled.

59.     UniCredit S.p.A. ("UniCredit") is an Italian joint stock company headquartered in Milan at Piazza Corduiso 20123 that owns and controls one of the largest banking and financial services group in Europe. UniCredit operates directly throughout the United States and New York through UniCredit, New York Branch, and indirectly through one or more subsidiary bank branches and representative offices, including UniCredit Bank, New York Branch, and other controlled operating subsidiaries and affiliates. UniCredit, New York Branch, and UniCredit Bank, New York Branch, maintain bank branch offices at 150 E. 42nd Street, New York, New York and, according to the Federal Reserve Board, hold assets and properties in New York and the United States—exclusive of other assets and properties directly or indirectly owned in New York and the United States by UniCredit—in excess of $17.5 billion as of June 30, 2010. In addition to UniCredit, New York Branch and UniCredit Bank, New York Branch, Unicredit has operated, directed and controlled numerous subsidiaries and affiliates incorporated and/or doing business in New York, including UniCredit Capital Markets, Inc., UniCredit U.S. Finance, Inc., and UniCredit Capital Markets Conversion, LLC, each of which is incorporated or qualified to do business in New York and has its principal executive offices at 150 E. 42nd Street, New York, New York, where UniCredit's New York branch offices are located. In addition, as early as 1993, UniCredit

established with The Bank of New York in New York depositary receipts (with tickers including "UNCFY") for shares of its common stock to actively trade on exchanges in New York. Beginning in at least 2000, UniCredit was involved with Madoff and BLMIS through its investment arm Pioneer. In 2005, UniCredit acquired Bank Austria. As UniCredit maintains and operates branches and numerous other businesses in New York, this Court has jurisdiction over UniCredit.

60.     Herald Asset Management Limited ("Herald Management") is a company organized under the laws of the Cayman Islands with a last known registered address at Whitehall House, 238 North Church Street, P.O. Box 31362, Seven Mile Beach, George Town, Grand Cayman, Cayman Islands. Upon information and belief, Herald Management is wholly-owned by Kohn's husband, Erwin Kohn, via a trust. Herald Management served as investment manager to Herald. Upon information and belief, Herald Management received fees and/or distributions to which it is not entitled.

61.     Eurovaleur, Inc. ("Eurovaleur") is aorganized under the laws of the State of New York with multiple last known addresses at 230 Park Avenue, Room 539, New York, New York 10169, and 767 5th Avenue, 5th Floor, Room 507, New York, New York 10022. Eurovaleur is wholly-owned by Kohn and members of her family. Upon information and belief, Eurovaleur served as the investment sub-adviser to Primeo and received 20% of the fees that BA Worldwide received in connection with Primeo. Upon information and belief, Eurovaleur holds an ownership interest in defendant Thema Asset Management Limited. Upon information and belief, Eurovaleur received fees and/or distributions to which it is not entitled.

62.     Pioneer Alternative Investment Management Limited ("Pioneer") is a company organized under the laws of Ireland with a registered address at I, George's Quay Plaza, George's Quay, Dublin 2, Ireland. Pioneer is a wholly-owned subsidiary of Pioneer Global Asset

Management S.p.A., a subsidiary of UniCredit. Pioneer served as an investment adviser to Primeo. Upon information and belief, Pioneer received fees and/or distributions to which it is not entitled.

63.     <u>Alpha Prime Asset Management Ltd.</u> ("Alpha Prime Management") is a company organized under the laws of Bermuda with a registered address at 83 Front Street, Hamilton HM 12, Bermuda. Alpha Prime Management served as the investment manager to Alpha Prime. Upon information and belief, Alpha Prime Management received fees and/or distributions of at least $16 million to which it is not entitled. As a term of a partial settlement agreement entered into by Alpha Prime and the SIPA Trustee on February 9, 2018, Alpha Prime Management agreed to participate in discovery requests made by the SIPA Trustee, including the giving of a deposition.

64.     <u>Regulus Asset Management Limited</u> ("Regulus") is a company organized under the laws of Bermuda with a registered address at 83 Front Street, Hamilton HM 12, Bermuda. Regulus served as an investment manager to Senator. Upon information and belief, Regulus received fees and/or distributions to which it is not entitled.

65.     <u>Carruba Asset Management Limited</u> ("Carruba") is a company organized under the laws of Bermuda with a registered address at 83 Front Street, Hamilton HM 12, Bermuda. Carruba served as investment adviser to Senator. Upon information and belief, in connection with that role, Carruba received fees and/or distributions to which it is not entitled.

66.     <u>Tereo Trust Company Limited</u> ("Tereo Trust") is a company organized under the laws of Bermuda with a principal place of business at Swiss Fund Services, 83 Front Street, Hamilton HM 12, Bermuda. Tereo Trust wholly owns Alpha Prime Management, Regulus, and Carruba. Upon information and belief, Tereo Trust received fees and/or distributions to which it is not entitled.

**D.      Management Defendants Associated with the Benbassat Funds**

67.      Genevalor, Benbassat et Cie ("Genevalor") is a partnership formed under the laws of Switzerland with a registered address at rue 6 Place Camoletti, CH 1207, Geneva, Switzerland. Upon information and belief, Mario Benbassat ("M. Benbassat") co-founded Genevalor. The following are partners in Genevalor: Alberto Benbassat ("A. Benbassat"), Stephane Benbassat ("S. Benbassat"), Roberto Nespolo ("Nespolo"), David T. Smith ("D. Smith"), M. Benbassat, and Union Bancaire Privee. Upon information and belief, Genevalor helped control and create Hermes, Lagoon, Thema International, Thema Fund, Thema Wise, and Geo Currencies. Genevalor, at various times, served as the distributor and sub-distributor of Thema International. Upon information and belief, Genevalor received fees and/or distributions to which it is not entitled.

68.      Hermes Asset Management Limited ("Hermes Management") is a company organized under the laws of Bermuda with a registered address at Ecosse Ltd., Bermudiana Arcade, 3rd Floor, 27 Queen Street, Hamilton HM II, Bermuda. Upon information and belief, Hermes Management is owned and controlled, in part, by the Benbassat Family and/or Genevalor. Hermes Management served as the investment manager of Hermes and Lagoon Trust. Upon information and belief, in connection with those roles, Hermes Management received at least $79 million in fees and/or distributions to which it is not entitled.

69.      Thema Asset Management (Bermuda) Ltd. ("Thema Management Bermuda") is a company organized under the laws of Bermuda with a registered address at Ecosse Ltd., Bennudiana Arcade, 3rd Floor, 27 Queen Street, Hamilton HM II, Bermuda. Upon information and belief, members of the Benbassat Family are co-owners and directors of Thema Management Bermuda. Thema Management Bermuda served as the investment manager of Thema Fund. Upon information and belief, Thema Management Bermuda received approximately $10 million in fees and/or distributions to which it is not entitled.

70.     <u>Thema Asset Management Limited</u> ("Thema Management BVI") is a company organized under the laws of the British Virgin Islands with best known registered addresses at Codan Trust Company (B.V.I) Ltd., Romasco Place, P.O. Box 3140, Road Town, Tortola, British Virgin Islands, and at Harneys Corporate Services, Ltd., Craigmuir Chambers, P.O. Box 71, Road Town, Tortola VG1110, British Virgin Islands. Upon information and belief, members of the Benbassat Family formed and are the directors of Thema Management BVI and, along with Kohn's company, Eurovaleur, are owners of the company. Thema Management BVI served as the investment manager and global distributor for Thema International. Upon information and belief, Thema Management BVI received at least $105 million in fees and/or distributions to which it is not entitled.

71.     <u>Equus Asset Management Limited</u> ("Equus") is a company organized under the laws of Bermuda with a registered address at Warner Building, 85 Reid Street, Hamilton HM 12, Bermuda. Equus is owned, in substantial part, by entities owned by members of the Benbassat Family and other partners in Genevalor. Upon information and belief, principals of Equus co-founded and were active in controlling Hermes, Thema Fund, Thema International, and Geo Currencies. Equus provided administrative support to Thema Management Bermuda in its capacity as investment manager of Thema Fund. In addition, Equus holds ownership interests in Hermes Management and Thema Management Bermuda. Upon information and belief, Equus received at least $1.7 million in fees and/or distributions to which it is not entitled.

72.     <u>Equus Asset Management Partners, L.P.</u> ("Equus Partners") is a partnership formed under the laws of Bermuda with a registered office at Warner Building, 85 Reid Street, Hamilton HM 12, Bermuda.  A. Benbassat, S. Benbassat, M. Benbassat, Nespolo, and D. Smith hold, or have held, partnership interests in Equus Partners. Equus Partners is an owner of defendant Equus

and, ultimately, holds interests in Hermes Management and Thema Management Bermuda by virtue of its ownership interest in Equus. Equus Partners also provided administrative support to Hermes Management, in its capacity as investment manager of Hermes and Lagoon Trust. Upon information and belief, Equus Partners received fees and/or other distributions to which it is not entitled.

73.     Aurelia Fund Management Limited ("Aurelia") is a company organized under the laws of Bermuda with a registered address at Conyers, Dill & Pearman, Clarendon House, 2 Church Street, Hamilton HM II, Bermuda. Upon information and belief, Aurelia has wound up, or is in the process of winding up, its operations in Bermuda and no longer is a going concern. Upon information and belief, Aurelia holds an ownership interest in Hermes Management, and principals of Aurelia co-founded and were active in controlling Hermes and Lagoon Trust. Aurelia provided administrative support to Hermes Management, the investment manager of Hermes and Lagoon Trust. Aurelia was also the investment adviser of Lagoon Trust. Upon information and belief, Aurelia received fees and/or other distributions to which it is not entitled.

74.     Bank Medici, Bank Austria, Genevalor, Herald Management, BA Worldwide, Pioneer, Eurovaleur, Alpha Prime Management, Regulus, Carruba, Hermes Management, Thema Management BVI, Thema Management Bermuda, Equus, Equus Partners, and Aurelia are referred to collectively herein as the "Management Defendants."

### E.     Beneficial Owner Defendants

75.     Inter Asset Management Inc. ("Inter Asset") is a company organized under the laws of the British Virgin Islands. Its registered agent is Citco B.V.I. Limited, Citco Building, P.O. Box 662, Wickhams Cay, Road Town, Tortola, British Virgin Islands. Upon information and belief, Inter Asset has an ownership interest in Hermes Management, and received fees and/or distributions to which it is not entitled.

76.     <u>T+M Trusteeship & Management Services S.A.</u> ("T+M") is a company organized under the laws of Switzerland with a registered address at rue de Prince 9-11, 1204 Geneva, Switzerland. Upon information and belief, T+M has an ownership interest in Thema Management BVI, and received fees and/or distributions to which it is not entitled.

77.     <u>GTM Management Services Corp. N.V.</u> ("GTM Management") is a company organized under the laws of Curacao with a registered address at c/o Holland Intertrust (Antilles) N.V., De Ruyterkade 58A, Curacao, Netherlands Antilles. Upon information and belief, GTM Management has an ownership interest in Hermes Management, and received fees and/or distributions to which it is not entitled.

78.     <u>Aurelia Asset Management Partners</u> ("Aurelia Partners") was a partnership organized under the laws of Bermuda with a registered address at Chevron International Limited, Chevron House, 11 Church Street, Hamilton HM 11, Bermuda. The partnership was dissolved on October 12, 2009. Upon information and belief, partnership interests in Aurelia Partners were held by Laurent Mathysen-Gerst, Olivier Ador, Pascal Cattaneo, Vladimir Stepczynski, and Jean-Marc Wenger. Aurelia Partners was the owner of Aurelia. Upon information and belief, Aurelia Partners received fees and/or distributions to which it is not entitled.

79.     <u>Cape Investment Advisors Limited</u> ("Cape Investment") is a company organized under the laws of Bermuda with a registered address at Warner Building, 85 Reid Street, Hamilton, HM 12, Bermuda. Cape Investment holds an ownership interest in Thema Management Bermuda. Upon information and belief, Cape Investment received fees and/or distributions to which it is not entitled.

80.     Bank Austria, UniCredit, Tereo Trust, Eurovaleur, Genevalor, Equus, Equus Partners, Cape Investment, Inter Asset, GTM Management, T+M, Aurelia, and Aurelia Partners are referred to collectively herein as the "Beneficial Owner Defendants."

### F.     The HSBC Defendants

81.     <u>HSBC Holdings plc</u> ("HSBC Holdings") is a public limited corporation, incorporated under the laws of England and Wales, with a principal place of business at 8 Canada Square, London E14 5HQ, United Kingdom. HSBC Holdings is the parent company of what is known as the HSBC Group, including all of the HSBC entities named as Defendants herein. Upon information and belief, HSBC Holdings received fees and/or distributions to which it is not entitled.

82.     <u>HSBC Bank plc</u> ("HSBC Bank") is a banking institution incorporated under the laws of England and Wales with a principal place of business at 8 Canada Square, London EI4 5HQ, United Kingdom. HSBC Bank was the payee bank for all of the HSBC-Related Feeder Funds. Upon information and belief, all moneys that were deposited with BLMIS by the HSBC-Related Feeder Funds went through HSBC Bank. Upon information and belief, all moneys which were withdrawn from BLMIS by the HSBC-Related Feeder Funds went through HSBC Bank. Upon information and belief, HSBC Bank received approximately $130 million in transfers to which it is not entitled.

83.     <u>HSBC Bank USA, NA</u> ("HSBC Bank USA") is a national bank chartered by the Office of the Comptroller of the Currency with a principal executive office at 452 Fifth Avenue, New York, New York 10018 and also with a corporate headquarters at 1800 Tysons Boulevard, Suite 50, McLean, VA. HSBC Bank USA operates over 50 branches in Manhattan alone. HSBC Bank USA created structured financial products and entered into transactions involving those structured products, which ultimately served to increase the amount of money invested with

BLMIS's IA Business. Upon information and belief, HSBC Bank USA (i) received approximately $50 million in transfers to which it is not entitled; (ii) acted as custodian to Kingate Global and Kingate Euro and consistently used New York banks to carry out its duties for both funds with respect to their investments in BLMIS and (iii) facilitated investments and redemptions in BLMIS by shareholders of Equity Portfolio who wired funds to HSBC in New York.

84.    HSBC USA Inc. ("HSBC USA Inc.") is a Maryland corporation registered to do business in New York, with a principal executive office at 452 Fifth Avenue, Tower 7, New York, New York 10018. HSBC USA Inc. and HSBC Bank USA share the same principal executive offices, chief executive officer and president (since 2000), and multiple directors (since 2006). Upon information and belief, HSBC USA Inc. received $26.5 in transfers to which it is not entitled.

85.    HSBC Securities Services (Bermuda) Limited ("HSSB"), is incorporated under the laws of Bermuda with a principal place of business at 6 Front Street, Hamilton HM 11, Bermuda. Upon information and belief, HSSB served as administrator to Thema Fund, Thema Wise, Hermes, and Alpha Prime, and directed and facilitated the transfer of millions of dollars into and out of BLMIS's IA Business. Upon information and belief, HSSB received fees and/or distributions to which it is not entitled.

86.    HSBC Institutional Trust Services (Bermuda) Limited ("HITSB") is a corporation organized and existing under the laws of Bermuda with a principal place of business at 6 Front Street, Hamilton HM II, Bermuda. HITSB served as the custodian for Alpha Prime, Hermes, Thema Wise, and Thema Fund. Upon information and belief, HITSB received fees and/or distributions to which it is not entitled.

87.    HSBC Bank Bermuda Limited ("HSBC Bank Bermuda"), formerly known as The Bank of Bermuda Limited, is a banking institution with a principal place of business at 6 Front

Street, Hamilton HM II, Bermuda. HSBC Bank Bermuda formerly served as the administrator and/or custodian of Alpha Prime, Thema Fund, Thema Wise, Hermes, Kingate Global, and Kingate Euro, and Square One Fund Limited ("Square One"), among others. Upon information and belief, HSBC Bank Bermuda entered into at least one sub-custodian agreement with BLMIS. Upon information and belief, HSBC Bank Bermuda received fees and/or distributions to which it is not entitled.

88.     <u>HSBC Securities Services (Luxembourg) S.A.</u> ("HSSL"), formerly known as Bank of Bermuda (Luxembourg) S.A., is a limited liability company incorporated as a societe anonyme under the laws of the Grand Duchy of Luxembourg, and maintains its principal place of business at 16, boulevard d'Avranches, L-1l60 Luxembourg. HSSL served as administrator to Lagoon, Herald, Herald (Lux), and Senator, and, upon information and belief, served as the sub-administrator to Thema Fund, Thema Wise, Alpha Prime, Hermes, and Primeo. HSSL also served as custodian to Lagoon, Herald, Herald (Lux), Primeo, and Senator, and served as sub-custodian to Alpha Prime, Hermes, and Thema Fund. Also, upon information and belief, HSSL engaged BLMIS to act as its sub-custodian to those feeder funds invested with BLMIS for which the bank served as custodian or sub-custodian. Upon information and belief, HSSL received fees and/or distributions to which it is not entitled. HSSL is also the successor in interest to HSBC Fund Services (Luxembourg) S.A. ("HSBC Fund Services") whom it acquired by way of merger in 2015. HSBC Fund Services, formerly known as Management International (Luxembourg) S.A., is a wholly-owned subsidiary of HSBC Holdings. HSBC Fund Services acted as sub-administrator and sub-registrar for Hermes. Upon information and belief, HSBC Fund Services received fees and/or distributions to which it was not entitled.

89. HSBC Bank (Cayman) Limited ("HSBC (Cayman)"), which merged into Bank of Bermuda (Cayman) Limited, is a banking institution incorporated and existing under the laws of the Cayman Islands with a principal place of business at HSBC House, 68 West Bay Road, Grand Cayman, KYI-II02, Cayman Islands. HSBC (Cayman) served as the administrator of Primeo. Upon information and belief, HSBC (Cayman) received fees and/or distributions to which it is not entitled.

90. HSBC Private Banking Holdings (Suisse) S.A. ("HSBC Private Banking Holdings (Suisse)") is a majority-owned subsidiary of HSBC Bank existing under the laws of Switzerland, with a principal place of business at Quai du General Guisan, 2, P.O. Box 3580, CH-1211, Geneva 3, Switzerland. Upon information and belief, HSBC Private Banking Holdings (Suisse)—and/or entities under its control—marketed and directed investor moneys to feeder funds invested with BLMIS, including the HSBC-Related Feeder Funds. Upon information and belief, HSBC Private Banking Holdings (Suisse) received fees and/or distributions to which it is not entitled.

91. HSBC Private Bank (Suisse) S.A. ("HSBC Private Bank (Suisse)") is a public company incorporated and existing under the laws of Switzerland, with a principal place of business at Quai du General Guisan, 2, P.O. Box 3580, CH-1211 Geneva 3, Switzerland. It is a subsidiary of HSBC Private Banking Holdings (Suisse). Upon information and belief, HSBC Private Banking Holdings (Suisse)—and/or entities under its control—marketed feeder funds invested with BLMIS, including the HSBC-Related Feeder Funds to investors. Upon information and belief, HSBC Private Bank (Suisse) received $372 million in transfers to which it was not entitled.

92.     HSBC Holdings, HSBC Bank, HSBC Bank USA, HSBC Private Banking Holdings (Suisse), HSBC Private Bank (Suisse), HSSB, HSSL, HSBC (Cayman), and HSBC Bank Bermuda are referred to collectively herein as the "HSBC Defendants."

93.     The HSBC Defendants are liable for damages caused by actions that enabled, prolonged, and worsened the Ponzi scheme, in amounts to be determined at trial but, in any event, no less than the subscriptions which the HSBC Defendants facilitated into BLMIS and/or the HSBC-Related Feeder Funds.

###### G.     Non-Party HSBC Entities

94.     HSBC Institutional Trust Services (Ireland) Ltd. ("HITSI") is a limited liability company incorporated under the laws of Ireland with a principal place of business in Dublin, Ireland. HITSI served as custodian to Thema International, and other Madoff feeder funds, including Defender Limited ("Defender"), Landmark Investment Fund "Landmark"), Optimal Strategic US Equity Limited, and Optimal Arbitrage Limited (collectively, "Optimal"). Upon information and believe, HITSI received fees and/or distributions to which it was not entitled.

95.     HSBC Securities Services (Ireland) Ltd. ("HSSI") is a limited liability company incorporated under the laws of Ireland with a registered office at Dublin, Ireland. HSSI served as administrator to Thema International, Defender, Landmark, and Optimal. Upon information and believe, HSSI received fees and/or distributions to which it was not entitled.

###### H.     HSBC Alternative Fund Services and HSBC's Role as Administrator and Custodian

96.     Various HSBC divisions, subsidiaries, and affiliates played prominent roles for the HSBC-Related Feeder Funds and other BLMIS feeder funds.

97.     As described above, pursuant to certain agreements, HSSB, HSBC Bank Bermuda, HSSL, and HSBC Fund Services (collectively, the "HSBC Administrator Defendants") acted as

administrators to the HSBC-Related Feeder Funds. The HSBC Administrator Defendants' primary responsibility was to calculate the funds' net asset value ("NAV").

98.     Also as described above, pursuant to certain agreements, HITSB, HSBC Bank Bermuda, and HSSL (collectively, the "HSBC Custodian Defendants") acted as custodians to the HSBC-Related Feeder Funds. The HSBC Custodian Defendants' primary responsibility was to safeguard the funds' assets.

99.     Each HSBC Administrator Defendant and HSBC Custodian Defendant acted on behalf of Alternative Fund Services, a subdivision of HSBC's Securities Services group. Before HSBC acquired Bank of Bermuda, Alternative Fund Services was known as Global Fund Services. HSBC Securities Services is itself a division of HSBC Holdings plc and part of the overall HSBC group headquartered in London and operating through entities that include HSBC Bank plc and HSBC Bank USA, N.A. On behalf of Alternative Fund Services, representatives of HSSL, HSBC Bank plc and HSBC Bank USA N.A. visited BLMIS.

### I.     HSBC Private Bank

100.    In addition to being a service provider, HSBC invested its own moneys in BLMIS's scheme through its Private Banking and Global Structured Fund Products groups. Defendant HSBC Suisse served as the headquarters for the HSBC's Private Banking group. HSBC Suisse was an investor in and redeemed from Fairfield Sentry Limited ("Fairfield Sentry") and Fairfield Sigma Limited ("Fairfield Sigma"). HSBC Bank USA invested in and redeemed from BLMIS feeder fund Fairfield Sentry. HSBC Bank USA and HSBC Suisse are referred to collectively as "HSBC Private Bank."

101.    Starting in or around 2000, HSBC Private Bank conducted extensive due diligence on Fairfield Sentry on an annual or semi-annual basis using HSBC Private Bank's New York employees. These HSBC Private Banking employees repeatedly visited Fairfield Greenwich

Group's ("FGG") headquarters in New York. FGG managed Fairfield Sentry, Fairfield Sigma and Greenwich Sentry L.P. ("Greenwich Sentry").

102.    Beginning in the late 1990s, HSBC Private Bank solicited its clients to invest in BLMIS feeder funds, including, but not limited to, Fairfield Sentry, Fairfield Sigma, Kingate Global, Kingate Euro, Primeo, Thema International, and Ascot Fund, Ltd. (collectively, the "Madoff Private Bank Feeder Funds").

103.    HSBC Private Bank marketed, recommended, and invested in the Madoff Private Bank Feeder Funds even though funds like Fairfield Sentry were not approved for HSBC's own fund platform. HSBC Private Bank also made written and oral representations that it performed due diligence on the funds it recommended. HSBC Private Bank told clients that it invested in BLMIS feeder funds and distributed a list of recommended investments, which included the Madoff Private Bank Feeder Funds.

### J.    HSBC Global Structured Fund Products

104.    HSBC's Global Structured Fund Products Group ("HSBC GSFP" or "GSFP") was managed out of New York and entered into transactions involving several feeder funds (the "GSFP Structured Products").

105.    The GSFP Structured Products transactions involved defendants HSBC Bank plc, HSBC Bank USA, and HSBC USA Inc. who are collectively referred herein to as the "GSFP Entities."

106.    With respect to certain GSFP Structured Products, HSBC Bank plc invested in and redeemed from the following BLMIS feeder funds: (i) Harley International (Cayman) Ltd. ("Harley") beginning in June 2007; (ii) Thema International beginning in August 2007; (iii) Rye Select Broad Market Portfolio Limited ("Rye Portfolio") beginning in August 2007; and (iv) Senator beginning in September 2007.

35

107. With respect to certain GSFP Structured Products, HSBC USA Inc. and/or HSBC Bank USA invested in and redeemed from the following BLMIS feeder funds: (i) Rye Select Broad Market Fund, L.P. ("Rye Broad Market") beginning in September 2006, and (ii) Greenwich Sentry beginning in March 2007.

108. The Madoff feeder funds in which GSFP invested are collectively referred herein as the "Madoff Reference Funds."

109. The GSFP Structured Products—which bore names like "accreting strike call option" and "collateralized swap"—provided leverage to would-be investors in BLMIS feeder funds. GSFP shouldered little risk in promising levered returns—it hedged these facilities by investing the levered amounts in the Madoff Reference Funds. Before finalizing each GSFP Structured Product, GSFP analyzed the Madoff Reference Funds.

110. GSFP employees in New York and London worked together to create the GSFP Structured Products and invest in the Madoff Reference Funds. GSFP's members in New York were integrally involved in the creation and sale of the GSFP Structured Product transactions. They also received notifications relating to the GSFP Structured Products, and were integrally involved in researching and monitoring the Madoff Reference Funds.

111. GSFP monitored the reference fund for compliance with GSFP's investment guidelines directed to the transactions and related hedges.

112. Upon information and belief, no later than February 2008, HSBC's Alternative Fund Services, GSFP, and HSBC Private Bank were aware of each other's analyses of BLMIS feeder funds.

113.    HSBC Bank plc, HSBC Bank USA, HSBC USA Inc., HSSB, HITSB, HSBC Bank Bermuda, HSSL, HSBC Suisse, HITSI, HSSI, and HSBC Fund Services are collectively referred to as "HSBC."

### K.    Non-Defendant Individuals

114.    <u>Sonja Kohn</u> facilitated all of the HSBC-Related Feeder Funds' investments with BLMIS, and was essential to marketing those funds to investors across Europe and around the world. She also played key roles for the Medici Funds, including managing their relationships with BLMIS.  Kohn regularly traveled to New York City to meet with Madoff.

115.    Kohn and/or members of her family are majority shareholders of defendant Bank Medici, which provided "services" to a number of the HSBC-Related Feeder Funds, and the direct or beneficial "owners" of a variety of companies that generated fees from other feeder funds invested with Madoff. In these roles, upon information and belief, Kohn received fees and/or distributions to which she is not entitled. In addition, upon information and belief, Kohn also received and benefited from payments directly from BLMIS and its sister company in London, Madoff Securities International Ltd.

116.    <u>Mario Benbassat</u> ("M. Benbassat"), a friend of Kohn, helped create the Benbassat Funds and directed those funds' investments into the IA Business. Upon information and belief, M. Benbassat was a director of a number of, and controlled, the Benbassat Funds, and regularly traveled to New York City to meet with Madoff. Also upon information and belief, M. Benbassat received fees and/or distributions to which he was not entitled.

117.    <u>Alberto Benbassat</u> ("A. Benbassat"), M. Benbassat's son, helped manage and served as a director of the Benbassat Funds. He also managed the Benbassat Funds' relationship with Madoff and regularly traveled to New York City to meet with Madoff. Upon information and belief, A. Benbassat received fees and/or distributions to which he was not entitled.

118.   Stephane Benbassat ("S. Benbassat"), M. Benbassat's son and A. Benbassat's brother, also helped manage and served as a director of a number of the Benbassat Funds. He also managed the Benbassat Funds' relationship with Madoff, and regularly traveled to New York City to meet with Madoff. Upon information and belief, S. Benbassat received fees and/or distributions to which he was not entitled.

119.   As detailed further herein, A. Benbassat, M. Benbassat, and S. Benbassat (collectively, the "Benbassat Family") created a variety of entities that purported to provide services to the Benbassat Funds. Likewise, Kohn and defendant UniCredit Bank Austria AG set up a variety of entities that claim to have provided services to the Medici Funds. Upon information and belief, as further detailed herein, all of these entities were established principally for the purpose of directing investment in BLMIS and further extracting fees from investors placed in the HSBC-Related Feeder Funds.

120.   Erwin Kohn is the husband of Kohn, and owns Herald Management through a trust vehicle.

121.   Ursula Radel-Leszczynski ("Radel-Leszczynski") served as a director of Primeo and Alpha Prime. Radel-Leszczynski also was the President of BA Worldwide from 2000 until at least 2007 and, upon information and belief, was subsequently employed by Pioneer or one of its affiliates. Also upon information and belief, Radel-Leszczynski co-founded Alpha Prime and Senator; was actively involved in the management of Primeo, Alpha Prime, and Senator; and managed Madoff's relationship with Primeo, Alpha Prime, and Senator. Upon information and belief, Radel-Leszczynski received fees and/or distributions to which she was not entitled. As a term of a partial settlement agreement entered into by Alpha Prime and the SIPA Trustee on

February 9, 2018, Radel-Leszczysnski agreed to participate in discovery requests made by the SIPA Trustee, including the giving of a deposition.

122.   Roberto Nespolo ("Nespolo") is a general partner of Genevalor and, upon information and belief, managed, administered, and marketed Hermes, Thema International, and Thema Fund for many years. Nespolo also served as a director of Thema Fund, Thema Management Bermuda, and Equus, and is a general partner of Equus Partners. Upon information and belief, Nespolo received fees and/or distributions to which he was not entitled.

123.   David T. Smith ("D. Smith") is a general partner of Genevalor and, upon information and belief, managed, administered, and marketed Hermes, Thema International, and Thema Fund for many years. D. Smith served as a director of Thema Fund, Hermes (and its subsidiary, Lagoon), Thema International, Hermes Management, and Thema Management Bermuda; was the President and a director of Equus; was the President and a Director of Cape Investment; and was a general partner of Equus Partners. Upon information and belief, D. Smith received fees and/or distributions to which he was not entitled.

124.   Laurent Mathysen-Gerst ("Mathysen-Gerst"), upon information and belief, co-founded and managed, administered, and marketed Hermes and Lagoon Trust. Mathysen-Gerst also served as a director of Hermes (and its subsidiary, Lagoon); was an authorized signatory for Hermes; served on Hermes's investment committee (which decided with which managers the fund invested); was a director and the President of Aurelia; and was a general partner of Aurelia Partners. Upon information and belief, Mathysen-Gerst received fees and/or distributions to which he was not entitled.

125.   Olivier Ador ("Ador"), upon information and belief, co-founded, managed, administered, and marketed Hermes and Lagoon Trust. Ador also was a general partner of Aurelia

Partners. Upon information and belief, in connection with those roles, Ador received fees and/or distributions to which he was not entitled.

126.   Pascal Cattaneo ("Cattaneo"), upon information and belief, co-founded and managed, administered, and marketed Hermes and Lagoon Trust. Cattaneo served as a director and Vice-President of Aurelia, and was a general partner of Aurelia Partners. Upon information and belief, Cattaneo received fees and/or distributions to which he was not entitled.

127.   Vladimir Stepczynski ("Stepczynski"), upon information and belief, co-founded, managed, administered, and marketed Hermes and Lagoon Trust. Stepczynski served as a director of Aurelia; was an authorized signatory for Hermes; served on Hermes's investment committee (which decided with which managers the fund invested); and was a general partner of Aurelia Partners. Upon information and belief, Stepczynski received fees and/or distributions to which he was not entitled.

128.   Jean-Marc Wenger ("Wenger"), upon information and belief, co-founded, managed, administered, and marketed Hermes and Lagoon Trust. Wenger served as a director of Aurelia, and was a general partner of Aurelia Partners. Upon information and belief, Wenger received fees and/or distributions to which he was not entitled.

## VI.   PERSONAL JURISDICTION

### A.   Management Defendants

129.   This Court has personal jurisdiction over all of the Management Defendants pursuant to N.Y. C.P.L.R. 301 and 302. All of the Management Defendants maintained minimum contacts with New York in connection with these claims. In addition, all of the Management Defendants routinely directed the transfer of investor funds to, and the receipt of investor funds from, BLMIS in New York; derived significant revenue from the purported sales and purchases of securities in New York; and committed tortious acts, both within and outside of New York, causing

injury within New York. The Management Defendants reasonably should have expected those acts to have consequences in New York, and derived substantial revenue from interstate or international commerce.

130.    Upon information and belief, the Management Defendants and/or their agents communicated regularly with persons in New York regarding BLMIS, and their agents communicated with BLMIS on multiple occasions in connection with these allegations.

131.    Upon information and belief, certain Management Defendants delivered to BLMIS's headquarters in New York account opening documents, including agreements, relating to BLMIS accounts maintained for the HSBC-Related Feeder Funds.

132.    Upon information and belief, the Management Defendants all received BLMIS account statements and trade confirmations, and derived substantial revenue based on the purported trading activities of BLMIS.

**B.    Beneficial Owner Defendants**

133.    This Court has personal jurisdiction over all of the Beneficial Owner Defendants pursuant to N.Y. C.P.L.R. 301 and 302. All the Beneficial Owner Defendants have maintained minimum contacts with New York in connection with these claims. At all relevant times, all of the Beneficial Owner Defendants have derived significant revenue from New York and committed tortious acts, both within and outside of New York, causing injury within New York.

134.    Upon information and belief, during at least a portion of the relevant period, Bank Austria, Eurovaleur, and UniCredit maintained offices in New York, New York, and regularly transacted business in New York.

135.    Upon information and belief, all of the Beneficial Owner Defendants have assisted in directing the transfer of funds into, and the receipt of funds from, BLMIS's account at JPMorgan

Chase, Account #xxxxxxxxxxxx'703, in New York, New York, for the explicit purpose of investing with BLMIS, and they and/or their agents regularly transacted business in New York.

### C.     HSBC Defendants

136.    This Court has personal jurisdiction over all of the HSBC Defendants pursuant to N.Y. C.P.L.R. 301 and 302 because they invested or assisted others to invest with BLMIS in New York, transacted business in New York, entered into agreements in New York, delivered agreements to BLMIS in New York, communicated regularly with persons in New York, sent money to and received money from BLMIS in New York. The HSBC Defendants derived significant revenue from New York. The HSBC Defendants have committed tortious acts both within and outside of New York, causing injury in New York, and the HSBC Defendants expected or should have reasonably expected those acts to have consequences in New York.

#### 1.     The HSBC Administrator Defendants

137.    This Court has personal jurisdiction over the HSBC Administrator Defendants because they acted as agents for the funds they administered in dealing with BLMIS in New York. The HSBC Administrator Defendants purposefully availed themselves of the laws of the State of New York by undertaking substantial commercial activities in New York and by receiving customer property in exchange for such activity.

#### 2.     The HSBC Custodian Defendants

138.    This Court has personal jurisdiction over the HSBC Custodian Defendants because the HSBC Custodian Defendants purposely availed themselves of the laws of the State of New York by undertaking substantial commercial activities in New York and by receiving customer property in exchange for such activity.

139.    The HSBC Custodian Defendants acted as agents for the funds for which they had custodial duties. Each HSBC Custodian Defendant, except HITSB, executed one or more sub-

custody agreements with BLMIS. As custodians and sub-custodians, the HSBC Custodian Defendants directed and facilitated the transfer of billions of dollars to and from BLMIS through HSBC Bank USA in New York for the BLMIS feeder funds they serviced. The transfers directed and/or facilitated by the HSBC Custodian Defendants to BLMIS were for the purported purchase and sale of securities in New York.

### 3. HSBC Private Bank and GSFP

140.    HSBC Private Bank and the GSFP Entities—HSBC Suisse, HSBC Bank USA, HSBC USA Inc., and HSBC Bank plc—are subject to personal jurisdiction because they purposely availed themselves of the laws and protections of the United States and New York by, among other things, knowingly creating, analyzing, and directing investments into BLMIS via various BLMIS feeder funds. HSBC Bank plc regularly analyzed BLMIS. HSBC Private Bank regularly conducted due diligence on BLMIS feeder funds such as Fairfield Sentry and Harley by sending HSBC Bank USA employees to the New York offices that supported these funds. HSBC Private Bank and GSFP also knowingly invested with feeder funds that invested with BLMIS, thereby knowingly accepting the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York.

141.    HSBC Bank USA and HSBC USA Inc. are domiciled in the United States, and maintain offices and regularly transact business in the State of New York.

## VII.    RED FLAGS STRONGLY SUGGESTED THAT BLMIS WAS A FRAUD

142.    BLMIS "is a perfect structure for fraud." These were the words of Christine Coe, the head of Global Risk for HSBC Securities Services at HSBC Bank plc. Coe was right. The problem she observed, the delegation of multiple key functions to BLMIS—which BLMIS performed for free and which obscured any system of checks and balances—was an obvious,

unequivocal hallmark of fraud. The defendants' incentive was Madoff's promise of guaranteed returns. But it was this very incentive that created the "perfect structure for fraud."

143.    Defendants knew of numerous trading impossibilities in the reported performance of the BLMIS Feeder Funds' accounts. These impossibilities are not facts "suggestive" of fraud or "warning signs" that should have led to further inquiry—they are quantitative evidence demonstrating that their BLMIS customer statements and trade confirmations reported non-existent securities transactions. In addition to objective trading impossibilities, defendants saw and recognized myriad other indicia of fraud.

### A.    Madoff's Secrecy

144.    Although Madoff publicized the simplicity of his investment strategy, he refused to provide even the most basic details of how he implemented that strategy. Madoff's secrecy was a red flag. As HSBC noted in a 2001 report regarding Greenwich Sentry, L.P. ("Sentry"), one of the largest Madoff feeder funds: "transparency issues prevent us from conducting a proper due diligence." Yet HSBC encouraged its customers to invest in a wide array of identical Madoff funds and products. The Defendants repeatedly identified Madoff's lack of transparency as a risk, but ultimately ignored the inexplicable secrecy and the implication that there was something to hide.

145.    The Defendants kept Madoff's name out of offering documents relating to the Feeder Funds to help maintain Madoff's secrecy.

146.    Upon information and belief, the Defendants acknowledged that they were concealing Madoff's identity and role in managing those feeder funds investing with BLMIS. Similarly, Bank Medici employees were instructed never to mention Madoff when discussing the funds with unsophisticated investors.

**B.    The Defendants Knew That BLMIS's Operational Structure Was Vulnerable to Fraud Because It Subverted Checks and Balances**

147.    Under their management contracts with the HSBC-Related Feeder Funds, the Management Defendants had the duty to implement and oversee investment strategies.

148.    The HSBC-Related Feeder Funds knew these duties existed. For example, Alberto Benbassat testified that Thema Management BVI had the following duties: managing the asset portfolio; maintaining responsibility for the behavior, composition, and analytics of the portfolio; selecting and monitoring investment sub-managers and sub-advisers; understanding the fund's strategy and assessing the repeatability of the strategy's returns; monitoring the portfolio's performance; reviewing portfolio risk; and reporting to the board of directors on performance risk and compliance.

149.    The Management Defendants knew that BLMIS—although required to under SEC regulations—did not register with the SEC as an investment adviser before August 2006, but, nonetheless, delegated their investment advisory duties to BLMIS.

150.    Under their custodial contracts with the HSBC-Related Feeder Funds, the HSBC Custodian Defendants' primary duty was to safeguard and verify assets. HSBC Bank Bermuda, HSSL, and HITSI each entered into sub-custody agreements with BLMIS on behalf of the BLMIS feeder funds delegating to BLMIS their primary custodial duty of holding and safeguarding assets. HSBC Bank Bermuda and HSSL, as custodians of Herald, Hermes, Lagoon, Thema Fund, and Senator were permitted to delegate custodial responsibilities, but were required to supervise and monitor the sub-custodians.

151.    The Management Defendants and the HSBC Custodian Defendants delegated most of these duties to BLMIS, concentrating in BLMIS the functions of the fund's investment adviser, custodian, and broker-dealer responsible for initiating and executing securities trades.

152.    Aside from their contractual obligations, the HSBC Administrator Defendants and HSBC Custodian Defendants were obligated to follow their respective jurisdictions statutes and regulations governing to whom they could sub-delegate duties. For instance, under Luxembourg law, HSSL could sub-delegate only to entities as sophisticated and reputable as HSSL was, and then only if HSSL could perform ongoing due diligence to ensure the sub-delegate's compliance.

153.    Kohn was aware that Madoff was broker and custodian, and managed the accounts. Likewise, Alberto Benbassat knew that Madoff was the one making the investment decisions, while acting as both investment adviser and custodian. An internal Hermes document lists Madoff and DiPascali as Lagoon's fund managers and BLMIS as Lagoon's administrator.

154.    The HSBC-Related Feeder Funds' directors had a duty to ensure that their funds' offering documents, including the prospectuses, accurately disclosed these relationships.

155.    Immediately after BLMIS's collapse, HSBC Private Bank informed its customers it had "consistently not approved the Madoff strategy for investment. All hedge funds that we recommend are followed by our analysts in terms of due diligence, including meeting physically the managers, which was not possible with Madoff's hedge funds."

156.    In 2007, HSBC conducted a Structured Trade Annual Review (STAR) of GSFP's investments in various BLMIS feeder funds (the "STAR Review"). The STAR Review noted that due to a lack of transparency, HSBC was relying on Madoff, rather than HSBC Product Control, to monitor investment guidelines relating to the underlying funds, which differed from its normal process. GSFP admitted that it could not confirm BLMIS's trade data with independent data. By the end of 2007, HSBC refused to increase GSFP's Madoff investment capacity.

157.    GSFP knew that funds invested with GSFP Structured Products were invested with BLMIS. Yet with respect to two structured products with funds managed by Tremont Group

Holdings, Inc. ("TGH"), and Tremont Partners, Inc. ("Tremont Partners," and with TGH, "Tremont"), HSBC Bank USA and HSBC Bank plc each agreed to refer to Madoff only as the "Account Manager" and not by name. The letter to HSBC Bank plc on behalf of Rye Select Broad Market XL Portfolio Limited ("Rye XL Portfolio") was sent care of HSBC Bank USA.

158.    GSFP understood that BLMIS was custodian, prime broker, and investment manager. In connection with GSFP's analysis of Rye Broad Market, Tremont understood that HSBC could accept the "reality that the custody of the assets is with Madoff (the[y] seem to have experience with this already)." Tremont banned GSFP from contacting BLMIS in 2007—around the time GSFP sought internal approval for the swap involving Rye XL Portfolio and HSBC Bank plc (the "Rye XL Portfolio Swap")—and admonished a GSFP employee for calling Madoff to ask about the number of people BLMIS employed.

**C.    Various HSBC Entities Knew That Having BLMIS as Custodian Was a Serious Fraud Risk**

159.    The HSBC Custodian Defendants were contractually obligated to ensure proper custody of fund assets.

160.    In the relevant jurisdictions, local law requires an independent custodian to hold and properly segregate assets and verify the existence and value of the assets and transactions. Failure to have such independent parties violates best industry practices. The service providers, including those that delegated their duties to BLMIS, were required to secure against fraud and/or verify the information BLMIS provided.

161.    As early as 1996, Thema International and its custodian HITSI knew that HITSI could not independently confirm the existence of Thema International's assets and was "dependent on the flow of information from Madoff."

162.     In 1997, a member of the Global Fund Services group stated that Thema International used an "unauthorized custodian . . . that is not subject to any form of vetting and performance monitoring by the bank's network managers."

163.     In or around 2000, another Global Fund Services employee expressed a desire for "[i]ndependent confirmation that the assets of Thema [International] exist and are registered in the name of Thema [International]."

164.     In late 2001, Brian Wilkinson, an HSSI managing director, expressed additional concerns over [Thema International's] custody arrangement. Wilkinson informed Gerald Brady, an HSBC employee and Thema International director, that HSSI could not independently verify that Madoff was trading: "[T]here are no 'Chinese' walls between asset management and clearing/custody [at BLMIS]. We are receiving trade details from Madoff the sub-custodian with no confirmation from Madoff the investment adviser, consequently we are posting trades . . . with no confirmation . . . [that] these are valid trades."

165.     By 2002, Wilkinson and Paul Smith worried about the risks inherent in BLMIS acting as both investment manager and sub-custodian without being subject to normal due diligence and monitoring procedures.

166.     Paul Smith later wrote to Fielding: "[w]e have a problem with [Madoff]. He is the manager, broker and custodian to his accounts. In today's world this is a red flag."

167.     By May 2005, John Gubert, head of HSBC Securities Services, was prepared to terminate Madoff relationships in relation to HSBC's activities as custodian and administrator. He told Brian Pettitt, an HSBC Bank plc employee and head of network management for HSBC Securities Services, that the information BLMIS provided was "unacceptable." Gubert also told Christine Coe and Brian Pettitt that HSBC had neither "full control of assets" nor "realtime site

[sic] of transaction flows," and noted that "there [was] no proof of best execution . . . or even actual execution."

168.    Between 2001 and 2008, HSBC Private Bank performed due diligence on Fairfield Sentry on at least nine occasions. Each time it raised as a concern the lack of an independent custodian and the inability to verify Fairfield Sentry's trading activity.

### D.    HSBC Bank plc Instructed KPMG to Audit BLMIS and KPMG and Concluded That BLMIS's Structure Was Rife With Risks of Fraud

169.    Because of its concerns with BLMIS, in September 2005, HSBC Bank plc engaged KPMG to review BLMIS for fraud and related operational risk that would arise from BLMIS's custody of the assets of eight BLMIS feeder funds, including the HSBC-Related Feeder Funds (the "2005 KPMG Review").

170.    Prior to the review, Fielding expressed concern that the review would not be well received by Madoff. Nevertheless, the decision was made and the review focused on BLMIS's methods of recording and reporting client funds it held as sub-custodian. HSBC sought evidence that BLMIS properly segregated the BLMIS feeder funds' assets—an unresolved concern since 2002, if not earlier.

171.    The 2005 KPMG Review was undertaken not as a routine, periodic review, but as a specific review for fraud prompted by concern that Madoff controlled all key aspects of the funds' investment activity. The review was to "make sure that the trades were real and that the money that the investors were placing into Madoff Securities was being used to make investments."

172.    The Thema International directors were concerned about the 2005 KPMG Review and "tried to resist it." In line with their consistent position to prevent scrutiny of BLMIS, David

Smith told Paul Smith that when the review was to be conducted at BLMIS's office "we expect your team will display full deference to the people they meet."

173.   Paul Smith attempted to meet with Madoff personally prior to the review, but when Madoff was unavailable, Paul Smith coordinated with Fielding, Coe, and KPMG to send an outline to help Madoff prepare for the 2005 KPMG Review.

174.   Following Madoff's receipt of the outline, KPMG conducted the BLMIS review.

175.   KPMG's findings from the 2005 KPMG Review were set forth in a February 16, 2006 report, titled "Review of fraud risk and related operational risks at Bernard L. Madoff Investment Securities LLC" (the "2006 KPMG Report"). It found, among other things, that there were risks of:

- falsification of client mandates;

- embezzlement of client funds;

- use of fabricated client instructions to disguise poor proprietary positions;

- diversion of client funds for Madoff's personal gain;

- inaccurate allocation of reinvested funds;

- diversion of cash resulting from the sale of equities and Treasury Bills;

- trades executed by unauthorized BLMIS staff members;

- sham trading to divert client cash;

- false reporting of trades without execution to collect commissions; and

- falsification of trade confirmations.

176.   As part of the 2006 KPMG Report, KPMG recommended that HSBC Bank plc independently confirm BLMIS's purported trading activities because the materials KPMG relied on for the review were provided by HSBC and could have been "easily replicated or falsified in order to commit fraud." Clearly, KPMG's concerns were well founded.

177. By the end of 2007, HSBC Bank plc asked KPMG to conduct a second review and revisit BLMIS. This review was to examine the same risks as the 2005 KPMG Review, but was expanded to assess the risk presented by BLMIS having custody of the assets of 12 BLMIS feeder funds, including the HSBC-Related Feeder Funds, and by HSBC having its own BLMIS investments through its HSBC GSFP and Private Banking divisions.

178. Coe testified that the second KPMG review in 2008 came about as a result of HSBC's reexamination of various lines of credit for BLMIS feeder funds. She was concerned that "[b]ecause of the way that cash was no longer as freely available as it had been, . . . [Madoff] m[ight] be tempted to use the money to do other things in the event that many of the funds asked for their money back."

179. In late June 2008, Coe wrote to KPMG requesting an urgent meeting among KPMG and HSBC personnel, including the "structured [products] team." A July 17, 2008 conference call involved HSBC employees from New York, London, and around the world, who voiced concerns that BLMIS was running a Ponzi scheme, front running, or employing other practices that opened HSBC to fraud risk (the "2008 HSBC Conference Call"). It was in connection with this meeting that Coe commented that BLMIS "is a perfect structure for fraud."

180. On the 2008 HSBC Conference Call, in response to a discussion of "the biggest risk" at BLMIS, Coe noted that it was that Madoff was "taking the money." KPMG offered "[t]he key thing is you need to test the existence of the actual trade. It's the only way you're going to be able to verify that this is not just an elaborate fraud."

181. KPMG sent BLMIS a list of funds and the related accounts it would be analyzing in advance of the KPMG visit.

182.    KPMG's conclusions were set forth in a September 8, 2008 report entitled "Review of fraud risk and related operational risks at Bernard L. Madoff Investment Securities LLC" (the "2008 KPMG Report"). The 2008 KPMG Report reiterated the concerns of fraud identified by the 2006 KPMG Report, and identified additional indicia of fraud including:

- "Client cash is diverted—signatures falsified on client instruction in an attempt to legitimize an unauthorized transaction (i.e., redemption)."

- "Stocks are intentionally not allocated a fair price from the bulk trade."

183.    After the 2008 KPMG Report, Thema International continued to resist, successfully, a meaningful audit of BLMIS.

184.    Following the 2008 KPMG Report, HSBC Bank plc's Head of Network Management expressed "nervousness in HSBC about the model i.e. broking, asset [management] and custody all under one roof, particularly in view of the Sentinel fraud, which had a similar structure."

185.    In October 2008, GSFP redeemed $65 million from Senator, the majority of its hedge on swap transactions with Wailea Advisors LP's funds. In an email to Radel-Leszczynski and Fischer, Wailea Advisors' principal, Joel Yanowitz, remarked that HSBC indicated it was "shorting" Madoff, and betting on Senator losing money.

186.    HSBC's decision to redeem came as surprise to Wailea and Senator. Yanowitz stated that "there [had] never been a situation where the bank chose to not own the underlying fund (at least in the case of Madoff investments) . . . until now."

## E.    Madoff's Purported Trade Volumes Were Too High to Be Believed

187.    Although for many years Madoff was not willing to disclose BLMIS's assets under management—an obvious red flag suggesting fraud—the Defendants knew that the IA Business was too big to plausibly execute the SSC Strategy: with billions under management, there were

not enough shares to enable Madoff's supposedly seamless entry into and exit out of the market. Madoff purported to purchase baskets of stocks and options which were then allocated to each customer account. Moreover, when BLMIS registered as an investment adviser in August 2006, it disclosed that it had $11.7 billion in assets under management at the end of July 2006. Even that inaccurately low disclosure of "assets under management," should have revealed to the Defendants that a fund of that size would entail trading immense percentages of some of the most highly-traded stocks in the world. Yet, at times, BLMIS's purported trades in stocks on behalf of its IA customers approached or exceeded the entire volume of trades in those stocks on the composite tape, which includes all listed and unlisted market volumes.

188.   For example, on November 26, 2007, BLMIS purportedly traded 8,608 shares of Abbott Laboratories (ABT) in Senator's account, an amount which, when extrapolated to the entire IA Business, would have exceeded the daily volume of that stock traded on the composite index by 407%.

189.   In fact, across all of the accounts of the funds for which the HSBC Administrator Defendants served as administrator, there were approximately 500 purported trades in stocks which, when extrapolated across the entire IA Business, would have exceeded the entire volume of trades in those stocks on the composite tape, and an additional approximately 450 which, if similarly extrapolated, would have represented more than 50% of the volume traded in those stocks on the composite tape. Likewise, across all of the accounts of the funds for which HSBC served as custodian there were approximately 500 purported trades where BLMIS's claimed trades exceeded the entire volume of the purportedly traded stock on the composite tape and approximately 450 purported transactions where BLMIS's "trades" represented more than 50% of the purportedly traded stock's volume on the composite tape.

190.     The implausibility of effecting trades comprising more than half of the daily trading volume in a particular stock should have concerned the Defendants and been seen as a sign of problems with the Madoff investments.  Likewise, the Defendants should have, at a minimum, been concerned that Madoff's massive trades never caused any market displacement. BLMIS's IA Business never caused the slightest ripple in the market. Madoff purported to fully exit and re-enter the market eight to twelve times every year, each time in just a few days, trading billions of dollars' worth of stocks without causing any price displacement or other market effect. This displacement was never observed because the trading did not occur. Based on the lack of observable market reaction, the Defendants knew or should have known that Madoff's trades were not happening as he claimed.

191.     At the very least, these observations should have caused the Defendants to inquire further about Madoff's purported trading activity. Instead, the Defendants buried their heads in the sand, or worse, and the Management Defendants and HSBC Defendants continued to receive fees for their "efforts."

### F.     There Were Not Enough Options to Implement Madoff's Purported Strategy

192.     Similarly, the Defendants were on notice of the impossibility of executing the number of options contracts required by Madoff's claimed SSC Strategy. It should have been obvious that there was insufficient open interest in the listed options contracts required to hedge the billions of dollars "under management" at BLMIS's IA Business. Additionally, as a practical matter it would be impossible to find OTC counterparties to supply the required option liquidity.

193.     At various times, Madoff claimed to purchase options over-the-counter or through option contracts on the Chicago Board Options Exchange ("CBOE"). Either method was obviously impossible on numerous occasions, because the option volume reported to BLMIS's customers exceeded the total volume of comparable options contracts traded on the CBOE by many hundreds

and even thousands. The volume of the purported options trading in the HSBC-Related Feeder Funds' accounts alone warranted further investigation by the Defendants. But the Defendants ignored this obvious sign of fraud and continued to market the funds.

194.    There were also days on which Madoff purportedly executed options trades, but publicly available records show no options that had the same purchase date, strike price, and expiration date as those Madoff purportedly traded on the CBOE on those days. The Defendants also ignored this red flag.

195.    The purported options trading in each of the Funds' accounts was far beyond worldwide reported volume. As the following table demonstrates, the volume of options contracts which BLMIS reported to the Defendants and feeder funds invested with BLMIS exceeded the total volume of contracts for options with the same purchase date, strike price, and expiration date traded on the CBOE:

|  | Total Transactions Over Volume | Total Transactions | Percentage of Transactions Over Volume |
|---|---|---|---|
| Alpha Prime/Alpha Prime Management | 153 | 440 | 34.77% |
| Aurelia/Equus Partners | 381 | 844 | 45.14% |
| BA Worldwide | 561 | 837 | 67.03% |
| Bank Medici | 236 | 399 | 59.15% |
| Defender | 72 | 102 | 70.59% |
| Eurovaleur | 272 | 714 | 38.10% |
| Genevalor | 613 | 860 | 71.28% |
| Geo Currencies | 55 | 631 | 8.72% |
| Herald/Herald Management | 223 | 399 | 55.89% |
| Herald (Lux) | 31 | 57 | 54.39% |
| Hermes Management/ Hermes/ Lagoon/ HSBC Fund Services | 381 | 844 | 45.14% |
| HITSB | 141 | 161 | 87.58% |
| HSBC Administrator | 780 | 871 | 89.55% |

| | Total Transactions Over Volume | Total Transactions | Percentage of Transactions Over Volume |
|---|---|---|---|
| HSBC Bank Bermuda | 784 | 861 | 91.06% |
| HSBC (Cayman) | 275 | 724 | 37.98% |
| HSBC Custodian | 813 | 875 | 92.91% |
| HSSB | 392 | 844 | 46.45% |
| HSSI/HITSI | 727 | 839 | 86.65% |
| HSSL | 562 | 859 | 65.42% |
| Kingate Euro | 422 | 843 | 50.06% |
| Kingate Global | 740 | 838 | 88.31% |
| Landmark | 43 | 80 | 53.75% |
| Optimal | 654 | 837 | 78.14% |
| Pioneer | 3 | 10 | 30.00% |
| Primeo Fund | 275 | 724 | 37.98% |
| Senator/Regulus/Carruba | 52 | 138 | 37.68% |
| Square One | 64 | 822 | 7.79% |
| Thema International | 502 | 825 | 60.85% |
| Thema Management BVI | 366 | 674 | 54.30% |
| Thema Wise/Thema Fund/Thema Management Bermuda/Equus | 126 | 553 | 22.78% |

196.    Similarly, the following graphs demonstrate that from 2001 to 2008, on behalf of accounts serviced by the HSBC Administrator Defendants, BLMIS purported to trade volumes that regularly were many hundreds of times greater than the total number of put and call options for options executed on the CBOE with the same purchase date, strike price, and expiration date:





197.   And the following graphs demonstrate that from 2001 to 2008, on behalf of accounts serviced by the HSBC Custodian Defendants, BLMIS purported to trade volumes that regularly were many thousands of times greater than the total number of put and call options executed on the CBOE with the same purchase date, strike price, and expiration date options:





### G.   Many Trades Appeared to Have Been Executed Outside the Daily Price Range

198.   Another red flag that Defendants ignored was that many of the trades described in the Defendants' account statements appeared to have been executed outside the daily price range. The Management Defendants and HSBC Defendants, as administrators, sub-administrators, custodians, and/or sub-custodians of the HSBC-Related Feeder Funds, should have reviewed trade confirmations on a regular basis in connection with these duties. But these Defendants ignored that the trade confirmations often revealed average trade values outside the daily price range.

199.   For example, Lagoon's account statement for January 2001 reported the purchase of 33,120 shares of Pfizer Inc. (PFE) with a settlement date of January 8, 2001. BLMIS's records state that those shares were purchased on January 3, 2001 at a price of $40.56. But the actual price range for Pfizer Inc. stock on January 3, 2001 was between $46.44 and $42.50. Upon information and belief, the Defendants reviewed these trade confirmations and took no action in response to

this anomaly. There are a total of 142 unique instances where Lagoon's account bought or sold securities outside of the daily price range.

200.    The following table demonstrates that BLMIS regularly purported to execute equities transactions on behalf of the accounts of the HSBC-Related Feeder Funds and of other feeder funds invested with BLMIS that were outside the transacted security's daily price range:

|  | Equities Total Trades Out of Range |
| --- | --- |
| Alpha Prime/Alpha Prime Management | 26 |
| Aurelia/Equus Partners | 277 |
| BA Worldwide | 304 |
| Bank Medici | 22 |
| Defender | 0 |
| Eurovaleur | 141 |
| Genevalor | 568 |
| Geo Currencies | 52 |
| Herald/Herald Management | 22 |
| Herald (Lux) | 0 |
| Hermes Management/Hermes/Lagoon/HSBC Fund Services | 277 |
| HITSB | 3 |
| HSBC Administrator | 1,116 |
| HSBC Bank Bermuda | 815 |
| HSBC (Cayman) | 141 |
| HSBC Custodian | 1,396 |
| HSSB | 278 |
| HSSI/HITSI | 417 |
| HSSL | 566 |
| Kingate Euro | 140 |
| Kingate Global | 140 |
| Landmark | 0 |
| Optimal | 278 |
| Pioneer | 0 |
| Primeo Fund | 141 |
| Senator/Regulus/Carruba | 0 |

|  | Equities Total Trades Out of Range |
|---|---|
| Square One | 134 |
| Thema International | 139 |
| Thema Management BVI | 139 |
| Thema Wise/Thema Fund/Thema Management Bermuda/Equus | 100 |

201.    Each of these obviously impossible trades should have put the Defendants on notice that Madoff was not actually investing as he purported to. Across all of the HSBC Administrator Defendants' accounts, there were 1,116 equity transactions executed at a price above the daily high or below the daily low for the purportedly traded security.  Likewise, across all of the accounts for which the HSBC Defendants served as custodian, there were 1,396 equity transactions executed at a price above the daily high or below the daily low for the purportedly traded security.

**H.    Madoff Insisted on Acting as His Own Custodian**

202.    The HSBC Custodian Defendants were supposed to ensure that Madoff had the customer funds he claimed to have and safeguard the integrity and trustworthiness of the customer statements. But because it would have been obvious to a competent custodian that Madoff did not have the assets he purported to have, Madoff insisted that he act as his own custodian. Despite the obvious risk of fraud posed by that arrangement, HSBC delegated to BLMIS the safekeeping of the assets of a number of feeder funds invested with BLMIS, including, but not limited to, Thema International, Thema Fund and its subsidiary, Thema Wise, Primeo, Hermes and its subsidiary, Lagoon, Alpha Prime, Herald, Herald (Lux), Kingate Euro, Kingate Global, Square One, Senator, Defender, and Landmark.

203.    HSBC's delegation of its custodial duties to Madoff violated industry practice, which required that assets be held by an independent custodian to verify the assets. HSBC's delegation of its custodial duties helped Madoff conceal his fraudulent trading because BLMIS

served as prime broker, custodian, and portfolio manager. The Defendants should have recognized Madoff's insistence on keeping custody of the assets he managed as an obvious indication of fraud.

204.    The problem with HSBC's delegation to BLMIS was identified by KPMG, which the HSBC Defendants retained to review BLMIS for the risk of fraud. KPMG wrote that allowing BLMIS to act as custodian for its own funds created the potential that the trades were "a sham in order to divert client cash." But the HSBC Defendants did not change course.

205.    HSBC itself recognized that it was a serious problem to have Madoff act as his own custodian. HSBC repeatedly pointed to BLMIS's role as a sub-custodian as a fraud risk. For example, HSBC identified as a risk the lack of "independent custody and verification of trading activity away from the investment manager (unlike a standard hedge fund that has a prime broker)." HSBC identified this risk every year from at least 2003 through 2008, yet did nothing.

206.    Further, upon information and belief, the Defendants never publicly disclosed that BLMIS acted as sub-custodian of investor assets. Instead, the HSBC Custodian Defendants allowed their names to be used to indicate falsely that HSBC exercised control over and care of investor assets. Despite having no control over the assets and providing no supervision over BLMIS, the HSBC Custodian Defendants collected fees for these "services."

207.    Fully aware that BLMIS was serving as custodian, despite HSBC's public representations and the plain risk of fraud, the Defendants nonetheless handed unsupervised responsibility over the safekeeping of the assets to BLMIS and Madoff. By giving BLMIS control over all of the assets, the HSBC Custodian Defendants played an indispensable role in allowing Madoff's scheme to grow and function for as long as it did.

I.    **Negative Cash Balances**

208.    Madoff's "execution" of the SSC Strategy resulted on occasion in negative cash balances for his accountholders. The negative cash balances were a glaring indication of Madoff's

fraud because they amounted to millions of dollars' worth of interest-free loans from Madoff to his accountholders.  Madoff's failure to collect interest on those "loans" indicated the positions were not real.

209.    Negative cash balances could occur for one of three principal reasons: (i) Madoff did not liquidate a sufficient number of Treasury bills to generate enough cash to purchase a basket of equities; (ii) the account satisfied a redemption request while in the market (BLMIS typically did not purport to sell anything to provide a withdrawal, but simply withdrew money, creating a negative cash event); or (iii) the purported purchase of put options occurred before the sale of corresponding call options, the sale of which was supposed to finance those put options according to the SSC Strategy.

210.    Based on a cursory review of customer statements, the HSBC-Related Feeder Funds' BLMIS accounts had a negative cash balance on approximately 800 separate occasions. For example, on January 11, 2006, Madoff purported to purchase a basket of equities on behalf of Primeo's BLMIS account but had not liquidated a sufficient number of Treasuries to finance the purchase, resulting in a negative cash balance in Primeo's account in the amount of $78,289,845. In other words, Madoff provided Primeo with a $78 million interest-free loan. Similarly, over a fourteen-day period in November 2005, Primeo had an average negative balance of $39,786,011. On 129 separate occasions, for a total of 573 days, Primeo's cash balances with Madoff had a negative value, yet Primeo was charged no interest, nor did Primeo have a margin agreement with BLMIS. No legitimate institution could have advanced those large sums of money without a margin account for Primeo, and none would have advanced those funds without charging interest. Madoff's failure to require a margin account and/or charge interest suggested fraud, yet his interest-free loans were never questioned.

211.    Madoff never charged any of the HSBC-Related Feeder Funds interest for the huge lines of credit extended to finance the SSC Strategy. The Defendants' failure to question this unorthodox practice demonstrates the total absence of any independent, meaningful, or reasonable due diligence. The Defendants should have been, at a minimum, suspicious of Madoff's advancement of hundreds of millions of dollars in interest-free loans to accountholders.

212.    As set forth in the following table, the Defendants' BLMIS accounts had negative cash balances for thousands of days, yet BLMIS never charged them interest for these extensions of credit:

| | Number of Days with Negative Cash Balances | Number of Instances of Negative Balances |
|---|---|---|
| Alpha Prime/Alpha Prime Management | 112 | 34 |
| Aurelia/Equus Partners | 1,085 | 327 |
| BA Worldwide | 1,045 | 264 |
| Bank Medici | 93 | 34 |
| Defender | 3 | 3 |
| Eurovaleur | 661 | 150 |
| Genevalor | 1,978 | 617 |
| Geo Currencies | 289 | 108 |
| Herald/Herald Management | 64 | 24 |
| Herald (Lux) | 2 | 2 |
| Hermes Management/ Hermes/ Lagoon/ HSBC Fund Services | 1,085 | 327 |
| HITSB | 57 | 15 |
| HSBC Administrator | 3,508 | 1,053 |
| HSBC Bank Bermuda | 2,349 | 740 |
| HSBC (Cayman) | 662 | 151 |
| HSBC Custodian | 4,232 | 1,308 |
| HSSB | 1,104 | 333 |
| HSSI/HITSI | 1,106 | 373 |
| HSSL | 2,101 | 591 |
| Kingate Euro | 375 | 128 |

|  | Number of Days with Negative Cash Balances | Number of Instances of Negative Balances |
| --- | --- | --- |
| Kingate Global | 349 | 127 |
| Landmark | 10 | 4 |
| Optimal | 651 | 233 |
| Pioneer | 1 | 1 |
| Primeo Fund | 662 | 151 |
| Senator/Regulus/Carruba | 14 | 4 |
| Square One | 312 | 93 |
| Thema International | 442 | 133 |
| Thema Management BVI | 415 | 125 |
| Thema Wise/Thema Fund/Thema Management Bermuda/Equus | 162 | 49 |

213.    Upon information and belief, the Defendants never questioned the loans or how Madoff funded them. As one of the world's largest lenders, the HSBC Defendants recognized the absurdity of Madoff lending HSBC's clients hundreds of millions of dollars for no charge whatsoever. The Defendants, including the HSBC Defendants, should have—and would have—known that Madoff was not executing the trades described on customer statements if it weren't for the financial incentives they had to look the other way.

**J.     Inadequacy of Madoff's Auditors**

214.    The Defendants knew that BLMIS used Friehling & Horowitz as its auditors. Friehling & Horowitz was an unknown, three-person accounting firm based in a strip mall in Rockland County, New York. The Defendants were on notice that BLMIS's auditors did not have the competence, resources, technological capabilities, or expertise to perform the domestic and international auditing functions associated with BLMIS and its billions under management. BLMIS's reliance on such an auditor like Friehling & Horowitz was an obvious indication that

things were not as they were supposed to be at BLMIS. But the Defendants again ignored the warning sign and expanded their relationships with BLMIS.

215.     The absurdity of this situation was not lost on the Defendants; HSBC Private Bank identified as a concern "Madoff's lack of [a] realistically independent auditor—Friehling & Horowitz is a very small firm with Madoff as its only major client." Despite being explicitly aware of this red flag, the Defendants did nothing.

### K.     Madoff's Returns Did Not Mirror Market Conditions

216.     BLMIS's IA Business appeared immune from market volatility, always achieving consistent rates of return. For example, during the drastic market downturns associated with the so called "dotcom bubble" in 2000, the terrorist attacks of September 11, 2001, and the housing-market and mortgage-backed-securities issues in 2008, Madoff's SSC Strategy had consistently positive returns. Even during the last 14 months of BLMIS's existence, BLMIS had positive returns even though the S&P 100 was down nearly 40%. From January 2000 through November 2008, the feeder funds that invested with BMLIS experienced no more than five months of negative returns, while the S&P 100 experienced 53 months of negative returns over the same period.

217.     Despite these illogical results, the Defendants never reviewed how Madoff's SSC Strategy could achieve those returns.  The Defendants ignored clear evidence that Madoff could not possibly generate the purported returns with the SSC Strategy. Genevalor employees were unable to replicate Madoff's performance using monthly account statements from BLMIS to reconstruct the SSC Strategy. But Genevalor never inquired further or had any of its funds—Hermes, Thema Fund, or Thema International—stop investing in, or withdraw its investments from, BLMIS. The Defendants turned a blind eye to the fact that the SSC Strategy produced results that bore virtually no correlation to the market.

**L.      Madoff Was Able to Execute Trades at the Perfect Time. Every Time.**

218.    Madoff appeared to have a near-perfect ability to buy low and sell high not only from day to day, but within each trading day. The Defendants were on notice that this was impossible as a practical matter. The pricing revealed on trade confirmations and account statements showed that Madoff's trades almost always occurred at precisely the right time of the day. With remarkable consistency, Madoff purchased shares in the lower half of the daily price range and sold shares in the upper half of the daily price range.

219.    Madoff's ability consistently to get the best price was an obvious red flag. Madoff's trade prices gravitated toward the optimal price point, even though Madoff claimed that he was "time-slicing," or entering the market at specific intervals over the course of a trading day, which meant that the reported trade prices were an average and should have gravitated toward the daily midpoint. Gravitating to the optimal price point, as Madoff's did, is a statistical impossibility that should have prompted independent, reasonable, and meaningful due diligence by the Defendants.

220.    In fact, each of the HSBC-Related Feeder Funds consistently received trade confirmations which showed purported executions of favorable price points within the day. This was impossible given Madoff's purported time slicing execution process, which should have led to execution at or near the midpoint of the daily trading range. A summary of these staggering results is set forth in the following table:

|  | Total Below Midpoint | Total Buys | Percentage Below Midpoint | Total Above Midpoint | Total Sells | Percentage Above Midpoint |
|---|---|---|---|---|---|---|
| Alpha Prime/Alpha Prime Management | 2,709 | 3,269 | 82.87% | 2,127 | 2,851 | 74.61% |
| Aurelia/Equus Partners | 10,832 | 14,171 | 76.44% | 8,852 | 12,673 | 69.85% |
| BA Worldwide | 10,911 | 13,858 | 78.73% | 9,029 | 12,431 | 72.63% |
| Bank Medici | 3,755 | 4,650 | 80.75% | 2,754 | 3,837 | 71.77% |
| Defender | 654 | 845 | 77.40% | 454 | 661 | 68.68% |
| Eurovaleur | 4,360 | 5,645 | 77.24% | 3,628 | 5,124 | 70.80% |

| | Total Below Midpoint | Total Buys | Percentage Below Midpoint | Total Above Midpoint | Total Sells | Percentage Above Midpoint |
|---|---|---|---|---|---|---|
| Genevalor | 22,734 | 29,391 | 77.35% | 18,493 | 26,194 | 70.60% |
| Geo Currencies | 3,462 | 4,454 | 77.73% | 2,699 | 3,858 | 69.96% |
| Herald/Herald Management | 2,526 | 3,060 | 82.55% | 1,992 | 2,671 | 74.58% |
| Herald (Lux) | 267 | 395 | 67.59% | 133 | 210 | 63.33% |
| Hermes Management/ Hermes/ Lagoon/ HSBC Fund Services | 10,832 | 14,171 | 76.44% | 8,852 | 12,673 | 69.85% |
| HITSB | 3,848 | 4,780 | 80.50% | 2,884 | 4,277 | 67.43 |
| HSBC Administrator | 44,967 | 57,806 | 77.79% | 36,351 | 51,071 | 71.18% |
| HSBC Bank Bermuda | 27,006 | 34,928 | 77.32% | 22,764 | 31,819 | 71.54% |
| HSBC (Cayman) | 4,490 | 5,795 | 77.48% | 3,628 | 5,124 | 70.80% |
| HSBC Custodian | 55,105 | 70,921 | 77.70% | 44,740 | 63,004 | 71.01% |
| HSSB | 12,756 | 16,561 | 77.02% | 10,231 | 14,735 | 69.43% |
| HSSI/HITSI | 16,212 | 21,011 | 77.16% | 13,069 | 18,493 | 70.67% |
| HSSL | 25,040 | 31,967 | 78.33% | 20,135 | 28,188 | 71.43% |
| Kingate Euro | 5,049 | 6,534 | 77.27% | 4,165 | 5,962 | 69.86% |
| Kingate Global | 5,089 | 6,581 | 77.33% | 4,129 | 5,833 | 70.79% |
| Landmark | 429 | 595 | 72.10% | 304 | 458 | 66.38% |
| Optimal | 10,149 | 13,130 | 77.30% | 8,252 | 11,654 | 70.81% |
| Pioneer | 130 | 150 | 86.67% | | | |
| Primeo Fund | 4,490 | 5,795 | 77.48% | 3,628 | 5,124 | 70.80% |
| Senator/Regulus/Carruba | 756 | 952 | 79.41% | 520 | 716 | 72.63% |
| Square One | 4,885 | 6,317 | 77.33% | 4,069 | 5,730 | 71.01% |
| Thema International | 4,980 | 6,441 | 77.32% | 4,059 | 5,720 | 70.96% |
| Thema Management BVI | 4,018 | 5,246 | 76.59% | 3,430 | 4,764 | 72.00% |
| Thema Wise/Thema Fund/Thema Management Bermuda/Equus | 3,460 | 4,325 | 80.00% | 2,883 | 3,943 | 73.12% |

221.  Across all of the accounts for which the HSBC Defendants served as administrator, BLMIS purported to purchase equities on 57,806 occasions; 44,967 of these were in the lower half of the daily price range. On behalf of these accounts BLMIS purported to sell equities on 51,071 occasions; 36,351 of these occurred in the upper half of the daily price range. In other words, Madoff was buying low 77.79% of the time and selling high 71.18% of the time.

222.  Across all of the accounts for which the HSBC Defendants served as custodian, BLMIS purported to purchase equities on 70,921 occasions; 55,105 of these were in the lower half

of the daily price range. On behalf of these accounts BLMIS purported to sell equities on 63,004

occasions; 44,740 of these occurred in the upper half of the daily price range. In other words,

Madoff was buying low 77.70% of the time and selling high 71.01 % of the time. Such a success

rate is impossible, especially since Madoff represented that he was time slicing. Yet, the HSBC

Defendants did nothing.

223.     HSBC repeatedly identified red flags concerning Madoff's other-worldly trading

ability, but then did nothing. As early as 2001, HSBC recognized the improbability of Madoff

being able to generate such consistent, positive returns with such a simplistic strategy:

> Bernie Madoff's <u>12 year track record</u> trading a <u>split strike
> conversion strategy</u> on the <u>S&P 100</u>, is quite simply <u>astounding</u>. His
> <u>annualized return</u> of 15%, (net of a 20% performance fee), at a <u>risk</u>
> of 3%, yields a <u>sharpe ratio</u> of 3.3. Over this period the fund has
> endured only <u>4 down months</u>, (the maximum of which was down
> 0.5%), and has now gone almost 6 years without a <u>drawdown</u>.
>
> With this track record, seemingly derived from such a <u>simple
> investment strategy</u>, certain members of the investment community
> are <u>baffled</u>, as to how such a return stream has been earned.

(emphasis in original).

224.     In January 2003, HSBC again admitted that "[i]t is unclear how [Madoff's] strategy

has generated a track record with almost no down months." Upon information and belief, HSBC

did nothing to inquire further.

**M.     Madoff Did Not Provide Real-Time Access to IA Business Accounts**

225.     Despite Madoff's reputation as being technologically advanced, BLMIS never

provided real-time access to IA Business accounts and sent only paper trade confirmations to its

customers. By the mid-2000s, electronic access and immediate investment performance

information were standard in the industry, and usually required by funds of funds engaged in real-

time hedging. BLMIS, however, transmitted paper copies of trade confirmations to the Defendants

and/or their affiliates or representatives three to four days after trades purportedly occurred. Upon information and belief, the HSBC Defendants requested electronic trade confirmations, but Madoff refused. His nonsensical explanation was that service providers would steal his "strategy" if they received electronic trade confirmations.  Madoff's departure from industry custom in this respect was yet another red flag ignored by the Defendants.

### N.    Madoff's Account Statements Purported to Transact With Non-Existent Funds

226.    The SSC Strategy purported to invest IA Business customers' funds in U.S. Treasury bills or mutual funds holding Treasury bills. One such fund was, until 2005, named the Spartan U.S. Treasury Money Market Fund. On August 15, 2005, that fund changed its name to Fidelity U.S. Treasury Money Market Fund. But after that date, Madoff's account statements still indicated that funds were invested in Fidelity Spartan U.S. Treasury Money Market Fund, which no longer existed. The Defendants' failure to investigate this error evidences their failure as administrators, custodians, managers, and advisers.

### O.    Madoff Never Identified His Options Counterparties

227.    Yet another warning sign was Madoff's failure to identify the parties on the other side of the thousands of hedging options transactions he purported to effect each month. This should have been an intolerable practice to the Defendants, who bore the risk if those counterparties defaulted on the options agreement.

228.    The SSC Strategy purportedly involved the purchase of a basket of between 35 and 50 S&P 100 equities together with a collar of S&P 100 Index put and call options on those stocks to limit the up-side potential and down-side risks. BLMIS purportedly executed agreements with third parties on behalf of account holders pursuant to the "Master Agreement for OTC Options."

229.    At times, Madoff claimed simply to execute over-the-counter options trades with a network of unidentified counterparties, claiming that their identities were proprietary. At other times, he claimed simply that the counterparties were large, European financial institutions. And at still other times, Medici employees were told that Madoff's counterparties were American pension funds. The Defendants had excellent reasons to care about the identity of Madoff's purported counterparties as, in those options contracts, they understood that it was the HSBC-Related Feeder Funds—not BLMIS—that bore the risk. Accordingly, the Defendants could be regularly exposed to hundreds of millions of dollars in potential risk. Had the purported counterparties been unable to meet their obligations, not only would there have been no collar, but the account would have been left exposed to the market without the protections that were so central to the SSC Strategy and they would not have been able to collect on the value of the options contracts.

230.    Despite this potential exposure, the Management Defendants and the HSBC Defendants, acting as the HSBC-Related Feeder Funds' administrator and/or custodian, failed to perform any reasonable, meaningful, or independent inquiry into the counterparties' ability to perform under the contracts. Given the hundreds of millions of dollars at risk had those purported option counterparties been unable to deliver cash as required by the puts and calls, the Defendants' lack of inquiry or skepticism evinces a disregard for the reasonable, meaningful, and independent due diligence demanded. Upon information and belief, the Defendants did not review, comment on, modify, negotiate, or reject any form of draft or final counterparty agreement or OTC transaction confirmation. Despite bearing the risk of the counterparties' failure to perform, the Defendants had no knowledge of the counterparties' identities. The Defendants chose to blindly accept Madoff's nonsensical explanations in order to continue to collect their fees.

**P.      Madoff's Options Transactions Were Frequently Inconsistent With The SSC Strategy**

231.    The Defendants' account statements frequently showed short-term, one-sided, speculative options trades that did not hedge any existing equity investment. These trades were inconsistent with the SSC Strategy and should have sounded alarms because they created precisely the market exposure that the SSC Strategy purported to avoid. This was a glaring red flag to sophisticated financial entities such as the Defendants. The Defendants' customer accounts revealed regular deviations from the much-vaunted SSC Strategy, yet the Defendants raised no objections.

232.    For example, on August 14, 2002, on behalf of Thema International, BLMIS purported to purchase 13,938 S&P 100 call option contracts with a strike price of 450 at $5.30 per option contract, which was the exact opposite of how the typical SSC Strategy opened. These options did not correspond to the purchase or sale of any equities in Thema International's BLMIS equities trading account, and was therefore a high-risk, stand-alone position, far exceeding the implied risk of the SSC Strategy. This position was closed on August 19, 2002 with the purported sale of these options at $18.44 per option, resulting in a gain of $18,305,532. Obviously, Madoff deviated from the SSC Strategy to smooth out his returns, when he needed to meet his goal and other "trading activity" failed to do so. There were a total of 44 such speculative option transactions on Thema International's BLMIS account, creating a total net gain of $51,569,327.75.

233.    As set forth in the following table, BLMIS purported to engage in hundreds of these speculative options transactions, virtually all of which were profitable, generating purported gains of hundreds of millions of dollars:

| | Total Speculative Option Trades | Net Gain or Loss |
|---|---|---|
| Alpha Prime/Alpha Prime Management | 12 | $4,191,723 |
| Aurelia/Equus Partners | 120 | $27,083,399 |
| BA Worldwide | 94 | $60,966,609 |
| Bank Medici | 16 | $38,411,760 |
| Defender | 4 | $4,659,731 |
| Eurovaleur | 58 | $20,009,432 |
| Genevalor | 220 | $83,376,629 |
| Geo Currencies | 42 | $1,395,283 |
| Herald/Herald Management | 8 | $23,000,802 |
| Herald (Lux) | 4 | $1,419,670 |
| Hermes Management/ Hermes/ Lagoon/ HSBC Fund Services | 120 | $27,083,399 |
| HITSB | 22 | $15,301,450 |
| HSBC Administrator | 387 | $231,240,773 |
| HSBC Bank Bermuda | 275 | $191,256,924 |
| HSBC (Cayman) | 58 | $20,009,432 |
| HSBC Custodian | 513 | $400,554,344 |
| HSSB | 130 | $33,410,936 |
| HSSI/HITSI | 148 | $148,987,012 |
| HSSL | 220 | $81,188,258 |
| Kingate Euro | 50 | $32,920,758 |
| Kingate Global | 76 | $136,392,813 |
| Landmark | 4 | $1,195,313 |
| Optimal | 96 | $91,562,641 |
| Pioneer | 0 | — |
| Primeo Fund | 58 | $20,009,432 |
| Senator/Regulus/Carruba | 4 | $2,154,612 |
| Square One | 21 | $1,212,781 |
| Thema International | 44 | $51,569,328 |
| Thema Management BVI | 40 | $37,578,040 |
| Thema Wise/Thema Fund/Thema Management Bermuda/Equus | 14 | $3,328,620 |

234.     Across all of the accounts for which the HSBC Defendants served as administrator, there were 387 such speculative options transactions, creating a total net gain of $231,240,773. In reviewing the account statements of the funds for which they served as administrator, the HSBC Administrator Defendants should have raised questions about these speculative option transactions as they left the funds dangerously exposed to downside risk and were inconsistent with the SSC Strategy. But, because these speculative events almost always created gains, smoothed out the returns, and ultimately generated fees, the HSBC Administrator Defendants chose to ignore these readily apparent red flags.

235.     Across all of the accounts for which the HSBC Defendants served as custodian, there was a total of 513 speculative options transactions, creating a total net gain of $400,554,344. In reviewing the account statements of the funds for which they served as custodian, the HSBC Custodian Defendants should have raised questions about these speculative option transactions as they left the funds dangerously exposed to downside risk and were inconsistent with the SSC Strategy.

236.     Additionally, Madoff engaged in options transactions that were often unbalanced because changes to Madoff's basket of equities did not result in corresponding changes to the hedging options. Such "unbalanced hedges" were also inconsistent with the SSC Strategy and should have caused Defendants to inquire about deviations from that strategy.

237.     One such unbalanced hedge is evident on the January and February 2004 BLMIS account statements of Kingate Global, Kingate Euro, Primeo, Thema International, Lagoon, Thema Wise, and Square One. On January 8, 2004, Madoff purported to purchase two baskets of S&P 100 stocks, each of which included shares of Texas Instruments Inc. (TXN). However, according to the account statements, the shares of Texas Instruments were not sold between

February 20 and 25, 2004, as were the other equities contained in the baskets, but rather on January 22, 2004. Despite this early sale of the Texas Instruments shares, the corresponding option hedges did not change. Madoff's failure to rebalance the hedge on these baskets was a deviation from the SSC Strategy that should have put Defendants on inquiry notice as to the purpose of the inconsistency.

238.     As set forth in the following table, the BLMIS account statements of the Defendants and the BLMIS account statements of feeder funds invested with BLMIS indicate that Madoff regularly did not make changes to the corresponding hedges when he purportedly sold one equity before the rest of the basket:

| | Sells Without Hedge Adjustment |
| --- | --- |
| Alpha Prime/Alpha Prime Management | 22 |
| Aurelia/Equus Partners | 34 |
| BA Worldwide | 73 |
| Bank Medici | 9 |
| Defender | 0 |
| Eurovaleur | 22 |
| Genevalor | 116 |
| Geo Currencies | 38 |
| Herald/Herald Management | 6 |
| Herald (Lux) | 0 |
| Hermes Management/Hermes/Lagoon/HSBC Fund Services | 34 |
| HITSB | 8 |
| HSBC Administrator | 202 |
| HSBC Bank Bermuda | 151 |
| HSBC (Cayman) | 22 |
| HSBC Custodian | 266 |
| HSSB | 39 |
| HSSI/HITSI | 80 |
| HSSL | 99 |
| Kingate Euro | 31 |
| Kingate Global | 33 |

| | Sells Without Hedge Adjustment |
|---|---|
| Landmark | 0 |
| Optimal | 48 |
| Pioneer | 0 |
| Primeo Fund | 22 |
| Senator/Regulus/Carruba | 3 |
| Square One | 24 |
| Thema International | 32 |
| Thema Management BVI | 29 |
| Thema Wise/Thema Fund/Thema Management Bermuda/Equus | 12 |

239. Across all of the accounts for which HSBC was administrator, Madoff did not rebalance the hedge on 202 occasions. By leaving the hedge unbalanced, Madoff deviated from his stated SSC Strategy, but HSBC did not question Madoff about these inconsistencies.

240. Across all of the accounts for which HSBC was custodian, Madoff did not rebalance the hedge on 266 occasions. By leaving the hedge unbalanced, Madoff deviated from his stated SSC Strategy, but HSBC did not question Madoff about these inconsistencies.

**Q.      BLMIS's Paper Trade Confirmations Filled With Inconsistencies**

241. The Defendants and/or their affiliates and representatives received trade confirmations from BLMIS containing numerous inconsistencies that should have raised a red flag that Madoff was not implementing the SSC Strategy as he claimed. Instead, the Defendants ignored these troubling trade confirmations.

242. For example, the trade confirmations did not reflect either the reporting or payment of the "Section 31" fees required by NASD and FINRA rules. This should have raised a red flag with the HSBC Defendants.

243. BLMIS's trade confirmations incorrectly characterized options as "trade origins," rather than transactions, on checklists that appeared on the trade confirmations. The trade

confirmations did not indicate the origin of those options trades. BLMIS's trade confirmations accurately characterized other transactions, such as purchases of stocks, as "transactions" and accurately indicated the origins of those other transactions. The inaccurate reporting of options transactions on BLMIS's trade confirmations should have raised a red flag with the Defendants that there were irregularities with BLMIS's options trading; however, the Defendants failed to make any inquiries about this.

244.    The trade confirmations also frequently indicated that BLMIS had effected the same trades as both principal and agent. Upon information and belief, the Defendants saw, but did not question, this paradox. At times, the front of the BLMIS trade confirmations coded purported trades as "principal transactions" while the backs of the trade confirmations stated, "[w]e have acted in the capacity of Agent for your transaction." Upon information and belief, the HSBC Defendants were aware of this conflicting language, yet failed to make any inquiries to resolve these inconsistencies.

245.    Finally, BLMIS's option trade confirmations often contradicted Madoff's claim that, from time to time, he purchased options in the over-the-counter market. All of the options trade confirmations contained Committee on Uniform Security Identification Procedures ("CUSIP") identification numbers, which indicated that the options Madoff utilized were S&P 100 Index options that were traded on the CBOE. Because the BLMIS options trade confirmations contained CUSIP numbers tied to the CBOE, the Defendants should have recognized that BLMIS's purported options trades were not purchased on the over-the-counter market, as Madoff represented.

### R. Madoff Walked Away From Hundreds of Millions of Dollars by Employing a Bizarre Fee Structure

246.    In addition to providing interest-free loans on billions of dollars, Madoff imposed an unusual fee structure that, when compared to the fees charged by most investment funds, including those charged by the Defendants here, meant that Madoff walked away from hundreds of millions, if not billions, of dollars in fees. Instead of charging a 1% -2% management fee and a 10% -20% performance fee typical of investment funds, Madoff charged only $0.04 per share on stock transactions, and $1.00 per option contract.

247.    HSBC's Private Bank Due Diligence Team, the Management Defendants, and other investment professionals all were aware that the largesse of this fee structure was an aberration.

248.    HSBC Private Bank highlighted Madoff's fee structure as a red flag on at least nine occasions in reports issued between 2001 and 2008. In 2007, for example, HSBC Private Bank noted, "[t]he lack of transparency involving fees paid to Madoff was disturbing." HSBC Private Bank later reached the same conclusion as other investment professionals, stating, "Things do not add up in terms of Bernie's compensation structure." The Defendants ignored these warnings, and continued to funnel money into BLMIS.

249.    David Smith, one of Thema International's directors, knew that Madoff's fees were unusual and wrote to Paul Smith, who at one point was the head of HSBC Alternative Fund Services and in charge of HSBC's relationship with Madoff, commenting that "Madoff does not receive a management fee." David Smith further noted that BLMIS's brokerage fees were "extremely cheap . . . and below market price."

250.    The Management Defendants, on the other hand, did charge and receive fees. The following chart shows estimated fees received by seven of the Management Defendants:

|  | Estimated Fees |
|---|---|
| Alpha Asset Management | $16,767,897 |
| Bank Medici | $12,905,415 |
| Hermes Management | $79,334,375 |
| BA Worldwide | $12,292,607 |
| Thema Management BVI | $105,437,711 |
| Thema Management Bermuda | $10,558,411 |
| Equus | $1,761,740 |

251.   Moreover, as a result of Madoff's minimal commission policy, an increased volume of fees went directly into the pockets of the HSBC Defendants in their capacities as managers and service providers. As HSBC Private Bank noted, "[t]he 20% performance fee goes to Fairfield Sentry." The more money the feeder funds made, the more money the HSBC Administrator Defendants, the HSBC Custodian Defendants, and the Management Defendants-and, ultimately, the Beneficial Owners-were taking in fees. These Defendants continued to procure billions of dollars to fuel the Madoff Ponzi scheme so that they could continue to reap their enormous fees.

**S.   Many Financial Professionals Publicly Questioned Madoff's Legitimacy**

252.   The Defendants ignored not only the red flags obvious from their relationship with BLMIS's IA Business, but also the warnings of many industry professionals. In May 2001, two industry analysts published articles specifically questioning the legitimacy of BLMIS's operations and its investment performance.  A *Mar/Hedge* newsletter, entitled "Madoff tops charts; skeptics ask how," reported on industry experts' bewilderment regarding Sentry's consistent returns and how such returns could be achieved so consistently and for so long. The article also observed that "others who use or have used the strategy ... are known to have had nowhere near the same degree of success."

253.   On May 7, 2001, Barron's published an article entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks investors to keep mum." In that article, Barron's

reported widespread Wall Street skepticism about BLMIS's IA Business, and noted the lack of transparency regarding the SSC Strategy as a result of Madoff's unwillingness to answer questions.

254.    Both articles suggested that BLMIS had between $6 billion and $7 billion in assets under management. The articles noted that some industry experts speculated that Madoff used information gleaned from his market-making business, such as the bid-ask spreads, to front-run the IA Business's trades and to subsidize and smooth the IA Business's returns.

255.    By the time these articles were published, the Defendants had already invested with BLMIS. The Defendants, however, performed no meaningful, independent, or reasonable inquiry or due diligence in response to assertions questioning Madoff's legitimacy or raising the possibility of fraud. Upon information and belief, the Defendants did not speak to the principals or anyone at Sentry regarding the contents of the articles and the serious red flags raised therein. The Defendants instead chose to deliberately ignore these serious indicia of fraud.

256.    Upon information and belief, the Barron's article was circulated among the Defendants, yet, upon information and belief, none who saw the article attempted to follow up on any of the issues it raised. Upon information and belief, Defendants' only response to these articles was to invent their own "answers"—without any independent inquiry—to the troubling questions the articles raised, including whether Madoff was  front-running, how Madoff was  able to purportedly trade such volumes without noticeably affecting the market, the overall lack of transparency, and why Madoff did not charge industry standard management and performance fees.

257.    In fact, HSBC appended the MAR/Hedge articles to various due diligence reports and often quoted from that article. Upon information and belief, all the Defendants were aware of the Barron's and MAR/Hedge articles and simply chose to ignore the red flags raised therein.

**T.     BLMIS Account Statements and Confirmations Often Reflected Settlement Anomalies in Options Transactions**

258.    The Defendants also ignored that a high percentage of options transactions in their BLMIS accounts settled in a time range outside of industry norms. It is common industry practice for options trades to settle on the business day following execution. However, BLMIS's trade confirmations regularly showed options transactions that purportedly settled as much as three days after execution. This allowed Madoff ample time to fabricate trades days after they purportedly took place. The Defendants should have been concerned that Madoff's very late settlement policies were enabling fraud. The frequency with which this occurred was staggering. For example, Herald (Lux)'s BLMIS account statements and trade confirmations indicate that out of 57 options transactions purportedly entered into on behalf of Herald (Lux)'s BLMIS account, only six settled on the business day following execution, meaning that 89.47% of all of the purported options activity in Herald (Lux)'s account did not comply with standard trading practices.

259.    As set forth in the following table, BLMIS purported to enter into thousands of options transactions on behalf of the accounts of Defendants and the accounts of feeder funds who invested with BLMIS that did not settle on the business day following the execution of the trade:

|  | Options-Trades not Settling T+1 | Options-Percentage not Settling T+1 |
|---|---|---|
| Alpha Prime/Alpha Prime Management | 233 | 51.89% |
| Aurelia/Equus Partners | 479 | 25.36% |
| BA Worldwide | 468 | 24.43% |
| Bank Medici | 434 | 69.89% |
| Defender | 98 | 94.23% |
| Eurovaleur | 118 | 16.05% |
| Genevalor | 1,203 | 29.93% |
| Geo Currencies | 231 | 35.76% |
| Herald/Herald Management | 233 | 57.11% |
| Herald (Lux) | 51 | 89.47% |
| Hermes Management/ Hermes/ Lagoon/ HSBC Fund Services | 479 | 25.36% |
| HITSB | 626 | 96.31% |
| HSBC Administrator | 2,511 | 31.60% |
| HSBC Bank Bermuda | 941 | 18.58% |
| HSBC (Cayman) | 130 | 17.40% |
| HSBC Custodian | 3,072 | 30.42% |
| HSSB | 785 | 35.57% |
| HSSI/HITSI | 975 | 31.95% |
| HSSL | 1,497 | 35.17% |
| Kingate Euro | 239 | 27.47% |
| Kingate Global | 316 | 24.71% |
| Landmark | 76 | 92.68% |
| Optimal | 543 | 27.90% |
| Pioneer | 12 | 100.00% |
| Primeo Fund | 130 | 17.40% |
| Senator/Regulus/Carruba | 136 | 95.77% |
| Square One | 237 | 28.18% |
| Thema International | 258 | 28.04% |
| Thema Management BVI | 108 | 14.14% |
| Thema Wise/ Thema Fund/ Thema Management Bermuda/ Equus | 235 | 41.67% |

260.   The Administrator and Custodian accounts did not settle on T + 1 close to one-third of the time.

261.   Settlement anomalies in such high percentages were clear red flags that should have prompted sophisticated financial entities such as the Defendants to conduct further investigations, request verifications of the trades, and demand more transparency into BLMIS's operations.

**U.    Madoff Purported to Execute Trades That Settled on Days When the Market Was Closed**

262.   Many of the Defendants' BLMIS account statements and trade confirmations reflected trades for which the settlement date and/or the trade date occurred on a weekend. Because the markets are closed on weekends, trade dates are unlikely to fall on weekends, and settlement dates require banks to be open.

263.   For example, the account statements for Lagoon, Optimal, Primeo, Square One, Geo Currencies, Kingate Global, Kingate Euro, and Thema International for January 2000 all reported the execution of S&P 100 Index put options and S&P 100 Index call options with a trade date of January 7, 2000 (a Friday) and a settlement date of January 8, 2000 (a Saturday), which was impossible. The relevant Defendants reviewed this trade confirmation and took no action in response to this anomaly. Rather, that this too was ignored by the Defendants, more than suggests they knew it was a Ponzi scheme.

**VIII.   The Defendants' Relationship With Madoff**

**A.    Kohn and the Benbassats Established a Complex Network Connecting Foreign Investors and Madoff**

264.   Together, the Management Defendants and HSBC Defendants built the infrastructure that would lead to an explosion of European and other foreign investment into BLMIS's IA Business beginning in the 1990s. These Defendants worked together to create, manage, and administer the HSBC-Related Feeder Funds, and to solicit investors for these funds.

Their efforts perpetuated and deepened the Ponzi scheme and, as the HSBC-Related Feeder Funds grew, enabled the Management Defendants and the HSBC Defendants to collect even greater fees for services they purported to provide.

265.    Kohn portrayed herself as an investment banker with connections to wealthy investors throughout Europe, including, among others, the members of the Benbassat Family, Federico Ceretti, and Carlo Grosso. These individuals were the hub of the foreign network that Madoff used to solicit new investors. Altogether, the funds with which Kohn, the Benbassats, Ceretti, and Grosso were involved funneled billions of dollars into BLMIS's IA Business. Kohn used the entities that she controlled, including Bank Medici, and entities with which she was affiliated, such as Bank Austria, coupled with the imprimatur of HSBC, to cultivate an aura of legitimacy for the HSBC-Related Feeder Funds that she helped create.

266.    Kohn benefited from the increased investment into BLMIS's IA Business. As the size of those feeder funds grew, so too did the fees she received. Moneys flowed to Kohn through Bank Medici and the other entities composing the investment network that funneled money to BLMIS.

267.    In November 1993, after a meeting of Madoff, Kohn, and Bank Austria officials, Kohn and Bank Austria were given an opportunity to open an account with BLMIS, and together formed Primeo. Primeo opened its first account with BLMIS on or about December 30, 1993. Shortly thereafter, Kohn, Bank Medici, and Bank Austria began to solicit investors for Primeo for the purpose of investing in BLMIS's IA Business.

268.    After successfully soliciting investors for Primeo, Kohn and Bank Austria expanded Primeo's base of investors in 1996 by publicly offering a new class of Primeo shares, known as the "Primeo Select Fund." Upon information and belief, Primeo Select Fund invested

one hundred percent of its assets in BLMIS. Later that year, Primeo Select Fund opened a second account with BLMIS. The following chart depicts the structure of Primeo:



## Primeo Fund Structure

269.    On January 28, 1997, Plaintiff's assignor OSUS opened its BLMIS account with a $3 million deposit.  Throughout 1997, OSUS made additional deposits totaling over $352 million into BLMIS: $4.8 million on March 3, 1997; $225,000 on March 31, 1997; $25.589 million on April 30, 1997; $1.2 million on May 1, 1997; over $18.5 million on May 19, 1997; $11.49 million on July 1, 1997; $1 million on July 14, 1997; $3 million on July 31, 1997; $8.5 million on August 15, 1997; $21.971 million on September 3, 1997; over $10.6 million on October 1, 1997; $18.2 million on November 4, 1997; and $2.484 million on December 1, 1997.

270.    Between 1998 and early 2003, OSUS continued to retain and increase its investment in BLMIS.  Over that time period, OSUS deposited an additional amount exceeding $530 million into BLMIS.

271.    In March 2003, two European investment bankers whom Kohn had introduced to Madoff, including Radel-Leszczynski, founded Alpha Prime, another fund that invested in BLMIS. The following chart depicts the structure of Alpha Prime:



272.    On August 29, 2003, OSUS deposited an additional $15 million into BLMIS, and on January 30, 2004, OSUS deposited an additional $50 million into BLMIS.

273.    In March 2004, Kohn and Bank Medici created Herald Fund for the purpose of investing its assets into BLMIS. Herald Fund, by itself, invested over $1.5 billion with BLMIS. The following chart depicts the structure of Herald Fund:



**Herald Fund Structure**

274.   On March 31, 2004, OSUS deposited an additional $20 million into BLMIS.  And on September 30, 2004, OSUS deposited an additional $25 million into BLMIS.  Throughout 2005 and into 2006, OSUS retained and increased its investment in BLMIS, making $592 million in deposits into BLMIS between the beginning of 2005 and May 31, 2006.

275.   In or around September 2006, Radel-Leszczynski and, upon information and belief, Bank Austria, created Senator. Upon information and belief, Senator was one hundred percent invested in BLMIS. The following chart depicts the structure of Senator:



276. In 2007, OSUS deposited an additional $145 million into BLMIS, and retained its BLMIS account which, by the close of 2007, reflected a net balance of over $1.4 billion in cash deposits.

277. Even as the Ponzi scheme neared its demise, Kohn and Bank Medici continued to create new funds in order to provide new sources of investment to Madoff. Bank Medici created Herald (Lux) in March 2008. Upon information and belief, Herald (Lux) was one hundred percent invested in BLMIS. The following chart depicts the structure of Herald (Lux):



278. On April 30, 2008, OSUS deposited an additional $60 million into BLMIS. On August 22, 2008, OSUS deposited an additional $99.5 million into BLMIS.

279. In total, the HSBC-Related Feeder Funds that Kohn created invested over $2.8 billion with BLMIS. During the time period that Kohn and Defendants were providing substantial assistance to the BLMIS operation, Plaintiff's assignor OSUS was induced to make net cash deposits into BLMIS totaling nearly $1.6 billion and to maintain its investment in BLMIS in the form of its account with a represented net value (including fictitious gains and equities) of, as of November 30, 2008, over $2.9 billion. Upon information and belief, for their role in soliciting investors and providing administrative services to the HSBC-Related Feeder Funds, Kohn and Bank Austria received significant fees.

**B.    The Benbassats Solicited Madoff Investors**

280. After Kohn introduced the members of the Benbassat Family to Madoff, the Benbassats, who had access to their own network of potential European investors, created several

investment vehicles that funneled money into the Ponzi scheme. The Benbassats and related parties marketed these investment opportunities, hoping to profit from management, administrative, and other fees generated by steering money into BLMIS's IA Business.

281.    In May 1992, the Benbassat Family's investment firm, Genevalor, co-founded Hermes. The following chart depicts the structure of Hermes:



282.    Upon information and belief, in May 1984, Genevalor created Geo Currencies, another fund that invested its assets into BLMIS.

283.    In December 2002, Genevalor created Thema International for the purpose of investing its assets into BLMIS. The following chart depicts the structure of Thema International:



284.    In February 2003, Genevalor created Thema Fund, which also invested in Madoff. The following chart depicts the structure of Thema Fund:



285.    In total, the Benbassat funds funneled over $1.9 billion—approximately ten percent of the principal invested in BLMIS's IA Business—into the Ponzi scheme.  During the time period that the Benbassat Family and Defendants were providing substantial assistance to the BLMIS operation, Plaintiff's assignor OSUS was induced to make net cash deposits into BLMIS totaling nearly $1.6 billion and to maintain its investment in BLMIS in the form of its account with a represented net value (including fictitious gains and equities) of, as of November 30, 2008, over $2.9 billion. The Benbassat Family and related Defendants collected millions of dollars for the variety of roles that they purported to undertake in connection with the operation of these funds. In fact, they did little other than simply turn money over to Madoff.

C. **HSBC Helped Funnel Foreign Investors into the HSBC-Related Feeder Funds**

286.     The HSBC-Related Feeder Funds relied on HSBC to act as their custodian, administrator, manager, and promoter. The goodwill attached to HSBC's name provided an air of legitimacy to the HSBC-Related Feeder Funds. HSBC's name appeared in offering materials and, upon information and belief, also on the account statements sent out for the HSBC-Related Feeder Funds. HSBC's imprimatur played a key role in the expansion of the Ponzi scheme, convincing investors in the feeder funds invested with BMLIS that these funds were a safe place to invest their money.

287.     In their various roles as administrators, custodians, and investment managers of the HSBC-Related Feeder Funds, the HSBC Defendants received over $25 million in fees.

D. **The Defendants Created Structured Products to Facilitate Additional Investment in the IA Business**

288.     Beginning in approximately 2006, the HSBC Defendants created the GSFP Structured Products, which directed hundreds of millions of dollars into Madoff's Ponzi scheme. Because of the leverage employed, the GSFP Structured Products offered investors the opportunity to earn a multiple of the returns generated by feeder funds invested with Madoff without the upfront capital necessary for a direct investment of that size.

289.     There were two main types of GSFP Structured Products: total return swaps ("swaps") and structured notes ("notes"). A swap is a bilateral financial transaction created to "swap" the cash flows of an asset or basket of assets for cash flows of another asset. Swaps enable investors to achieve multiples of the returns from a reference asset—here, a feeder fund invested with BLMIS—without having to own the asset. In exchange for paying the leveraged return on the reference fund at maturity, the financing institution—here, HSBC—collected significant structuring and financing fees on the leveraged amount. A structured note is a financial transaction

in which a financial institution issues a note to an investor in exchange for a future payment based on the performance of an underlying reference fund, or index. Like swaps, notes typically employ leverage to provide investors with the possibility of multiples of the returns from the reference asset.

290.   Typically, in both swaps and notes, the financing institution that has promised a leveraged return on the performance of a reference funds will hedge its risk by investing both its own money and the cash collateral provided by the swap counterparty or note purchaser directly in the reference fund. A note or swap investor makes a synthetic investment in a reference fund, because it is entitled at maturity to the leveraged returns generated by the reference fund, but it is the financing institution that is the actual owner of the reference fund shares.

291.   In connection with the marketing and sale of the GSFP Structured Products, the HSBC Defendants were once again confronted by serious red flags that BLMIS's IA Business was not what it purported to be. For example, HSBC admitted its inability to confirm trade data by comparison to an independent data set.

> Calculations on investment guidelines for the underlying funds for these transactions such as risk measures, position and sector concentration percentages are being calculated by Madoff and sent to Product Control [at HSBC]. This process, which differs from the normal process ... is due to lack of transparency of detailed fund information.

292.   Similarly, HSBC Bank conceded that a swap done in 2007 needed to be hedged "entirely (no delta exposure) ... [because]we do not currently monitor Madoff Strategy trades with sufficient granularity to meet restrictions outlined in the risk mandate ...."

293.   In 2008, members of HSBC GSFP visited Fix Asset Management ("FIX") to conduct a due diligence review of Harley and FIX. Harley was a feeder fund that invested with BLMIS and was the reference fund of the structured product transaction under review. HSBC

concluded that it was "very familiar" with Madoff's operations and SSC Strategy and was "comfortable with the strategy's risk," so it could "proceed with the transaction." This recommendation came despite the fact that, on multiple occasions, HSBC's own due diligence had raised significant concerns about investing in BLMIS through other channels. Upon information and belief, HSBC turned a blind eye to red flags of possible fraud at BLMIS, and moved forward with the creation of GSFP Structured Products.

294.    HSBC was aware of ongoing and significant concerns regarding Madoff, yet continued to solicit investors for the GSFP Structured Products. In 2005, D. Smith, an officer of a feeder fund that invested with BLMIS and that served as a reference fund for one of the total return swaps, discouraged HSBC from intruding upon BLMIS through due diligence, and warned that doing so would risk angering Madoff and could endanger the ability of those feeder funds that invested with BLMIS to continue to make investments in BLMIS.

295.    Upon information and belief, that feeder fund did not perform adequate due diligence upon BLMIS and invested in BLMIS, despite being aware of many significant red flags. In an email to HSBC, D. Smith acknowledged that Madoff was not a registered investment adviser, that Madoff declined to work with custodians, and that experts in the industry had repeatedly tried, but were unable to replicate BLMIS's strategy and returns. Although the feeder fund advised HSBC of these red flags, HSBC continued to solicit funds for the GSFP Structured Products.

**E.    The HSBC Swaps**

296.    Between June 2006 and September 2007, HSBC Bank USA and HSBC Bank entered into seven financing swaps for which the reference funds were HSBC-Related Feeder Funds. The GSFP Structured Products caused hundreds of millions to be invested with the feeder funds, and, ultimately, into the IA Business, thereby prolonging Madoff's Ponzi scheme.

297.     The seven GSFP Structured Products used the following feeder funds invested with BLMIS as reference assets: (i) Rye Select Broad Market Fund, L.P. ("Broad Market"); (ii) Greenwich Sentry; (iii) Harley; (iv) Thema International; (v) Senator; and (vi) Rye Select Broad Market Portfolio Limited ("Broad Market Portfolio").

### 1.     The Rye XL Fund Swap

298.     In September 2006, HSBC Bank USA entered into a swap with Rye Select Broad Market XL Fund, L.P. ("Rye XL") with shares of Rye Select Broad Market Fund, a feeder fund invested with BLMIS, serving as the reference fund (the "Rye XL Fund Swap"). As part of the Rye XL Fund Swap, Rye XL received a notional exposure to Broad Market of $140 million. Upon information and belief, HSBC funded this exposure by charging Rye XL a fee of LIBOR plus 90 basis points.

299.     Initially, the Rye XL Fund Swap had a maximum notional exposure of $300 million, however, due to increased interest in Broad Market, the size of the swap was increased to $350 million in October 2006, and then to $450 million in January 2007. Upon maturity, the Rye XL Swap contemplated a payout to Rye XL of up to 3.5 times the leveraged performance of Broad Market.

300.     Upon information and belief, HSBC Bank USA redeemed $50 million from Broad Market in the fall of 2007, and an additional $13.5 million in the summer of 2008, at a time when it knew or deliberately avoided knowing of Madoff's fraud.

### 2.     The Wickford Fund Swap

301.     In March 2007, HSBC Bank USA entered into a swap transaction with Wickford Fund L.P. ("Wickford"), which provided levered exposure to the returns generated by Sentry (the "Wickford Fund Swap").

302.    Wickford received a notional exposure to Sentry of $10 million in the swap transaction. HSBC Bank USA funded this exposure by charging Wickford a financing fee of LIBOR plus 110 basis points.

303.    Upon maturity, the Wickford Fund Swap contemplated a payout to Wickford of up to 3.5 times the leveraged performance of Sentry. Upon information and belief, HSBC Bank USA redeemed $13 million from Sentry on August 29, 2008, at a time when it knew or deliberately avoided knowing of Madoff's fraud.

### 3.    The Santa Clara II Fund Options Swap

304.    In June 2007, HSBC Bank entered into a swap transaction with Santa Clara II Fund ("Santa Clara") that provided Santa Clara with levered exposure to the returns generated by Harley (the "Santa Clara Options Swap"). Santa Clara received a maximum notional exposure to Harley of $300 million in the swap transaction. Upon maturity, the Santa Clara Options Swap contemplated a payout to Santa Clara of up to 4.5 times the leveraged performance of Harley. HSBC Bank funded this exposure by charging Santa Clara a financing fee of LIBOR plus 110 basis points.

305.    Upon information and belief, HSBC Bank made redemptions from Harley and received transfers at a time when it knew or deliberately avoided knowing of Madoff's fraud.

### 4.    The BNP Paribas Accreting Strike Call Option Transaction

306.    In September 2007, HSBC Bank USA entered into an accreting strike call option transaction, which had the same economics as a total return swap, with BNP Paribas that provided BNP Paribas with levered exposure to the returns generated by Harley. As part of the BNP Paribas transaction, BNP Paribas received a notional exposure to Harley of $70 million. Upon information and belief, HSBC Bank USA funded this exposure by charging BNP Paribas a financing fee.

307.    Upon information and belief, HSBC Bank USA made redemptions and received transfers from Harley at a time when it knew or deliberately avoided knowing of Madoff's fraud.

### 5.    The Gaspee Offshore Swap

308.    Also in July 2007, HSBC Bank entered into a swap transaction with Gaspee Offshore Fund Ltd. ("Gaspee"), which provided levered exposure to Thema International Fund (the "Gaspee Offshore Swap"). As part of the Gaspee Offshore Swap, Gaspee received a notional exposure to Thema International of $12.8 million. HSBC Bank funded this exposure by charging Gaspee a financing fee of LIBOR plus 110 basis points. In 2008, when Thema International was redeemed in full, Senator replaced Thema International as the reference fund.

309.    Upon maturity, the Gaspee Offshore Swap contemplated a payout to Gaspee of up to 3.5 times the leveraged performance of Senator.

310.    Upon information and belief, HSBC Bank made redemptions and received transfers from Thema International and Senator at a time when it knew or deliberately avoided knowing of Madoff's fraud.

### 6.    The Rye Select Broad Market XL Portfolio Limited Swap

311.    HSBC Bank entered into a swap transaction in August 2007, with Rye Select Broad Market XL Portfolio Limited ("Rye XL Portfolio"), in which Class D shares of Broad Market Portfolio served as the reference fund (the "Rye XL Portfolio Swap"). As part of the Rye XL Portfolio Swap, Rye XL Portfolio received a notional exposure to Broad Market Portfolio of $56 million. Upon maturity, the Rye XL Portfolio Swap agreement contemplated a payout to Rye XL Portfolio of up to 3.5 times the leveraged performance of Broad Market Portfolio.

312.    HSBC Bank funded this exposure by charging Rye XL Portfolio a fee of LIBOR plus 90 basis points.

313.   Upon information and belief, HSBC Bank redeemed $15.9 million from Rye XL Portfolio during the fourth quarter of 2008, a time when it knew or deliberately avoided knowing of Madoff's fraud.

### 7.   The Wailea Swap

314.   In September 2007, HSBC Bank USA entered into two swap agreements with Wailea Partners L.P. ("Wailea Partners") and Wailea Offshore Fund Ltd. ("Wailea Offshore Fund"). In both swap transactions, Senator served as the reference fund (respectively, the "Wailea Offshore Swap" and the "Wailea Partners Swap"). As part of the Wailea Partners Swap, Wailea Partners received a notional exposure of $31 million to Senator. As part of the Wailea Offshore Swap, Wailea Offshore Fund received a notional exposure of $14 million to Senator. Upon maturity, both these swap agreements contemplated a payout to Wailea Partners and Wailea Offshore Fund of up to 3.5 times the leveraged performance of Senator.

315.   HSBC Bank USA funded this exposure by charging Wailea Partners and Wailea Offshore Fund a financing fee of LIBOR plus 110 basis points.

316.   Upon information and belief, HSBC Bank USA made redemptions from and received transfers from Senator at a time when it knew or deliberately avoided knowing of Madoff's fraud.

### F.   The Leveraged Note Programs

317.   By 2006, a number of different financial institutions' leveraged investment vehicles had emerged that, like the GSFP Structured Products, increased investments in the BLMIS IA Business.

318.   The leveraged note purchasers received multiples of the returns of an underlying fund, without actually owning the asset. These notes created an additional access point through

which investors could gain exposure to feeder funds invested with BLMIS that they otherwise could not invest in due to capacity limitations or minimum investment requirements.

319. The HSBC Defendants and Management Defendants benefited from leveraged note programs that were linked to the performance of the HSBC-Related Feeder Funds. As investments in the HSBC-Related Feeder Funds increased, through investment in the leveraged note programs, the fees the HSBC Defendants and Management Defendants received also increased.

### G. The STAIRS Note Programs

320. The HSBC Defendants also sought to create leveraged products through which individual high-net worth investors could invest in hedge funds, including gaining exposure to certain feeder funds that invested with BLMIS. Under these leveraged products, which HSBC Bank USA called "leveraged hedge fund basket-linked STAIRS Notes" (the "STAIRS Notes"), individual investors would receive multiples of the returns generated by a basket of hedge funds selected by HSBC Bank USA. The STAIRS Notes products would have provided yet another avenue by which investors could access BLMIS and by which Madoff could tap into a new source of funds.

321. For example, as of January 9, 2007, HSBC Bank USA was attempting to create a seven-year STAIRS Notes program, with a notional exposure of $40 million to a reference portfolio comprising two hedge funds, Permal FX Financial and Futures and Broad Market, a feeder fund that was wholly invested in BLMIS. An investor participating in this STAIRS Note program would have received returns of up to three times that of the referenced fund, less the fees collected by HSBC Bank USA.

322. The HSBC Defendants also would have benefited from the STAIRS Note programs. For example, in connection with the program described above, HSBC Bank USA would

have received net revenues of at least $588,492 in fees during each of the seven years of the STAIRS Note program.

### H.      The Defendants Enabled Madoff to Act as His Own Custodian

323.    The HSBC Custodian Defendants entered into custodian agreements with the HSBC-Related Feeder Funds (and with a number of other fund families that directed property belonging to BLMIS customers to Madoff such as the Kingate funds, Defender, and Landmark). The following chart depicts these relationships:



324.    In connection with these agreements, the HSBC Custodian Defendants committed to undertaking significant responsibilities, including maintaining segregated accounts; overseeing the administration of the payment and redemption of funds; and otherwise transferring, exchanging, or delivering securities as directed by the feeder funds invested with BLMIS.

325.    The HSBC Custodian Defendants did not discharge these responsibilities. Instead, they delegated these responsibilities to Madoff either informally or by entering into formal sub-

custody agreements with BLMIS. Even after delegating these duties, the HSBC Custodian Defendants continued to collect fees and, in total, collected millions in fees for these services.

326.    The HSBC Custodian Defendants' delegation of their duties as custodian of the HSBC-Related Feeder Funds meant that there was no independent oversight over BLMIS's activities, which was critical to sustaining the Ponzi scheme. Obviously, BLMIS did not perform the duties HSBC delegated, and the HSBC Custodian Defendants did not even pretend to supervise BLMIS to ensure that BLMIS performed these duties,although, as the custodians of the HSBC-Related Feeder Funds, they were obligated to do so. The HSBC Custodian Defendants never even questioned why BLMIS was willing to perform these duties without compensation, and did not question the fact that BLMIS insisted on keeping custody of the assets.

327.    The HSBC Custodian Defendants also failed to notify investors that they had delegated their custodial duties to BLMIS. Instead, they continued to allow investors to believe that HSBC was acting as custodian. Although the HSBC Custodian Defendants had relinquished their custodial duties, the "HSBC" name continued to be emblazoned upon the HSBC-Related Feeder Funds' documents and gave the appearance that the HSBC Custodian Defendants approved of the manner in which BLMIS segregated and monitored its customers' investments.

328.    At least two of the funds for which the HSBC Defendants acted as custodians— Herald (Lux) and Thema International—were governed by UCITS. This means that the funds were created under the Undertakings for Collective Investments in Transferable Securities, a set of directives and laws issued by the European Union. UCITS funds are also governed by the relevant national law.

329.    Herald (Lux) was incorporated in Luxembourg as a UCITS compliant *Société d'Investissement À Capital Variable* ("SICAV") fund, and thus was open to investments from the

public at large, rather than being limited to investments from sophisticated investors. Thema International was authorized in 2006 by the Irish Financial Regulator to operate as a UCITS compliant fund in Ireland.

330.    HSSL acted as the custodian of Herald (Lux), and HITSI acted as custodian to Thema International.

331.    UCITS regulations require custodians of fund assets to ensure that the sale, issue, repurchase, and cancellation of securities are carried out in accordance with the law and with the company's articles of incorporation. UCITS regulations also prohibit companies from acting as both investment adviser and custodian, and UCITS regulations require custodians of fund assets to act solely in the interest of the fund's investors.

332.    HSSL failed to carry out its duties in compliance with UCITS regulations. HSSL and HITSI did not ensure that BLMIS's investment activities were carried out in accordance with the law. HSSL and HITSI violated UCITS regulations when they entered into sub-custody agreements with BLMIS, the entity that acted as an investment adviser to Herald (Lux) and Thema International. HSSL and HITSI also failed to act solely in the interest of the funds' investors. Indeed, despite being confronted with all of the badges of BLMIS's fraud, the HSBC Custodian Defendants yielded to BLMIS, surrendering billions of dollars to its custody and enabling Madoff's scheme to continue and expand.

**I.    HSBC As Administrator of the HSBC-Related Feeder Funds**

333.    The HSBC Administrator Defendants served as administrators, registrars, and service agents pursuant to agreements with the HSBC-Related Feeder Funds. The following chart depicts the relationships between the HSBC Administrator Defendants and the HSBC-Related Feeder Funds:



334.    The HSBC Administrator Defendants were responsible for the day-to-day administration of the funds, which entailed, among other things, issuing and redeeming fund shares, and maintaining the books and records of those funds.

335.    The HSBC Administrator Defendants failed to discharge their responsibility of valuing over-the-counter options contracts. To value over-the-counter options contracts, the HSBC Administrator Defendants needed to obtain at least weekly quotations from options trading counterparties, which was never done. Because Madoff would not reveal the identities of purported counterparties, even if the HSBC Administrator Defendants had attempted to verify the value, volume, or existence of any over-the-counter transactions purportedly made by BLMIS, they would not have been able to do so. The HSBC Administrator Defendants' failure to identify the counterparties, despite the obligation to do so, enabled the continuation of the Ponzi scheme.

J.     **HSBC Marketed Madoff to its Private Banking Clients**

336.    On top of the fact that HSBC served as administrators and custodians to the HSBC-Related Feeder Funds, HSBC Private Bank marketed Madoff feeder funds to their clients. Even though HSBC issued overwhelmingly negative due diligence reports noting the many red flags associated with BLMIS, HSBC Private Bank still persuaded wealthy clients to invest in BLMIS. These efforts provided additional assets that perpetuated and worsened the Ponzi scheme.

337.    Upon information and belief, HSBC Private Bank's high net-worth clients had relationships of trust and confidence with HSBC Private Bank. These clients trusted HSBC Private Bank and relied on HSBC's reputation when deciding among investment strategies. Upon information and belief, but for the recommendations of HSBC Private Bank, these individuals would not have invested with BLMIS.

338.    Upon information and belief, HSBC Private Bank began marketing Sentry to its high net-worth clients as early as 1999. This occurred even though HSBC Private Bank failed to conduct any meaningful due diligence on Sentry, and the fund was not a part of the HSBC Private Bank platform. Upon information and belief, HSBC violated internal policies by marketing and recommending a fund not on its official platform. On at least nine separate occasions between 2001 and 2009, HSBC Bank USA conducted due diligence on Sentry for the purpose of including the fund on its official platform.

339.    In July 2001, the HSBC Private Bank due diligence team met with Fairfield Greenwich ("Fairfield") officers. At this meeting, Stephen Kinne, a high-ranking member of HSBC Bank USA's due diligence team, inquired about the many obvious red flags, including Madoff's choice to forego lucrative fees, the identities of the counterparties to Madoff's over-the-counter options transactions, and the percentage of securities that Madoff held at the Depositary

Trust Corporation. Upon information and belief, none of the Fairfield representatives provided adequate responses to HSBC Bank USA's questions.

340.    On August 7, 2001, HSBC Bank USA issued a due diligence report on Sentry ("2001 Report"). The 2001 Report stated that the due diligence team had been unable to meet with Madoff and that, therefore, the team formed its "opinions" solely on the basis of meetings with Fairfield representatives and a MAR/Hedge article on Madoff. The 2001 Report noted that, without meeting Madoff, there was no way for HSBC to assess Madoff's trading system, risk controls, or compliance procedures. As a result, HSBC Bank USA stated that it was "very difficult" to understand how Madoff was able to make money in such a consistent fashion. The 2001 Report also noted multiple red flags associated with Madoff, including his taking custody of securities and refusal to accept fees at the fund level.

341.    In January of 2003, HSBC Bank USA issued another due diligence report on Sentry, which noted many of the same concerns addressed in the 2001 Report. According to Research Committee Minutes, David Mullane, a member of the due diligence team, warned, "I would not invest in [Sentry] nor would I want investors to invest."

342.    Also in 2003, HSBC Bank USA issued a due diligence report for Ascot Fund, another feeder fund that invested with BLMIS. The report noted similarities between the investment strategies employed by Ascot Fund and Sentry. HSBC Bank USA gave Ascot Fund a 1 rating, the worst possible score.

343.    In 2004, HSBC Bank USA issued yet another report regarding Sentry. In addition to noting the previously-mentioned red flags, HSBC Bank USA noted the concern that Madoff's track record was "[t]oo good to be true."

344. HSBC Bank USA's comprehensive knowledge of these many red flags did not prevent HSBC Private Bank from simultaneously encouraging high-net worth investors to invest in feeder funds that invested with BLMIS. In 2004, an HSBC Private Bank adviser in Geneva represented to at least one investor that Kingate Global was part of HSBC's diversified funds and that HSBC was, itself, invested in Kingate Global. Two years later, HSBC Private Bank forwarded marketing materials to the same investor recommending Kingate Global and Sentry for investment. In 2008, when the investor inquired further about Kingate Global, HSBC Private Bank informed the investor that HSBC had completely divested from Kingate due to "problems" with the fund.

345. In November of 2004, HSBC Private Bank in Geneva recommended Kingate Global to another investor, touting its 10% to 12% returns. HSBC Private Bank informed the investor that HSBC had sent its own inspectors to confirm that those funds were operating properly, and that they tracked the performance of all hedge funds its clients were invested in, including Kingate.

346. HSBC Private Bank informed another investor in 2004 that HSBC Private Bank did not sell every available fund, but only those that passed HSBC Private Bank's due diligence requirements. At each meeting, the HSBC Private Bank adviser confirmed that HSBC performed due diligence on all recommended funds. Upon information and belief, these recommendations led these investors to invest in Kingate Global and Sentry.

347. In early 2005, based on the recommendations of an HSBC Private Bank adviser in Zurich, one investor placed $300,000 in Sentry. At the time, HSBC Private Bank did not inform the investor of its significant concerns regarding Sentry, any other feeder funds invested with BLMIS, or BLMIS's IA Business. In 2007 the investor was finally informed by his adviser to "get out" because HSBC had conceded that it did not understand the investment strategy.

348.     HSBC Private Bank in New York recommended Sentry to another investor in 2005, assuring him that HSBC was in contact with the fund, was confident in the fund, and was performing due diligence. In September 2005, HSBC provided an "Investment View and Proposal" listing Sentry as one of the proposed funds. HSBC Private Bank never warned the investor about its concerns regarding Sentry, other feeder fund that invested with BLMIS, or BLMIS. After Madoff's arrest, however, the same HSBC Private Bank adviser stated that he, in fact, disliked Sentry.

## IX.   INITIAL AND SUBSEQUENT TRANSFERS TO DEFENDANTS PROVIDED SUBSTANTIAL ASSISTANCE TO THE PERPETUATION OF THE FRAUD

### A.     Initial Transfers From BLMIS to Initial Transferees

349.     Hermes, Lagoon, Lagoon Trust, Thema International, Thema Fund, Thema Wise, and Alpha Prime are collectively the "Initial Transferees."

350.     From the opening of the Initial Transferees' accounts with BLMIS to the commencement of the Madoff bankruptcy proceeding, BLMIS made transfers to, or for the benefit of, Hermes, Lagoon, and/or Lagoon Trust of approximately $297,354,246 (the "Lagoon Transfers"), Thema International of approximately $735,536,907 (the "Thema Transfers"), Thema Fund/Thema Wise of approximately $130,135,000 (the "Thema Wise Transfers"), and Alpha Prime of approximately $83,170,000 (the "Alpha Prime Transfers") (collectively the "Transfers"). In late 2004, HSBC Bank plc began acting as the bank receiving redemptions and sending subscriptions for the HSBC-Related Feeder Funds' BLMIS accounts through HSBC Bank plc's account in New York.

### B.     Subsequent Transfers from Initial Transferees

351.     Hermes Management, Alpha Asset Managment, Thema Management Bermuda, Equus, Thema Management BVI, Bank Medici, BA Worldwide, HSBC Bank plc, HSBC Bank

Bermuda, HSSB, HITSB, HSSL, HSBC Fund Services, Thema Fund, Hermes, and/or Lagoon Trust are collectively referred to as the "Defendant Subsequent Transferees."

352.    Upon information and belief, the Initial Transferees transferred approximately $260,267,183 to the Defendant Subsequent Transferees prior to the commencement of the Madoff bankruptcy proceeding (the "Defendant Subsequent Transfers") as follows:

1.    **Hermes, Lagoon, and/or Lagoon Trust transferred to:**

- Hermes Management approximately $79,334,375 in monthly fees for serving as Hermes's investment manager from 1996 to December 2008;

- HSBC Bank Bermuda, HITSB, and/or HSSL, in the aggregate, approximately $4,154,514 in monthly fees for serving as Hermes's custodian and/or sub-custodian from 1996 to 2008 and $117,802 in monthly fees for serving as Lagoon Investment Trust's sub-administrator and sub-custodian from 2006 to 2008; and

- HSBC Bank Bermuda, HSSB, HSBC Fund Services, and/or HSSL, in the aggregate, approximately $1,148,549 in monthly fees for serving as Hermes's administrator and/or sub-administrator from 1996 to 2008.

2.    **Alpha Prime transferred to:**

- HSBC Bank Bermuda, HSSB, HITSB, and/or HSSL, in the aggregate, approximately $1,090,669 in monthly fees for the services they rendered as Alpha Prime's custodian, administrator, registrar, sub-custodian, sub- administrator, sub-registrar, and payment bank from March 2003 to December 2008;

- Alpha Asset Management approximately $16,767,897 in monthly management fees and annual performance fees for serving as Alpha Prime's investment manager from June 1, 2003 to December 2008; and

- BA Worldwide approximately $975,816 in monthly fees for serving as Alpha Prime's investment adviser from February 24, 2003 through July 2007.

3. **Thema Wise/Thema Fund transferred to:**

- HSBC Bank Bermuda, HITSB, and/or HSSL, in the aggregate, approximately $535,922 in monthly fees for serving as Thema Wise/Thema Fund's custodian and/or sub-custodian;

- HSBC Bank Bermuda, HSSB, and/or HSSL, in the aggregate, approximately $754,445 in monthly fees for serving as Thema Wise/Thema Fund's administrator and/or sub-administrator;

- Thema Management Bermuda approximately $10,558,411 in monthly fees for serving as Thema Fund's investment manager from 2003 to December 2008; and

- Equus approximately $1,761,740 in monthly fees for providing Thema Wise administrative support from 2003 to 2008.

4. **Thema International transferred to:**

- HSSI approximately $5,344,343 in monthly fees for serving as Thema International's administrator from May 1996 to December 2006;

- HITSI and/or HSBC Bank Bermuda approximately $4,830,499 in monthly fees for serving as Thema International's custodian and/or sub-custodian from May 1996 to December 2006;

- HSSI, HITSI, and/or HSBC Bank Bermuda approximately $3,232,218 in monthly fees for serving as Thema International's custodian and/or administrator from January 2007 to December 2008;

- Thema Management BVI approximately $105,437,711 in monthly fees for serving as Thema International's investment manager and distributor from 1996 to 2008;

- Bank Medici approximately $12,905,415 in monthly fees for serving as Thema International's investment manager from 2007 to 2008;

- BA Worldwide approximately $11,316,791 in monthly fees for serving as Thema International investment adviser from 2000 to 2006; and

- Equus fees for providing Thema International administrative support.

C. **Additional Transfers from HSBC**

353. Other feeder funds made transfers to HSBC Bank plc, HSBC Bank USA, HSBC USA Inc., and HSBC Suisse (together with the Defendant Subsequent Transfers, the "Subsequent Transfers").

354. Rye Broad Market, Rye Portfolio, Rye Select Broad Market Prime Fund L.P. ("Rye Prime Fund"), Rye Select Broad Market Insurance Portfolio LDC ("Rye Insurance"), Greenwich Sentry, Harley, Fairfield Sentry (collectively, the "Private Bank/GSFP Initial Transferees"), and Thema International received transfers directly from BLMIS. Those transfers were then subsequently transferred either directly or indirectly to HSBC Bank plc, HSBC Bank USA, HSBC USA Inc., and HSBC Suisse in connection with HSBC's Private Bank and GSFP businesses. Upon information and belief, HSBC Bank USA, HSBC USA Inc., HSBC Bank plc, and HSBC Suisse received approximately $529,498,361 prior to the commencement of the Madoff bankruptcy.

355. BLMIS acted as the Private Bank/GSFP Initial Transferees' and Thema International's investment adviser and purported to invest the funds' assets according to the SSC strategy that involved the purchase and sale of U.S. securities and U.S. Treasury bills over U.S. exchanges. BLMIS also acted as the executing broker for the transactions and as custodian for the securities purportedly held on the BLMIS feeder funds' behalf.

1. **The Rye Funds**

a. **Background**

356. TGH, a Delaware corporation, and Tremont Partners, a Connecticut corporation registered under the Investment Advisers Act of 1940, operating from Rye, New York, managed six BLMIS feeder funds. Rye Broad Market, Rye Select Broad Market XL Fund L.P. ("Rye XL"), and Rye Prime Fund—were registered in Delaware (collectively, the "Delaware Registered Funds"). Rye Portfolio, Rye XL Portfolio, and Rye Insurance (collectively, the "Cayman

Registered Funds") were registered in the Cayman Islands (together with the Delaware Registered Funds, the "Rye Funds").

357.   Except for Rye XL and Rye XL Portfolio, all of the Rye Funds had direct accounts with BLMIS,.

358.   Rye XL and Rye XL Portfolio received transfers as set forth in the following chart.



359.   Rye XL and Rye XL Portfolio were levered funds whose returns were based on Rye Broad Market's and Rye Portfolio's performance respectively. Generally, investments in Rye XL and Rye Portfolio were affected through swap transactions, for example a swap involving Rye XL and HSBC Bank USA (later novated to HSBC Bank plc) (the "Rye XL Swap"), and a swap involving Rye XL Portfolio and HSBC Bank plc (the "Rye XL Portfolio Swap")—Rye XL's returns were based on Rye Broad Market's performance and Rye XL Portfolio's returns were based on Rye Portfolio's performance.

360.   Although Tremont and the Rye Funds had nominal presence in the Cayman Islands, none had offices or operations there. TGH, Tremont Partners, and the Rye Funds all had their principal place of business in New York and, while they had registered offices in the Cayman

Islands, they were managed from their Rye, New York headquarters. Rye XL Portfolio similarly had its registered address at a law firm in the Cayman Islands.

361.    At the time of the Rye Funds' transfers to the HSBC entities, their marketing, operations, diligence, and their communications with BLMIS, investors, and potential investors were conducted by Tremont's employees in New York.

362.    The transfers from Rye Broad Market, Rye Portfolio and Rye XL Portfolio to the GSFP Entities, as well as all redemptions and subscriptions for the Rye Funds to/from BLMIS, went through New York bank accounts at the Bank of New York.

363.    The Customer Agreements between BLMIS and the Rye Funds with BLMIS accounts gave BLMIS full discretion over the assets under management. Pursuant to the Trading Authorizations, Madoff was authorized to be the Rye Funds' "agent and attorney in fact" to buy, sell and trade in securities. The Customer Agreements are governed by New York law and the transactions under the Customer Agreements are subject to the provisions of the Securities Exchange Act of 1934 and the rules and regulations of the SEC and the Board of Governors of the Federal Reserve System.

364.    Disputes under the Rye Funds' Customer Agreements would be resolved under New York law by the American Arbitration Association, or "an arbitration facility provided by any exchange of which the broker is a member, or the National Association of Securities Dealers Inc., and in accordance with the rules pertaining to the selected organization."

365.    In other BLMIS-related lawsuits in which they have been named defendants, each of the Rye Funds has invoked New York General Business Law article 23-A, §§ 352–353 to assert that their BLMIS-related activities were directed to promoting or inducing the sale of securities within or from New York.

### b.      Initial Transfers to the Rye Funds

366.    BLMIS made transfers to: (1) Rye Broad Market in the approximate amount of $384,140,000 (the "Rye Broad Market Initial Transfers"); (2) Rye Portfolio in the approximate amount of $619,287,477 (the "Rye Portfolio Initial Transfers"); (3) Rye Prime Fund in the approximate amount of $1,010,000,000 (the "Rye Prime Fund Initial Transfers"); and (4) Rye Insurance in the approximate amount of $126,869,887 (the "Rye Insurance Initial Transfers", and collectively, the "Rye Initial Transfers").

### c.      Subsequent Transfers from the Rye Funds

367.    Before investing with the Rye Funds, GSFP visited Tremont's Rye, New York office, including on March 29, 2007, before HSBC Bank plc entered the Rye XL portfolio swap, purchased Rye Portfolio shares, and substituted for HSBC Bank USA as the counterparty in the Rye XL Swap on or about August 31, 2005. Thereafter, an HSBC employee in New York entered a subscription agreement on behalf of HSBC Bank plc agreeing to send U.S. dollars to an account for Rye Portfolio at the Bank of New York in New York.

368.    On December 1, 2008, a GSFP employee in New York submitted a redemption request for HSBC Bank plc to make a partial redemption of $15.9 million from Rye Portfolio. The funds were wired to the HSBC Bank plc account at HSBC Bank USA on or about that same date.

369.    Rye XL Portfolio received transfers of at least $74,298,573 from Rye Portfolio, at least $318,000 from Rye Insurance, and at least $4,726,202 from Rye XL.

370.    Rye XL received at least $48 million from Rye Broad Market and at least $292,472,765 from Rye Prime Fund.

371.    HSBC Bank plc received at least $53,000,000 from Rye XL Portfolio to HSBC Bank plc's account at HSBC Bank USA. HSBC Bank plc received at least $15.9 million of the Rye Portfolio Initial Transfers in transfers from Rye Portfolio.

372. HSBC Bank USA received at least $50,000,000 of the Rye Broad Market Initial Transfers in transfers from Rye Broad Market.

373. HSBC USA Inc. received at least $13,500,000 of the Rye Broad Market Initial Transfers in transfers from Rye Broad Market Fund.

### 2. Greenwich Sentry and Fairfield Sentry

#### a. Background and Initial Transfers

374. BLMIS made transfers to Greenwich Sentry in the approximate amount of $206,038,654 (the "Greenwich Sentry Initial Transfers").

375. BLMIS made transfers to Fairfield Sentry in the approximate amount of $3 billion (the "Fairfield Sentry Initial Transfers" and collectively with Greenwich Sentry Initial Transfers, "Fairfield Initial Transfers").

#### b. Subsequent Transfers from Fairfield Sentry, Fairfield Sigma, and Greenwich Sentry

376. HSBC Private Bank invested in Fairfield Sentry and/or Fairfield Sigma by executing subscription agreements. Beginning in at least January 1, 2003, those agreements were governed by New York law and require that disputes be resolved only in New York. By executing these agreements, HSBC Private Bank represented it read and understood the Private Placement Memoranda for Fairfield Sentry and/or Fairfield Sigma ("Fairfield PPMs"). The Fairfield PPMs describe BLMIS as an SEC-registered New York broker-dealer, which custodied most, if not all, of Fairfield Sentry's and Fairfield Sigma's assets. BLMIS also was identified as executing the SSC strategy through the purchase of U.S. securities and U.S. Treasury bills on Fairfield Sentry's and Fairfield Sigma's behalf. The Fairfield PPMs state that BLMIS's services are "essential to the continued operation of the Fund."

377. Since at least 2000, all subscriptions and redemptions sent to and received by Fairfield Sentry passed through an account at HSBC Bank USA in New York. For example, Banque Lombard Odier & Cie S.A. ("Lombard"), acting pursuant to its subscription agreement with Fairfield Sentry, directed funds to a New York correspondent bank account at HSBC Bank USA at least 37 times from 1996 to 2008, such funds for ultimate deposit in BLMIS's account at JPMorgan Chase Bank N.A. in New York. Lombard was likewise directed to send subscription money to HSBC Bank USA for ultimate deposit in Kingate Global's bank account on at least 28 occasions from 1998 to 2006, which were also directed to BLMIS's account at JPMorgan Chase Bank N.A. in New York. In all, Lombard received over $179 million in transfers of funds from BLMIS via the HSBC account and other accounts located in New York.

378. HSBC Bank USA and HSBC Suisse understood FGG was a New York-based group that operated Fairfield Sentry from its primary offices in New York.

379. HSBC Suisse redeemed monies from Fairfield Sentry and requested that redemptions be sent in U.S. dollars to HSBC Suisse's account at HSBC Bank USA in New York.

380. Fairfield Sigma was invested entirely in Fairfield Sentry. FGG personnel made all operational decisions regarding Fairfield Sentry, Fairfield Sigma, and Fairfield Greenwich.

381. HSBC Private Bank regularly sent its New York employees to FGG's office in New York to review Fairfield Sentry. Internal HSBC reports from these reviews showed that HSBC knew BLMIS was behind Fairfield Sentry's investment and that the only way to adequately review Fairfield Sentry was to review BLMIS's operations. HSBC questioned FGG and sought to understand BLMIS by "see[ing] the desks where the SSC strategy is executed" and "meet[ing] with a [sic] operations person at BLM[IS] to understand how the custody of assets takes place."

382.     Fairfield Sentry subsequently transferred at least $783,320,553 of the Fairfield Initial Transfers to Fairfield Sigma ("Fairfield Sigma Subsequent Transfers").

383.     Fairfield Sigma subsequently transferred approximately $9,195,298 of the Fairfield Sigma Subsequent Transfers to HSBC Suisse.

384.     HSBC Suisse received approximately $363,383,585 in transfers from Fairfield Sentry.

385.     HSBC Bank USA received, upon information and belief, approximately $31,775,129 in transfers from Fairfield Sentry.

386.     HSBC USA Inc., as part of GSFP, received at least $13,000,000 of the Greenwich Sentry Initial Transfers in transfers from Greenwich Sentry, a limited partnership formed under the laws of the State of Delaware and a direct investor in BLMIS.

### 3.     Harley

387.     Harley invested nearly 100% of its assets with BLMIS in New York and received approximately $1 billion in transfers of customer property from BLMIS within two years of the commencement of the Madoff bankruptcy proceeding. Of this amount, HSBC Bank plc received approximately $15,599,960 in transfers from Harley.

#### a.     Initial Transfers to Harley

388.     BLMIS made transfers to Harley in excess of $1 billion (the "Harley Initial Transfers").

#### b.     GSFP's Subsequent Transfers From Harley

389.     HSBC Bank plc invested directly in Harley by executing subscription agreements, at least one of which was signed by a New York-based HSBC employee. Pursuant to these

subscription agreements, HSBC Bank plc agreed to send subscriptions to The Northern Trust Banking Corporation in New York.

390.   HSBC Bank USA in New York also facilitated the structured product relating to GFSP's investment in Harley, which was to be booked with HSBC Bank plc.

391.   Prior to finalizing this transaction, on May 16, 2007, members of GSFP went to the New York offices of Fixed Asset Management Ltd. ("FAM"), who provided marketing and administrative services for Harley, to perform a due diligence review of Harley and FAM. That review was summarized in a written report (the "FAM Due Diligence Report").

392.    The FAM Due Diligence Report noted that Harley's risk management was weaker than that employed by other BLMIS feeder funds, but that HSBC would be provided with "full position transparency . . . ."

393.   On or about November 25, 2008, an HSBC Bank USA employee requested from Harley a redemption of $3,599,960 for HSBC Bank plc. The redemption was sent to HSBC Bank plc's account at HSBC Bank USA in New York.

394.   Upon information and belief, sometime in early December 2008, HSBC Bank plc redeemed an additional $12 million from Harley.

395.   HSBC Bank plc received, upon information and belief, approximately $15,599,960 of the Harley Initial Transfers from Harley.

#### 4.    Thema International

396.   In 2007, HSBC Bank plc entered into a swap transaction with Gaspee Offshore Fund Ltd. ("Gaspee") (the "Gaspee Offshore Swap").

397.   To hedge its commitment in the Gaspee Offshore Swap, HSBC Bank plc invested in Thema International's U.S. dollar class, and agreed to send subscriptions to HSBC Bank USA's account in New York for the benefit of Thema International's administrator, HSSI.

398.     GFSP's team in New York created, approved, and monitored the Gaspee Offshore Swap and knew that the underlying investment was in BLMIS. HSBC's Market Risk department in New York approved the underlying trading strategy and was very comfortable with the Gaspee Offshore Swap. GSFP in New York also performed the due diligence on Prospect Capital, the investment manager for Gaspee. GSFP worked with HSBC's Alternative Fund Services in its review of Genevalor in relation to Thema International.

399.     HSBC's Product Control group in New York handled the monitoring of the Thema International's related compliance and guidelines.

### 5.     Subsequent Transfers from Thema International

400.     On April 10, 2008, GSFP employees in New York through a GSFP New York employee, requested a full redemption from Thema International directing that the money be sent to HSBC Bank USA in New York for the benefit of HSBC Bank plc.

401.     On May 22, 2008, $14,094,388.97 was transferred out of Thema International's custodial account, for, upon information and belief, HSBC Bank plc.

402.     Upon information and belief, Thema International subsequently transferred prior to the Filing Date at least $14,094,388.97 of the initial transfers it received from BLMIS directly to HSBC Bank plc ("Thema Subsequent Transfers").

403.     HSBC Bank plc received $14,094,388.97 in transfers from Thema International directing that the money be sent to HSBC Bank USA in New York for the benefit of HSBC Bank plc.

404.     SPV's allegations herein  the Initial Transfers and the Subsequent Transfers are made upon information and belief. SPV reserves the right to supplement information on the Initial Transfers, the Subsequent Transfers, any additional transfers, based on further investigation and case discovery.

### D. Kingate Funds' Accounts in Custody of HSBC Bank Bermuda Limited

405.    Kingate Global and Kingate Euro (the "Kingate Funds") maintained at least four accounts at HSBC Bank Bermuda, including Account # XXX-XXXXXX-511, Account # XXX-XXXXXX-512, Account # XXX-XXXXXX-561, and Account #XXXX353 ("HSBC Bank Bermuda Accounts").

406.    HSBC Bank Bermuda served as the custodian for the Kingate Funds from 1994 through 2008. During that time, BLMIS fraudulently transferred at least $916 million into the HSBC Bank Bermuda Accounts.

407.    As of December 2008, the HSBC Bank Bermuda Accounts held on behalf of the Kingate Funds approximately $133 million, of which approximately $108 million originated from BLMIS.

408.    HSBC Bank Bermuda received at least $328,798 in fees from the Kingate Funds during the years 1997-2007, as follows: paid by Kingate Global, $273,735; and paid by Kingate Euro, $55,063. Upon information and belief, HSBC Bank Bermuda received an additional $137,566 in fees from the Kingate Funds, as follows: paid by Kingate Global, $25,000; and paid by Kingate Euro, $112,566.

## X.    The Aftermath: The Defendants Understated Their Failure To Perform Due Diligence

409.    After Madoff's arrest on December 11, 2008, in a desperate attempt to preserve their public image with investors, the Defendants quickly attempted to hide their failure to investigate the obvious signs of fraud at BLMIS.

410.    Four days later, HSBC Holdings issued a press release attempting to play down the involvement and economic exposure of the HSBC Defendants, commenting:

> In the interests of clarity, HSBC confirms that it has provided
> financing to a small number of institutional clients who invested in

funds with Madoff. On the basis of information presently available, HSBC is of the view that the potential exposure under these financing transactions is in the region of US$1 billion. Also, in the context of its normal global custody business, HSBC has custody clients who have invested with Madoff. HSBC does not believe that these custodial arrangements should be a source of exposure to the Group.

## XI.    CAUSES OF ACTION

### COUNT ONE:
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

#### Against All Defendants

411.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein. This count is asserted against all Defendants for actions which aided and abetted the breach of BLMIS's fiduciary duty pursuant to New York law.

412.    BLMIS owed a fiduciary duty to act in the best interests of investors and funds, including Plaintiff's assignor OSUS, and to perform its services with the degree of care, caution, and prudence expected in the financial services industry. BLMIS failed to fulfill its fiduciary duties by misappropriating and diverting customer funds, including those of OSUS.

413.    All of the Defendants, as described above, had actual knowledge of the breaches of fiduciary duty committed by BLMIS, were aware of numerous red flags strongly suggesting that BLMIS was misappropriating and diverting customer funds, and/or consciously avoided confirming the existence of BLMIS's breach of fiduciary duty. By virtue of their long-standing relationships with BLMIS, their multiple investigations into BLMIS, and their roles as managers, advisers, administrators and custodians of the HSBC-Related Feeder Funds, the Defendants knew that BLMIS was engaged in breaching its fiduciary duties.

414.    The Defendants were confronted with myriad red flags and indicia of fraud on the part of BLMIS, and thus had actual knowledge that BLMIS was breaching its fiduciary duties or, at a minimum, failed to investigate further, thus consciously avoiding confirming what they knew in light of the clear deficiencies and evident falsities associated with BLMIS. To the extent that the Defendants consciously avoided facts that, if confirmed, would have laid bare the fraudulent nature of the Ponzi scheme, the Defendants had actual knowledge of BLMIS's breach.

415.    HSBC Private Bank (Suisse), HSBC Bank USA, HSBC USA Inc., and HSBC Bank plc substantially assisted BLMIS in its breach of fiduciary duty by marketing funds invested in BLMIS, encouraging clients to invest in BLMIS on the basis of purported due diligence, and funneling significant assets into BLMIS. HSBC Bank USA and/or HSBC Bank USA also substantially assisted BLMIS in its breach of fiduciary duty by leveraging feeder fund investments in BLMIS through swap agreements, thereby enabling BLMIS to attract more investor principal. The HSBC Custodian Defendants substantially assisted BLMIS in its breach of fiduciary duty by providing custody services to the funds invested in BLMIS and delegating their control of assets to BLMIS, which eliminated independent oversight of fund assets. The HSBC Administrator Defendants substantially assisted BLMIS in its breach of fiduciary duty by calculating the HSBC-Related Feeder Funds' net asset value and disseminating the net asset value to customers. The actions of the HSBC Defendants, which were motivated by the opportunity to obtain massive fees and other forms of profit, furthered the Ponzi scheme.  The conduct of those Defendants was a proximate cause of the injuries to Plaintiff's assignor OSUS, which, during the time period those Defendants were providing substantial assistance to the BLMIS operation, was induced to make net cash deposits into BLMIS totaling nearly $1.6 billion and to maintain its investment in BLMIS

in the form of its account with a represented net value (including fictitious gains and equities) of, as of November 30, 2008, over $2.9 billion.

416.    The Management and Beneficial Owner Defendants substantially assisted BLMIS in its breach of fiduciary duty by funneling billions of dollars into BLMIS and allowing BLMIS to continue its Ponzi scheme.  Those Defendants were motivated to substantially assist the BLMIS Ponzi scheme by the opportunity to obtain massive fees and other forms of profit.  The conduct of those Defendants was a proximate cause of the injuries to Plaintiff's assignor OSUS, which, during the time period those Defendants were providing substantial assistance to the BLMIS operation, was induced to make net cash deposits into BLMIS totaling nearly $1.6 billion and to maintain its investment in BLMIS in the form of its account with a represented net value (including fictitious gains and equities) of, as of November 30, 2008, over $2.9 billion.

417.    As a direct and reasonably foreseeable result of (a) BLMIS's breach of fiduciary duty and (b) Defendants aiding and abetting in that breach, Plaintiff has suffered substantial injury.

418.    The injury to Plaintiff occurred on or after December 11, 2008, when BLMIS collapsed and it became impossible for OSUS to withdraw funds from its $2.9 billion dollar account.

## COUNT TWO:
## AIDING AND ABETTING FRAUD

### Against All Defendants

419.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein. This count is asserted against all Defendants for actions which aided and abetted BLMIS's fraud pursuant to New York law.

420.    As set forth above, BLMIS was engaged in a complex and longstanding plan to enrich itself at the expense of investors. As part of this plan, BLMIS repeatedly made false

statements regarding the sale and repurchase of securities and other financial instruments, the value of investor accounts, and the total value of assets under management.

421.    All of the Defendants, as set forth above, had actual knowledge of the fraud committed by BLMIS, were aware of numerous red flags strongly suggesting that BLMIS was engaged in fraudulent activity, and/or consciously avoided BLMIS's fraud. By virtue of their longstanding relationships with BLMIS, their multiple investigations into BLMIS, and their roles as managers, advisers, administrators and custodians of the HSBC-Related Feeder Funds, the Defendants knew that BLMIS was engaged in fraudulent activity.

422.    The Defendants were confronted with myriad red flags and indicia of fraud on the part of BLMIS, and by failing to investigate further, consciously avoided the clear deficiencies and evident falsities associated with BLMIS. To the extent that the Defendants consciously avoided facts that, if confirmed, would have laid bare the fraudulent nature of the Ponzi scheme, the Defendants had actual knowledge of BLMIS's breach.

423.    HSBC Private Bank (Suisse), HSBC Bank USA, HSBC USA Inc., and HSBC Bank plc substantially assisted BLMIS in its fraud by marketing funds invested in BLMIS, encouraging clients to invest in BLMIS on the basis of purported due diligence, and funneling significant assets to BLMIS. HSBC Bank USA and/or HSBC USA Inc. substantially assisted BLMIS in its fraud by leveraging feeder fund investments in BLMIS through swap agreements, thereby enabling BLMIS to attract more investor principal. The HSBC Custodian Defendants substantially assisted BLMIS in its fraud by providing custody services to the funds invested in BLMIS and delegating their control of assets to BLMIS, which eliminated independent oversight of fund assets. The HSBC Administrator Defendants substantially assisted BLMIS in its fraud by calculating the HSBC-Related Feeder Funds' net asset value and disseminating the net asset value to customers. The

actions of the HSBC Defendants furthered the Ponzi scheme. Those Defendants were motivated to substantially assist the BLMIS Ponzi scheme by the opportunity to obtain massive fees and other forms of profit. The conduct of those Defendants was a proximate cause of the injuries to Plaintiff's assignor OSUS, which, during the time period those Defendants were providing substantial assistance to the BLMIS operation, was induced to make net cash deposits into BLMIS totaling nearly $1.6 billion and to maintain its investment in BLMIS in the form of its account with a represented net value (including fictitious gains and equities) of, as of November 30, 2008, over $2.9 billion.

424. The Management and Beneficial Owner Defendants substantially assisted BLMIS in its fraud by funneling billions of dollars into BLMIS and allowing BLMIS to continue its Ponzi scheme. Those Defendants were motivated to substantially assist the BLMIS Ponzi scheme by the opportunity to obtain massive fees and other forms of profit. The conduct of those Defendants was a proximate cause of the injuries to Plaintiff's assignor OSUS, which, during the time period those Defendants were providing substantial assistance to the BLMIS operation, was induced to make net cash deposits into BLMIS totaling nearly $1.6 billion and to maintain its investment in BLMIS in the form of its account with a represented net value (including fictitious gains and equities) of, as of November 30, 2008, over $2.9 billion.

425. As a direct and reasonably foreseeable result of (a) BLMIS's fraud and (b) Defendants aiding and abetting in that fraud, Plaintiff has suffered substantial injury.

426. The injury to Plaintiff occurred on or after December 11, 2008, when BLMIS collapsed and it became impossible for OSUS to withdraw funds from its $2.9 billion dollar account.

## COUNT THREE:
## KNOWING PARTICIPATION IN A BREACH OF TRUST

### Against All Defendants

427.    Plaintiff incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein. This count is asserted against all Defendants for the knowing participation in the breach of trust owed to Plaintiff by BLMIS pursuant to New York law.

428.    In purporting to act as investment adviser and otherwise, Madoff and/or BLMIS had fiduciary duties to BLMIS customers, including Plaintiff.  Madoff and/or BLMIS were in a position of superior knowledge and expertise to BLMIS customers, including Plaintiff, who relied on and reposed their trust and confidence in Madoff and/or BLMIS.  This created a relationship of high trust and confidence whereby Madoff and/or BLMIS were entrusted with the funds BLMIS customers, including Plaintiff, provided for investment.

429.    Defendants knew that Madoff and/or BLMIS were operating an investment advisory business or, at a minimum, were operating as broker-dealers with authority to manage discretionary accounts, and in that capacity were holding customer funds as fiduciaries.

430.    Defendants knew, among other things, that Madoff and/or BLMIS were registered investment advisers, as evidenced by public filings, and that Madoff and/or BLMIS were exercising discretion over their customer accounts. Moreover, Defendants knew that Madoff and/or BLMIS were implementing a discretionary strategy.

431.    Defendants further knew that, by virtue of their respective roles as custodian, administrator, investment manager, and/or investment advisor, each was a fiduciary in their own right and that each had delegated its fiduciary duties to Madoff.

432.    Madoff and/or BLMIS breached this trust by misappropriating and diverting the BLMIS customer funds, including Plaintiff's.

433.    Defendants knew that Madoff and/or BLMIS were breaching their fiduciary duties by misappropriating and diverting customer funds.  At a minimum, Defendants knew of suspicious conduct by and facts concerning Madoff and/or BLMIS that would have led a reasonably prudent person to suspect that Madoff and/or BLMIS were misappropriating and diverting the funds of BLMIS customers, including Plaintiff's, and Defendants failed to inquire whether Madoff and/or BLMIS were misappropriating and diverting those funds.  Reasonable inquiry would have revealed that the only plausible explanation for the suspicious conduct was that Madoff and/or BLMIS were misappropriating and diverting the customer funds in breach of their fiduciary duties.

434.    Defendants knew of the impossible volume of options and equities trading being reported by Madoff and/or BLMIS; Madoff's and/or BLMIS's improbable rates of return; the failure of Madoff and/or BLMIS to ever identify counterparties; the use of delayed, hard copy-only trade confirmations by Madoff and/or BLMIS; Madoff's and/or BLMIS's reporting of stock trades that were outside the range of prices for such stocks on the reported days; and Madoff's and/or BLMIS's use of a small, unknown auditing firm.

435.    Despite this knowledge, Defendants knowingly participated in Madoff's and/or BLMIS's fraud, served as the sponsor and outward custodian, manager, and administrator of the HSBC-Related Feeder Funds; provided the HSBC-Related Feeder Funds with an appearance of legitimacy, including the infrastructure for in investments into BLMIS; ignored the numerous red flags that they had access to and were required to review; and failed to report Madoff's fraudulent activities.  Defendants were motivated to substantially assist Madoff's and BLMIS's breach of trust by the opportunity to obtain massive fees and other forms of profit.  The conduct of

Defendants was a proximate cause of the injuries to Plaintiff's assignor OSUS, which, during the time period Defendants were providing that substantial assistance to the BLMIS operation, was induced to make net cash deposits into BLMIS totaling nearly $1.6 billion and to maintain its investment in BLMIS in the form of its account with a represented net value (including fictitious gains and equities) of, as of November 30, 2008, over $2.9 billion.

436.   Defendants are therefore liable for all funds Madoff and/or BLMIS misappropriated from investors after the point at which Defendants knew or through reasonable inquiry would have known that Madoff and/or BLMIS were misappropriating those funds.

437.    As a result of Defendants' knowing participation in this breach of trust, Plaintiff lost billions of dollars.

438.   The injury to Plaintiff occurred on or after December 11, 2008, when BLMIS collapsed and it became impossible for OSUS to withdraw funds from its $2.9 billion dollar account.

## COUNT FOUR:
## UNJUST ENRICHMENT

### Against All Defendants

439.   Plaintiff incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein. This count is asserted against all Defendants for unjust enrichment pursuant to New York law.

440.   Defendants have unjustly benefitted through their receipt of customer property that they have acquired only as a result of perpetuating in the Ponzi scheme operated by BLMIS and/or Madoff.

441.   Because of the conduct by which they perpetuated, deepened, and induced others to invest in the BLMIS Ponzi scheme, Defendants were unjustly enriched by many millions of

dollars in fees and other proceeds and by profits made from the use of that money. That enrichment came at the expense of others including BLMIS IA Business customers, including Plaintiff's assignor OSUS.

442.   Defendants' conduct resulted in the loss of billions of dollars by BLMIS investors and creditors. Equity and good conscience require full restitution of the monies received by Defendants, directly and indirectly, from BLMIS. This includes not only fees and other proceeds received from customers of Defendants but also any profits made from Defendants' use of that money.

443.   As a direct and proximate result of Defendants' actions, Plaintiff, through its assignor OSUS, lost investment capital and suffered damages in an amount to be proved at trial.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against the Defendants as follows:

(i)     Compensatory, exemplary, and punitive damages in an amount to be proven at trial;

(ii)    prejudgment interest;

(iii)   an award of restitution of monies Defendants received from Madoff and/or BLMIS and any profits earned through Defendants' use of those monies;

(iv)    establishment of a constructive trust over the proceeds of the unjust enrichment of Defendants in favor of Plaintiff;

(v)     all applicable interest, costs, and disbursements of this action; and

(vi)    such other, further, and different relief as the Court deems just, proper and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: August 20, 2018.                    Respectfully submitted,

                                           */s/ Collin J. Cox*
                                           R. Paul Yetter
                                           Collin J. Cox
                                           James E. Zucker
                                           Autry W. Ross
                                           YETTER COLEMAN LLP
                                           811 Main Street, Suite 4100
                                           Houston, Texas 77002
                                           [Tel.] (713) 632-8000
                                           [Fax] (713) 632-8002

                                           Matthew C. Heerde
                                           LAW OFFICE OF MATTHEW C. HEERDE
                                           222 Broadway 19th Floor
                                           New York, New York 10038
                                           [Tel.] 347-460-3588
                                           [Fax] 347-535-3588

                                           ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I certify that this pleading was filed electronically with the Court, and thus served simultaneously upon all counsel of record, this 20th day of August, 2018.

                                           */s/ Collin J. Cox*