UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



MAR 3 0 2019

|  |  |
| --- | --- |
| SPV Osus Ltd., | |
| Plaintiff, | 18-cv-3497 (AJN) |
| —v— | OPINION & ORDER |
| UniCredit Bank Austria *et al.*, | |
| Defendants. | |

ALISON J. NATHAN, District Judge:

The facts of the Madoff scandal are by now familiar. Bernard L. Madoff managed billions of dollars in investments through his brokerage firm, Bernard L. Madoff Investment Securities LLC ("Madoff Investment"). While it promised investors consistent returns and low fees, Madoff Investment was in fact an elaborate Ponzi scheme, which could only survive by finding new sources of investment money. Once the scheme was revealed and Madoff arrested, Madoff Investment collapsed. This suit is one of many that has arisen in the aftermath.

Plaintiff SPV Optimal SUS Ltd. ("SPV") is the assignee of an investment fund, Optimal Strategic US Equity Ltd. ("Optimal"), that had invested with Madoff Investment. SPV has brought suit against a number of companies that it alleges aided and abetted Madoff's scheme and were unjustly enriched by it. Defendants have moved to dismiss for lack of personal jurisdiction and for failure to state a claim. For the reasons that follow, the Court GRANTS the motion to dismiss as to all claims against all defendants.

## I.     Background

### A.     Optimal's Investments in Madoff Investment, Assignment to SPV, and Subsequent Litigation

From January of 1997 onwards, Optimal began investing "virtually all of its assets" in Madoff Investment. First Amended Complaint ("Am. Compl."), Dkt. No. 67, ¶ 24. From the period between 1997 and December 2008 when Madoff's Ponzi scheme collapsed, Optimal deposited over $1.6 billion dollars in Madoff Investment. Am. Compl. ¶ 24. Over the course of its investment with Madoff Investment, Optimal was provided with fraudulent customer statements showing false gains. Am. Compl. ¶¶ 28-29. Immediately prior to the collapse of Madoff Investment, Optimal's customer statement reported a net of over $2.9 billion in "investments, purported gains, and option positions." Am. Compl. ¶ 24.

After the scandal broke at the end of 2008 and Madoff's scheme collapsed, a trustee was appointed under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*, to oversee Madoff Investment's liquidation. *See generally Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. 285 (Bankr. S.D.N.Y. 2011). In May of 2009, Optimal and an affiliate entered a settlement agreement with the Trustee that allowed Optimal's claim in the bankruptcy proceedings for roughly $1.5 billion. Defendants' Consolidated Motion to Dismiss ("Def. Consol. Mot."), Dkt. No. 73, at 5 n.4.

SPV, a Bahamian corporation, was then created and Optimal assigned SPV "the entirety of its claim and all rights arising out of or in connection with the claim against [Madoff Investment]." Am. Compl. ¶¶ 21-22. SPV then proceeded to bring unsuccessful lawsuits in both the United States and abroad against various other creditors to the Madoff Investment estate. *See SPV Osus Ltd. v. UBS AG ("UBS II")*, 882 F.3d 333 (2d Cir. 2018) (affirming dismissal of SPV's claims in two cases); Moloney Decl. Ex. E (Judgment, *SPV Optimal Ltd. v. HSBC*

2

*Institutional Trust Servs. (Ireland) Ltd.*, Appeal No. 62/2017 [31 July 2018]) (Irish Supreme Court affirming dismissal of SPV's claims).

Plaintiff brought this action alleging aiding and abetting claims, as well as undue enrichment, against what it describes as three categories of defendants: (1) the Management Defendants, (2) the Beneficial Owner Defendants, and (3) the HSBC Defendants. The HSBC Defendants are no longer in this case following a settlement. Dkt No. 102. The Court will discuss the two remaining categories and the general allegations against them in turn.

### B. The Management Defendants

The Management Defendants consist of UniCredit Bank Austria AG ("Bank Austria"); UniCredit S.p.A. ("UniCredit"); Pioneer Alternative Investment Management Limited, now know as PAI Management Limited ("PAI"); Alpha Prime Asset Management Ltd. ("Alpha Prime Management"); Regulus Asset Management Limited ("Regulus"); Carruba Asset Management Limited ("Carruba"); Hermes Asset Management Limited ("Hermes Management"); Thema Asset Management (Bermuda) Ltd. ("Thema Management Bermuda"); Thema Asset Management Limited ("Thema Management BVI"); Equus Asset Management Limited ("Equus"); Equus Asset Management Partners, L.P.("Equus Partners"); and Aurelia Fund Management Ltd. ("Aurelia"). Am. Compl. ¶¶ 57, 59, 62-66, 68-74.

Plaintiff alleges of all the Management Defendants generally that they "built the infrastructure that would lead to an explosion of European and other foreign investment into Madoff Investment beginning in the 1990s." Am. Compl. ¶¶ 40, 264. This primarily refers to the fact that the Management Defendants created, managed, and administered feeder funds that served as investment vehicles for billions of dollars with Madoff Investment. Am. Compl. ¶¶ 40, 264, 416, 424. They also solicited investors for these funds. Am. Compl. ¶ 40, 264. This

allegedly "perpetuated and deepened the Ponzi scheme and, as the [feeder funds] grew, enabled the Management Defendants . . . to collect even greater fees for services they purported to provide." Am. Compl. ¶ 264, 424. As to Optimal, Plaintiff alleges that the Management Defendants' actions caused Optimal to invest and remain invested in Madoff Investment. Am. Compl. ¶¶ 40, 416, 424-25.

Plaintiff also alleges that the Management Defendants knew or should have known that Madoff Investment was a fraud because of a number of "red flags." Am. Compl. ¶¶ 413-14, 421-22, 433-35. Plaintiff points to a wide range of purported red flags including, *inter alia*, Madoff's secrecy, the absence of checks and balances, suspicious features of Madoff's model, anomalies in his reports, and unrealistic outcomes. Am. Compl. ¶¶ 142-263. The Management Defendants' failure to investigate or inform other investors of the ongoing fraud allegedly harmed Plaintiff because it caused Optimal to invest and remain invested in Madoff Investment, but also because—given the nature of the Ponzi scheme—Optimal allegedly could have demanded and received its money back up until the scheme collapsed upon Madoff's arrest on December 11, 2008. Am. Compl. ¶ 25.

As to the Management Defendants' contacts with the forum relevant to the personal jurisdiction analysis, Plaintiff alleges of all the Management Defendants generally that they:

- "[R]outinely directed the transfer of investor funds to, and the receipt of investor funds from, [Madoff Investment] in New York";
- "[D]erived significant revenue from the purported sales and purchases of securities in New York";
- "[C]ommitted tortious acts, both within and outside of New York, causing injury within New York";
- "[C]ommunicated regularly with persons in New York regarding [Madoff Investment], and their agents communicated with [Madoff Investment] on multiple occasions in connection with these allegations";
- "[R]eceived [Madoff Investment] account statements and trade confirmations, and derived substantial revenue based on the purpose trading activities of [Madoff Investment]"

4

- And finally that "certain Management Defendants delivered to [Madoff Investment's] headquarters in New York account opening documents, including agreements, relating to [Madoff Investment] accounts maintained for the HSBC-Related Feeder Funds."

Am. Compl. ¶¶ 129-32.

### C. The Beneficial Owner Defendants

The Beneficial Owner Defendants consist of T + M Trusteeship & Management Services ("T+M"), Cape Investment Advisors Limited ("Cape Investment"), Bank Austria, UniCredit, Tereo Trust Company Limited ("Tereo Trust"), Equus, Equus Partners. Am. Compl. ¶¶ 57, 59, 66, 71-72, 76, 79-80. These companies are allegedly owners or have an ownership interest in various of the Management Defendants. Am. Compl. ¶¶ 57, 59, 66, 71-72, 76, 79.

As to the Beneficial Owner Defendants, Plaintiff reprises its allegations towards the Management Defendants, alleging that the Beneficial Owner Defendants: helped to solicit and funnel funds into Madoff Investment, lent Madoff Investment legitimacy, helped build the infrastructure for European investments, and failed to investigate or report the aforementioned red flags. Am. Compl. ¶¶ 40, 413-14, 416, 421-22, 424-25, 433-45. This allegedly harmed Optimal by leading Optimal to invest and remain invested in Madoff Investment.

As to the Beneficial Defendants' contacts with the forum relevant to the personal jurisdiction analysis, Plaintiff alleges generally of all the Beneficial Owner Defendants that they "derived significant revenue from New York and committed tortious acts, both within and outside of New York, causing injury within New York." Am. Compl. ¶ 133. In addition, "during the relevant period, Bank Austria . . . and UniCredit maintained offices in New York, New York, and regularly transacted business in New York." Am. Compl. ¶ 134. Moreover, Plaintiff alleges that "all of the Beneficial Owner Defendants have assisted in directing the transfer of funds into, and the receipt of funds from, [Madoff Investment's] account at JPMorgan

Chase . . . in New York, New York, for the explicit purpose of investing with [Madoff Investment], and they and/or their agents regularly transacted business in New York." Am. Compl. ¶ 135.

Finally, although the feeder funds that were created, managed, andadministered by the Defendants were the vehicles by which investments were made into Madoff Investment, they are not parties to this action. Several other parties named in this action were never served and thus the claims against them are dismissed without prejudice.[1] *See, e.g., Jackson v. City of New York*, No. 14 CIV. 5755 (GBD), 2015 WL 5698535, at *1 n.2 (S.D.N.Y. Sept. 28, 2015) (citing Fed. Rule Civ. Pro. 4(m)).

### D.     Procedural Background

SPV filed the instant case in the Supreme Court of New York, County of New York, on December 11, 2014. Def. Consol. Mot. at 9-10. One of the Defendants removed to this Court on April 20, 2018. Dkt. No. 1. On July 5, 2018, Defendants moved to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction and Rule 12(b)(6) for failure to state a claim. Dkt. Nos. 45-54. In response, Plaintiff filed a First Amended Complaint, which is the operative complaint in this matter. Dkt. No. 67. Defendants then again moved to dismiss based on lack of personal jurisdiction and failure to state a claim. Dkt. Nos. 71-80. Pursuant to an agreed briefing schedule between the parties, five different subgroups of Defendants filed supplemental memoranda of law in support of their motion to dismiss, making arguments specific to themselves. Dkt. Nos. 70, 74-80.

---

[1] These are: Sonia Kohn, Mario Benbassat, Alberto Benbassat, Stephane Benbassat, 20:20 Medici AG, BA Worldwide Fund Management Ltd., Herald Asset Management Limited, Eurovaleur, Inc., Genevalor, Inter Asset Management, Inc., GTM Management Services Corp., Aurelia Asset Management Partners, and Erwin Kohn.

These five subgroups are organized around the corporate relationships between the various Defendants, particularly their ownership relationships. For example, the "Alpha Prime Subgroup" includes three Management Defendants—Alpha Prime Management, Carruba, and Regulus—and the alleged owner of those three entities, Tereo Trust, which is a Beneficial Owner Defendant. Accordingly, several of the five subgroups include both Management Defendants and a Beneficial Owner Defendant. In light of the briefing by the parties and given that Plaintiff makes certain allegations relating to forum contacts against only some of these subgroups, in its personal jurisdiction analysis below the Court analyzes these five subgroups separately.

## II. Motion to Dismiss Standard

### A. Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction

For a case to survive a motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction, a plaintiff must make a *prima facie* showing that personal jurisdiction exists. *Thomas v. Ashcroft*, 470 F.3d 491, 495 (2d Cir. 2006). On a Rule 12(b)(2) motion, a defendant may submit affidavits and documents beyond the pleadings, and a court "may determine the motion on the basis of affidavits alone; or [the court] may permit discovery in aid of the motion; or [the court] may conduct an evidentiary hearing on the merits of the motion." *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981). If a court determines that it is not necessary to "conduct a full-blown evidentiary hearing," then "plaintiffs need only make a *prima facie* showing of personal jurisdiction over the defendant." *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008) (internal quotation marks omitted); *Marine Midland Bank*, 664 F.2d at 904 ("Eventually, of course, the plaintiff must establish jurisdiction by a preponderance of the evidence, either at a pretrial evidentiary hearing or at trial. But until such a hearing is held, a *prima facie* showing suffices, notwithstanding any controverting presentation by the moving party, to defeat the motion."). This showing can be

made through a plaintiff's "own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant." *S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) (internal quotation marks omitted). And "[i]n evaluating whether the requisite showing has been made, [courts] construe the pleadings and any supporting materials in the light most favorable to the plaintiffs." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013).

### B.      Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim achieves "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully," *id.*, and if plaintiffs cannot "nudge[] their claims across the line from conceivable to plausible, their complaint must be dismissed," *Twombly*, 550 U.S. at 570. "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011). When considering a motion to dismiss under Rule 12(b)(6), "a court must accept as true all of the [factual] allegations contained in [the] complaint." *Iqbal*, 556 U.S. at 678. However, the court should not accept legal conclusions as true: "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

### III. Discussion

Defendants moved to dismiss for lack of personal jurisdiction under Rule 12(b)(2). In the alternative, Defendants move to dismiss under Rule 12(b)(6) for failure to state a claim. The Court analyzes these motions in turn. For the reasons given below, the Court concludes that Plaintiff has failed to make a *prima facie* showing of personal jurisdiction and that, even assuming personal jurisdiction existed, Plaintiff's claims would not survive Defendants' motion to dismiss under Rule 12(b)(6).

Turning first to personal jurisdiction, the Court will provide the standard for analyzing personal jurisdiction, then apply that standard to the five subgroups of Defendants that filed separate, supplemental motions to dismiss.

#### A. Personal Jurisdiction Legal Standard

This case was removed to federal court as an action "related to" a bankruptcy case. *See* 28 U.S.C. § 1452; 28 U.S.C. § 1334(b). If "a case is removed to federal court pursuant to 28 U.S.C. § 1452, personal jurisdiction is allowed to the extent permitted by the Constitution of the United States." *UBS II*, 882 F.3d at 343. "To establish personal jurisdiction over a defendant, due process requires a plaintiff to allege (1) that a defendant has certain minimum contacts with the relevant forum, and (2) that the exercise of jurisdiction is reasonable in the circumstances." *Id.* (quoting *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 674 (2d Cir. 2013)). As to what constitutes the relevant forum, when a federal court's jurisdiction is based on 28 U.S.C. § 1334(b), some courts in this district have held that the relevant forum is the United States, not the state in which the court sits. *SPV Optimal Ltd. v. AIA LLC*, No. 15-cv-619 (JSR), 2016 WL 3039192, at *3 (S.D.N.Y. May 26, 2016), *aff'd sub nom. UBS II*, 882 F.3d 333 ("[W]hen an action is in federal court on 'related to' jurisdiction . . . [w]e need only ask whether [defendant] has minimum contacts with the United States such that subjecting it to personal

jurisdiction does not offend the Due Process Clause of the Fifth Amendment to the United States Constitution." (quoting *In re Celotex Corp.*, 124 F.3d 619, 630 (4th Cir. 1997)); *see also Cortlandt St. Recovery Corp. v. Deutsche Bank AG, London Branch*, No. 14-CV-01568 JPO, 2015 WL 5091170, at *4 (S.D.N.Y. Aug. 28, 2015) ("in a bankruptcy action, the sovereign exercising authority is the United States, not the individual state where the federal court is sitting" (internal quotation marks omitted)). On the other hand, in a recent decision examining similar claims brought by the same Plaintiff in federal court under "related to" jurisdiction, *UBS II*, the Second Circuit did not address this question directly but focused its minimum contacts analysis on the forum of New York. 882 F.3d at 344-45. In either event, for the reasons given below, whether the relevant forum is New York or the United States more broadly, the Court's conclusions as to personal jurisdiction remain the same.

To determine whether sufficient contacts with the forum exists, courts have distinguished between "general" jurisdiction and "specific" jurisdiction: general jurisdiction "permits a court to hear 'any and all claims' against an entity," *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 134 (2d Cir. 2014) (quoting *Daimler AG v. Bauman*, 134 S. Ct. 746, 755 (2014)), while the scope of specific jurisdiction is limited to claims that "arise out of or relate to the entity's contacts with the forum," *id.* (internal quotation marks and alterations omitted). The Court will analyze each in turn.

## B.     General Jurisdiction

Turning first to general jurisdiction, Plaintiff does not respond to Defendants' argument that general jurisdiction does not exist as to any of the Defendants. *See* Def. Consol. Mot. at 12; Plaintiff's Consolidated Opposition ("Pl. Consol. Opp."), Dkt. No. 90; Plaintiff's Supplemental Opposition to Defendants Alpha Prime *et al.* ("Pl. Alpha Prime Opp."), Dkt. No. 92; Plaintiff's

Supplemental Opposition to Defendants Hermes Management *et al.* ("Pl. Hermes Opp."), Dkt.

No. 91; Plaintiff's Supplemental Opposition to Defendant Bank Austria ("Pl. Bank Austria

Opp."), Dkt. No. 95; Plaintiff's Supplemental Opposition to Defendants PAI Management *et al.*

("Pl. PAI Opp."), Dkt. No. 93; Plaintiff's Supplemental Opposition to Defendant T + M ("Pl. T +

M Opp."), Dkt. No. 94. Therefore, Plaintiff has waived this argument. *See, e.g., Kao v. British*

*Airways, PLC*, No. 17-cv-0232 (LGS), 2018 WL 501609, at *5 (S.D.N.Y. Jan. 19, 2018)

("Plaintiffs' failure to oppose Defendants' specific argument in a motion to dismiss is deemed

waiver of that issue." (citing *Arista Records, LLC v. Tkach*, 122 F. Supp. 3d 32, 38–39 (S.D.N.Y.

2015)). Even if Plaintiff had not waived this argument, general jurisdiction is lacking. Plaintiff

does not allege that any of the Defendants are incorporated or have a principal place of business

in the United States, nor that there are any facts that would render this an "exceptional case."

*UBS II*, 882 F.3d at 343 (quoting *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 629 (2d Cir.

2016)). Indeed, the most extensive physical presence of any of the Defendants in the forum are

branch offices and subsidiaries, Am. Compl. ¶¶ 57, 59, which are not sufficient to support

general jurisdiction except in truly exceptional cases. *See Gucci*, 768 F.3d at 135; *UBS II*, 882

F.3d at 343. Therefore, no general jurisdiction exists as to any of the Defendants.

### C.    Specific Jurisdiction

Specific jurisdiction "is confined to adjudication of issues deriving from, or connected

with, the very controversy that establishes jurisdiction." *UBS II*, 882 F.3d at 344 (quoting

*Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). A defendant's

"general connections with the forum are not enough" to confer specific jurisdiction. *Id. (quoting*

*Bristol–Myers Squibb Co. v. Superior Court of Calif., San Francisco Cty.*, 137 S.Ct. 1773, 1781

(2017)). Instead, "the defendant's suit-related conduct must create a substantial connection with

11

the forum." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). This turns on not just the degree of contacts, but whether a sufficient causal relationship exists between the contacts and the suit-related conduct.

Courts require either proximate or but-for causation depending on the extent of a defendant's contacts with the forum. The determination of the appropriate causal standard to apply turns on "the relationship among the defendant, the forum, and the litigation." *UBS II*, 882 F.3d at 344 (quoting *Chew v. Dietrich*, 143 F.3d 24, 29 (2d Cir. 1998)). Thus, "[w]here the defendant has had only limited contacts with the [forum] it may be appropriate to say that he will be subject to suit in that [forum] only if the plaintiff's injury was proximately caused by those contacts." *Id.* Whereas, if "the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts within the [forum] are not the proximate cause of the plaintiff's injury." *Id.*; *see also Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 98 (S.D.N.Y. 2015) ("when an entity's contacts with the forum are 'more substantial,' courts have determined that it is sufficient that those contacts be a 'but for' cause of the plaintiff's injury" (quoting *In re LIBOR–Based Fin. Instruments Antitrust Litig.*, No. 11–mdl–2262 (NRB), 2015 WL 4634541, at *23 (S.D.N.Y. Aug. 4, 2015))). The Court will therefore first examine the level of contacts of the various Defendants and then determine whether the relevant causal standard is met.

The Court's application of the Second Circuit's specific jurisdiction test is directly guided by *UBS II,* a recent Second Circuit decision analyzing the issue of personal jurisdiction in the context of another suit brought by the same Plaintiff against other foreign companies, alleging similar theories of causation and liability based on those defendants' investments with Madoff

Investment. 882 F.3d 333. The foreign defendant in the *UBS* litigation with the most extensive contacts with the United States had formed a feeder fund, immediately opened an account with Madoff Investment, "delivered the account opening documents to [Madoff Investment] on [the feeder fund's] behalf," and "contracted with [Madoff Investment] to serve as [the feeder fund's] custodian, processed investor redemptions, and engaged in regular communication with [Madoff Investment] concerning [the feeder fund]." *SPV OSUS Ltd. v. UBS AG ("UBS I")*, 114 F. Supp. 3d 161, 170 (S.D.N.Y. 2015), *aff'd*, 882 F.3d 333 (2d Cir. 2018). The Second Circuit found that these contacts were insufficient since: (1) none of the foreign defendants resided in New York; (2) the plaintiff's complaint "alleges the injuries suffered by [Optimal] were caused by Madoff and [Madoff Investment]"; (3) there was no allegation "that [Optimal] relied on [defendants'] contacts with the feeder funds when [Optimal] decided to invest directly with [Madoff Investment]"; (4) similarly, there was no allegation "that [Optimal] based its decision to invest with Madoff Investment on the fact that the [defendants] helped create and service the feeder funds"; and (5) "the contacts alleged by SPV between the [defendants], the forum and the litigation amount to a handful of communications and transfers of funds." *UBS II*, 882 F.3d at 344-45. The foreign defendants' contacts with the forum were thus "too tenuous to support the exercise of specific jurisdiction." *Id.* In light of the similarities between *UBS II* and the instant case, the Second Circuit's decision provides a binding roadmap for this Court's analysis of specific jurisdiction.

As noted above, five separate subgroups of Defendants have each filed a supplemental motion to dismiss. Each of the supplemental motions addresses the question of specific jurisdiction as it relates to the moving subgroup. As discussed in Section I(B), Plaintiff has made certain jurisdictional allegations as to all Management Defendants generally. Similarly, Plaintiff

makes certain jurisdictional allegations as to all Beneficial Owner Defendants generally. Since

the five subgroups include both Management and Beneficial Owner Defendants, the allegations

that apply generally to all Management and Beneficial Owner Defendants apply to each of the

subgroups. In addition, Plaintiff makes certain specific jurisdictional allegations that are relevant

only to some of the five subgroups of Defendants.

Consistent with this structure, the Court will analyze the issue of personal jurisdiction as

it relates to the five separate subgroups of Defendants in turn.

### 1. Plaintiff Has Failed to Make a *Prima Facie* Showing of Specific Jurisdiction Over Defendants Alpha Prime Management, Regulus, Carruba, and Tereo Trust

Turning to the first subgroup of Defendants (the "Alpha Prime Subgroup"), Defendants

Alpha Prime Management, Carruba, and Regulus are companies organized under Bermuda law

and registered in Bermuda. Am. Compl. ¶¶ 63-65. Alpha Prime Management was an investment

manager to Alpha Prime Fund, one of the non-party feeder funds that invested in Madoff

Investment. Am. Compl. ¶¶ 44, 63. Regulus was an investment manager to Senator Fund, a

non-party feeder fund that invested in Madoff Investment. Am. Compl. ¶¶ 45, 64. Carruba was

an investment adviser to Senator Fund. Am. Compl. ¶ 65. All three are Management

Defendants. Tereo Trust is also organized under Bermuda law and registered in Bermuda. Am.

Compl. ¶ 66. It allegedly "wholly owns" the other three Defendants and is categorized as a

Beneficial Owner Defendant. Am. Compl. ¶ 66. Plaintiff provides diagrams of these

relationships at ¶¶ 271 and 275 of the Complaint.

As to personal jurisdiction, because Plaintiff's jurisdictional allegations against the Alpha

Prime Subgroup rely almost entirely on the broad allegations against all of the Management

Defendants and Beneficial Owner Defendants generally, the Court analyzes the Management

Defendants and the Beneficial Owner Defendants in the Alpha Prime Subgroup in turn. For the reasons given below, the Court concludes that Plaintiff has failed to make out a *prima facie* showing of specific jurisdiction against any of the Defendants in the Alpha Prime Subgroup.

### a. The Forum Contacts Alleged Against these Management Defendants Are Insufficient to Confer Specific Jurisdiction

First, Plaintiff's allegations concerning the Management Defendants in the Alpha Prime Subgroup are quite limited. Plaintiff relies almost entirely on the alleged contacts that it attributes to all of the Management Defendants generally. These allegations effectively mirror those in *UBS II*, 882 F.3d at 344-45. None of these foreign companies reside in the United States or are alleged to have any physical presence in the country. *Id.* As in *UBS II*, the alleged contacts between these Defendants and the United States are limited to communications, transfers of funds, managing of funds, sending of account opening documents, and collecting fees. *Id.*; *see also UBS I*, 114 F. Supp. 3d at 165-66, 169-71; *Hau Yin To v. HSBC Holdings PLC*, No. 15-cv-3590 (LTS), 2017 WL 816136, at *2, 4-6 (S.D.N.Y. Mar. 1, 2017), *aff'd*, 700 F. App'x 66 (2d Cir. 2017) (in another Madoff Investment case, "foreign defendant's communications with a party in New York or sending of monies into New York [were] not sufficient to establish jurisdiction" under the New York long-arm statute); *Hill v. HSBC Bank PLC*, 207 F. Supp. 3d 333, 339-40 (S.D.N.Y. Sept. 15, 2016) (communications with and payments to Madoff Investment, as well increasing flow of funds into Madoff Investment by creating and marketing financial products, were insufficient under New York long-arm statute). Plaintiff also alleges that the Management Defendants "committed tortious acts, both within and outside of New York, causing injury within New York," Am. Compl. ¶ 129, an allegation that is impermissibly conclusory. *Iqbal*, 556 U.S. at 681 (conclusory allegations are "not entitled to be

assumed true"). These limited contacts are the same as those held insufficient to establish

personal jurisdiction in *UBS II*, 882 F.3d at 344-45.

In an effort to distinguish this case from *UBS II*, Plaintiff makes two arguments that are

specific to the Defendants in the Alpha Prime Subgroup. First, Plaintiff argues that non-party

feeder funds Alpha Prime and Senator have availed themselves of New York courts by bringing

suit against HSBC entities related to the Madoff scandal as well as "for the purpose of pursuing

claims related to the Madoff bankruptcy estate." Pl. Alpha Prime Opp. Mot., Dkt. No. 83, at 2-3.

Yet these non-party feeder funds are separate entities from these Defendants, who served as their

investment managers and advisors. Plaintiff points to no authority for the proposition that use of

forum courts by feeder funds grants personal jurisdiction over separate entities who advised or

managed those funds. To the contrary, even a formal parent-subsidiary relationship or a

"dominated affiliate" relationship will only allow for the exercise of personal jurisdiction by

association if the subsidiary or affiliate is "either an 'agent' or a 'mere department' of the foreign

parent," neither of which Plaintiff sufficiently alleges or argues here. *See, e.g.*, *Jazini v. Nissan

Motor Co., Ltd.*,148 F.3d 181, 184; *SPV OSUS Ltd. v. AIA LLC*, 2016 WL 3039192, at *4 n.5

(citing cases). As the Second Circuit has held, "sparse allegations of agency . . . are too

conclusory to make a *prima facie* showing of personal jurisdiction." *Charles Schwab Corp. v.

Bank of Am. Corp.*, 883 F.3d 68, 86 (2d Cir. 2018) (when determining whether an agency

relationship exists for the purposes of extending personal jurisdiction, courts look to whether

"the alleged agent acted in [the forum] for the benefit of, with the knowledge and consent of, and

under some control by, the nonresident principal." (internal quotation marks omitted)). Second,

as to unspecified Defendants, Plaintiff implies for the first time in its briefing that there were

"contracts with New York choice-of-law clauses." Pl. Consol. Opp. at 7. Yet without any

complaint allegation or evidence that such contracts exist and who they were between, this unsupported assertion made for the first time in briefing cannot serve as the basis for jurisdiction. *See, e.g.*, *Southwick Clothing LLC v. GFT (USA) Corp.*, 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in Plaintiff's opposition papers, and hence such new allegations and claims should not be considered."). Therefore, Plaintiff fails to show that the contacts in this matter are meaningfully different from those in *UBS II.*

Given these limited contacts, *UBS II* governs and Plaintiff has failed to allege a *prima facie* case that these Management Defendants' contacts with the United States proximately caused its injuries. As discussed above, "[w]here the defendant has had only limited contacts with the [forum] it may be appropriate to say that he will be subject to suit in that [forum] only if the plaintiff's injury was proximately caused by those contacts." *UBS II*, 882 F.3d at 344 (quoting *Chew*, 143 F.3d at 29). The injuries suffered by Optimal were directly caused by Madoff and Madoff Investment, not these Defendants. *Id.* at 344-45. To get around this, Plaintiff raises the same attenuated theories of causation rejected in *UBS II.* Plaintiff contends that it continued investing in Madoff Investment in part because Defendants lent Madoff Investment legitimacy and provided it with the money necessary to keep functioning. Yet crucially there is no allegation that Optimal based its decision to invest on these Defendants' actions or that it relied on these Defendants' investments in Madoff Investment when it chose to invest and to remain invested. *Id.* at 344-45. Nor is there an allegation that Plaintiff actually relied directly on the "infrastructure" that the Defendants supposedly created. So even if the money funneled by feeder funds advised by the Defendants helped keep Madoff Investment afloat, "[t]his is a textbook example of a 'but-for' theory of causation masquerading as a theory

of proximate causation." *SPV Optimal Ltd. v. AIA LLC*, 2016 WL 3039192, at *6; *UBS I*, 114 F. Supp. at 171 (describing this theory as "highly speculative" and "at most an attenuated form of 'but-for' causation").[2] Further attenuating causation, and as in the *UBS* action, these Defendants began servicing the Senator and Alpha Prime feeder funds *after* Optimal's initial investment in 1997. Am. Compl. ¶¶ 271, 275, 352. *UBS II*, 882 F.3d at 344-45. Finally, as Judge Rakoff found in *UBS I*, the idea that "if the [defendants] had disclosed their knowledge of the fraud before Madoff's arrest in December 2008, then SPV could have redeemed its investments in [Madoff Investments] before the Ponzi scheme collapsed" is a "dubious proposition" and a "fanciful hypothetical[]." *UBS I*, 114 F. Supp. at 171. In light of the nature of Madoff's Ponzi scheme, revealing the fraud to the world would have been "highly unlikely" to allow SPV to recover its investments since there was "insufficient capital to redeem all investors' investments." *Id.* And Plaintiff gives no argument for why revealing the fraud would not have produced bankruptcy proceedings and clawback of those funds. *Id.* Given the absence of proximate causation between these "limited contacts" and Plaintiff's alleged harm, Plaintiff's allegations are "insufficient to allow the exercise of specific personal jurisdiction over the [defendants]." *Id.* at 345 (citing *Hau Yin To v. HSBC Holdings PLC*, 2017 WL 816136 (S.D.N.Y. 2017)).

Plaintiff attempts to avoid this outcome by arguing that the causation analysis in *UBS II* is distinguishable on the facts for the following reasons: (1) more feeder funds are involved here than the two funds at issue in *UBS II*; (2) unlike in *UBS II*, some of the Defendants' investments in Madoff Investment pre-date Plaintiff's initial investment in 1997; and (3) in *UBS II*, Plaintiff

---

[2] Judge Rakoff analyzed these proximate causation theories in his analysis of the merits of nearly identical claims, yet as he noted in his *UBS I* decision, the proximate cause question as to personal jurisdiction is closely related to the proximate causation analysis on the merits. *UBS I*, 114 F. Supp. 3d at 170 n.9.

only alleged that the defendant created marketing materials for Madoff Investment, while in this case Plaintiff has alleged that Defendants built, expanded, and maintained "the infrastructure that would lead to an explosion of European and other foreign investment into Madoff Investment . . . beginning in the 1990s." Pl. Consol. Opp. at 23; Am. Compl. ¶40. As to the first point, the total number of feeder funds associated with *all* Defendants is not relevant. Rather, what is relevant for the personal jurisdiction analysis as to any Defendant is the number of feeder funds associated with *each* Defendant. *Charles Schwab*, 883 F.3d at 84 ("due process demands that courts assess each defendant's contacts . . . individually" (internal quotation marks and brackets omitted)). No Defendant is associated with more than four feeder funds, so the number of funds is insufficient grounds to distinguish *UBS II*.

Second, as to timing, the fact that some of the feeder funds at issue here were created pre-1997 might strengthen but-for causation, but it does not reduce the degree of attenuation with respect to proximate causation. This is because absent any allegation "that [Optimal] *relied* on [Defendants'] contacts with the feeder funds when [Optimal] decided to invest directly with [Madoff Investment]" or "that [Optimal] *based* its decision to invest with [Madoff Investment] on the fact that the [Defendants] helped create and service the feeder funds," the degree of attenuation remains too great. *UBS II*, 882 F.3d at 344-45 (emphasis added). Third, for the same reasons, even if Defendants played a larger role than the defendants in *UBS II* in helping Madoff Investment to expand its market, Plaintiff has still not alleged proximate causation between that expansion and Optimal's investment in Madoff Investment. Therefore, none of these differences cure the fatal absence of proximate causation between Defendants' alleged contacts with the forum and Plaintiff's alleged harm.

### b. The Forum Contacts Alleged Against Beneficial Owner Defendant Tereo Trust Are Insufficient to Create Specific Jurisdiction

The alleged contacts of Tereo Trust, the sole Beneficial Owner Defendant in the Alpha Prime Subgroup, are equally limited. Plaintiff levels the same allegations against Tereo Trust as all of the other Beneficial Owner Defendants, alleging that it "derived significant revenue from New York" and "assisted in directing the transfer of funds into, and the receipt of funds from, [Madoff Investment's] account at JPMorgan Chase . . . for the explicit purpose of investing with Madoff Investment, and they and/or their agents regularly transacted business in New York." Am. Compl. ¶ 135. Transfers of funds, communications, and collection of fees are typically insufficient. *See UBS II*, 882 F.3d at 344-45; *Hau Yin To*, 2017 WL 816136, at *2, 4-6. Plaintiff's further allegations of unspecified "tortious acts" and "regularly transacted business," Am. Compl. ¶¶ 133, 135, are impermissibly conclusory. *See Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 184 (2d Cir. 1998) (a "conclusory statement" that is only "a restatement, with slight changes, of the legal standard" for exercising personal jurisdiction is inadequate to make a *prima facie* showing). Further compounding the problem, the Complaint states that this business was regularly transacted by the Defendants "and/or their agents." Am. Compl. ¶ 135. Yet for an agency relationship to be sufficient to grant personal jurisdiction, Plaintiff must make sufficient allegations to satisfy a multi-factor test, which it does not do here. *See Jazini*, 148 F.3d at 184–85. In addition, for the same reasons as above, Plaintiff's allegations regarding forum clauses in unspecified contracts and the activities of the Alpha Prime and Senator feeder funds cannot be attributed to Tereo Trust. The limited contacts of Tereo Trust therefore also indicate that the correct standard is proximate cause. *See UBS II*, 882 F.3d at 344-45. For the same reasons as above, Plaintiff's allegations are insufficient to make a *prima facie* showing that Tereo Trust's contacts with the forum proximately caused Plaintiff's alleged harm.

**2.    Plaintiff Has Failed to Make a *Prima Facie* Showing of Specific Jurisdiction Over Defendants Hermes Management, Thema Management Bermuda, Thema Management BVI, Equus, Equus Partners, Aurelia, and Cape Investment**

The Court now turns to the second subgroup of Defendants (the "Hermes Subgroup"). Hermes Management, Thema Management Bermuda, Equus, Equus Partners, and Aurelia are all companies organized under the laws of Bermuda and registered in Bermuda. Am. Compl. ¶¶ 68-69, 71-72. Thema Management BVI is a company organized under the laws of the British Virgin Islands and registered in the British Virgin Islands. Am. Compl. ¶ 70. Hermes served as investment manager to non-party feeder funds Hermes and Lagoon Trust. Am. Compl. ¶ 68. Thema Management Bermuda served as investment manager to the non-party feeder fund Thema. Am. Compl. ¶ 69. Thema Management BVI was investment manager and "global distributor" to the non-party feeder fund Thema International. Am. Compl. ¶ 70. Equus provided administrative support to Thema Management Bermuda and holds ownership interest in Hermes Management and Thema Management Bermuda. Am. Compl. ¶ 71. In addition, some of Equus' principals "were active in controlling" non-party feeder funds Hermes, Thema Fund, Thema International, and Geo Currencies. Am. Compl. ¶ 71. Equus Partners is an owner of Equus and gave administrative support to Hermes Management in its role as investment manager to non-parties Hermes and Lagoon Trust. Am. Compl. ¶ 72. Cape Investment, which has an ownership interest in Thema Management Bermuda, is organized under Bermuda law and registered in Bermuda. Am. Compl. ¶ 79. Cape Investment is grouped as a Beneficial Owner Defendant. Am. Compl. ¶ 80. Plaintiff provides a diagram of these relationships on ¶ 281 of the Complaint.

Plaintiff offers three arguments for why the Hermes Subgroup Defendants have sufficient contacts with the forum to warrant specific jurisdiction: (1) the general allegations as to all

Management Defendants; (2) the general allegations as to all Beneficial Owner Defendants; (3) specific jurisdiction exists over all of the Management Defendants in the Hermes Subgroup by virtue of contacts with the forum by non-party members of the Benbassat family; and (4) specific jurisdiction exists over some of the Defendants in the Hermes Subgroup because of the actions of non-party David Smith. For the reasons given in the above analysis of the Alpha Prime Subgroup, the general allegations against all the Management and Beneficial Owner Defendants generally are insufficient to confer specific jurisdiction. The Court therefore will analyze only the latter two arguments in turn.

First, Plaintiff argues that the Management Defendants in this subgroup have contacts with the forum by virtue of the actions of non-parties Mario Benbassat, Alberto Benbassat, and Stephane Benbassat (collectively, the "Benbassat Family"). Am. Compl. ¶¶ 116-119. Yet personal jurisdiction "must arise out of contacts that the 'defendant *himself*' creates with the forum." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (emphasis in original) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). While ownership relationships may sometimes be sufficient to attribute the contacts of one entity to another, mere allegations of ownership, control, or an agency relationship are insufficient. *See Societe d'Assurance de l'Est SPRL v. Citigroup Inc.*, No. 10-cv-4754 (JGK), 2011 WL 4056306, at *7 (S.D.N.Y. Sept. 13, 2011) (under New York long-arm statute, personal jurisdiction over principals did not confer jurisdiction over the agent, even when plaintiff alleged that agent "carried out" the orders of the principal); *Charles Schwab*, 883 F.3d at 86 ("sparse allegations of agency" insufficient to make out a *prima facie* showing of personal jurisdiction); *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984) ("considerable degree of control" and "supervision" not enough). Plaintiff alleges that each of the Management Defendants in the

Hermes subgroup are "directly or indirectly owned and/or controlled by members of the Benbassat family . . . who, beginning in 1992, set up a variety of feeder funds for the purpose of funneling investments to [Madoff Investment]."[3]  Pl. Hermes Opp. at 2; Am. Compl. ¶¶ 68-72, 79.  Plaintiff further alleges that members of the Benbassat family "regularly traveled to New York City to meet with Madoff" and that Stephane and Alberto Benbassat were in charge of managing the relationship of the underlying non-party feeder funds with Madoff.  Am. Compl. ¶¶ 116-118.  Finally, Plaintiff also alleges that the Benbassat family participated in establishing, investing in, and managing the underlying feeder fund serviced by these Defendants.  Am. Compl. ¶¶ 68-72, 116-19.  Yet Plaintiff fails to allege that any of the Benbassat family were acting in their capacities as direct or indirect owners or controllers of the relevant Management Defendants when they traveled to New York or met with Madoff.  *See Societe d'Assurance de l'Est*, 2011 WL 4056306, at *7.  Nor does Plaintiff offer a theory as to how these Management Defendants are sufficiently identical to the Benbassat Family that the forum contacts of the latter should be attributed to the former.  *See, e.g.*, *Volkswagenwerk Aktiengesellschaft*, 751 F.2d at 120.  The contacts of the Benbassat Family with the United States therefore cannot be attributed to these Management Defendants *themselves* and are therefore not relevant to the Court's personal jurisdiction analysis here.  *See Walden*, 571 U.S. at 284.

Second, as to Hermes Management, Thema Management Bermuda, Equus, and Equus Partners, Plaintiff also contends that personal jurisdiction exists due to the actions of non-party David Smith.  Pl. Hermes Opp. at 4.  This argument fails for similar reasons.  David Smith was director of Hermes Management and Thema Management Bermuda, President and director of

---

[3] In Plaintiff's Supplemental Opposition to these Defendants Supplemental Brief in Support of the Motion to Dismiss, it contends that each of these Defendants was owned or controlled by the Benbassat Family, but there is no allegation in the Complaint that Cape Investment is owned or controlled by the Benbassat Family.  Am. Compl. ¶ 79.

Equus, and general partner of Equus Partners. Am. Compl. ¶ 123. He also served a variety of roles at the non-party feeder funds, including serving as director of the Thema International Fund. Am. Compl. ¶ 123. Plaintiff alleges generally that the directors of non-party feeder fund Thema International, "tried to resist" a 2005 audit of Madoff Investment by the accounting firm KPMG carried out at the behest of former Defendant HSBC. Am. Compl. ¶ 172.[4] David Smith allegedly said that those conducting the audit should "display full deference to the people they meet." Am. Compl. ¶ 172. Plaintiff also alleges in more general terms that David Smith "discouraged HSBC from intruding upon Madoff Investment through due diligence, and warned that doing so would risk angering Madoff and could endanger the ability of [the feeder funds] to invest in [Madoff Investment] and continue to make investments in [Madoff Investment]." Am. Compl. ¶ 294. Finally, Plaintiff also alleges that David Smith, in an email to HSBC, acknowledged various of the "red flags" around Madoff Investment. Am. Compl. ¶ 295. Yet, Plaintiff does not allege that David Smith took these actions in his role as director, president, or general partner of the relevant Management Defendants here. The Complaint offers no more specificity than the implication that David Smith took these actions as an officer of one of the non-party feeder funds. Am. Compl. ¶¶ 172, 294. Nor does Plaintiff allege or contend that the organizational structure of these Management Defendants is such that *any* contacts attributable to David Smith would be attributable to them. *See Charles Schwab*, 883 F.3d at 86; *Societe d'Assurance de l'Est*, 2011 WL 4056306, at *7. Therefore, these contacts fail to indicate that jurisdiction exists as to these Management Defendants *themselves*. *Walden*, 571 U.S. at 284. And even if these contacts were attributable to these Management Defendants, the allegations about Smith refer only to his contact with KPMG or HSBC, not with the forum itself. *Id.* at 285

---

[4] The "tried to resist" language is in quotation marks in the Complaint, but does not indicate expressly who is being quoted.

("our 'minimum contacts' analysis looks to the defendant's contacts with the [forum] itself, not the defendant's contacts with persons who reside there"). Therefore, the allegations about David Smith do not influence the Court's jurisdictional analysis.

Given that the contacts of the Benbassat Family and David Smith are not attributable to the Hermes Subgroup Defendants, their only alleged contacts with the United States are the allegations common to all the Management Defendants and Beneficial Owner Defendants. For the same reasons as above, given these limited contacts, the proper causal standard is proximate causation and these allegations are insufficient to make a *prima facie* showing of proximate causation between those contacts and Plaintiff's alleged harm. Therefore, Plaintiff has failed to make its *prima facie* showing of personal jurisdiction.

### 3. Plaintiff Has Failed to Make a *Prima Facie* Showing of Specific Jurisdiction Over Defendant Bank Austria

The third subgroup of Defendants consists solely of Bank Austria. Bank Austria is a company organized under Austrian law and registered in Vienna, Austria. Am. Compl. ¶ 57. It is categorized as both a Management Defendant and a Beneficial Owner Defendant. As to its relationship to the claims at issue, Bank Austria "helped to create, control, and/or market" the non-party feeder funds Primeo, Alpha Prime, and Senator. Am. Compl. ¶ 57.

Bank Austria's contacts with this forum related to this case are insufficient to confer personal jurisdiction. Plaintiff levies the same insufficient allegations as it did against the other Management and Beneficial Owner Defendants. In addition, Plaintiff alleges that Bank Austria maintained a branch office in New York during part of the relevant time period and that "numerous Bank Austria-controlled and -directed subsidiaries and affiliates" are incorporated in New York and have principal offices in New York, New York "and/or [are] doing business in New York." Am. Compl. ¶ 57. Finally, Plaintiff alleges that during the relevant time period,

Bank Austria twice registered with the SEC through depository slips for its shares to trade on exchanges in New York. Am. Compl. ¶ 57. While this indicates that Bank Austria has a greater physical presence in this forum, Plaintiff does not allege that this presence is related to its claims. *See, e.g.*, *Gucci Am.*, 768 F.3d at 134 (scope of specific jurisdiction is limited to claims that "arise out of or relate to the entity's contacts with the forum" (internal brackets omitted)). Indeed, unlike in the *UBS* action, *UBS I*, 114 F. Supp. 3d at 166, Plaintiff does not allege that Bank Austria's branch or subsidiaries processed redemption requests or took any other actions related to the relevant feeder funds. *See* Am. Compl. ¶ 57. And even in *UBS I* where one of the defendant's branches did process redemptions for the relevant feeder fund, this was still not enough to confer personal jurisdiction. *UBS I*, 114 F. Supp. 3d at 166, 170. Therefore, Bank Austria's contacts with the forum that are related to Plaintiff's claims are limited to the same general allegations against all of the Management and Beneficial Owner Defendants. For the same reasons as above, these allegations are insufficient to make a *prima facie* showing of personal jurisdiction.

### 4. Plaintiff Has Failed to Make a *Prima Facie* Showing of Specific Jurisdiction Over Defendants PAI and UniCredit.

The fourth subgroup of Defendants consist of UniCredit and its subsidiary, PAI. UniCredit S.p.A. is an Italian joint stock company that is headquartered in Milan, Italy. Am. Compl. ¶ 59. PAI is organized under the laws of Ireland with a registered address in Dublin, Ireland. Am. Compl. ¶ 62. PAI is a wholly-owned subsidiary of a subsidiary of UniCredit. Am. Compl. ¶ 62. These parties' involvement with Madoff Investment stems from the fact that PAI served as investment advisor to the non-party feeder fund Primeo. Am. Compl. ¶ 62.

These Defendants' contacts with this forum related to this case are insufficient to confer personal jurisdiction. Plaintiff levies the same insufficient allegations as it did against the other

Management and Beneficial Owner Defendants. In addition, Plaintiff alleges that UniCredit operates directly in the United States and New York via UniCredit, New York Branch, which has an office in New York, New York. Am. Compl. ¶ 59. UniCredit S.p.A. also allegedly operates indirectly through subsidiary bank branches, representative offices, and other controlled subsidiaries and affiliates, some of which have offices in New York, New York. Am. Compl. ¶ 59. Plaintiff alleges that in UniCredit holds over $17.5 billion in assets or properties in New York and the United States. Am. Compl. ¶ 59. In addition, UniCredit established depositary receipts for its stock to trade on exchanges in New York. Am. Compl. ¶ 59. UniCredit's involvement with Madoff and Madoff Investment allegedly took place through PAI, its investment arm. Am. Compl. ¶ 59. UniCredit also acquired Bank Austria in 2005. Am. Compl. ¶ 59. Yet as with Bank Austria, Plaintiff does not allege that UniCredit's physical presence in this forum is related to Plaintiff's allegations here. Therefore, these Defendants' contacts with the forum that are related to Plaintiff's claims in this case are limited to the same general allegations against all of the Management and Beneficial Owner Defendants. For the same reasons as above, these allegations are insufficient to make a *prima facie* showing of personal jurisdiction.

### 5. Plaintiff Has Failed to Make a *Prima Facie* Showing of Specific Jurisdiction Over Defendant T+M

The fifth and final subgroup of Defendants consists solely of T + M. T + M is a company organized under Swiss law and registered in Geneva, Switzerland. Am. Compl. ¶ 76. Plaintiff alleges that T + M has an ownership interest in Thema Management BVI. Am. Compl. ¶ 76. Plaintiff makes no allegations specific to T + M that are any different from those levied against all the Beneficial Owner Defendants generally. For the same reasons as above, these are insufficient to make a *prima facie* showing of personal jurisdiction.

**D. Jurisdictional Discovery**

Plaintiff requests that the Court allow jurisdictional discovery if it holds that Plaintiff has failed to make its *prima facie* showing of personal jurisdictional. Pl. Consol. Opp at 9. The Court agrees with Defendant that jurisdictional discovery would be unnecessary and futile and denies Plaintiff's request.

As an initial matter, Plaintiff has failed to make a sufficient start towards establishing jurisdiction or explained how discovery could cure the issues identified by the Court. To warrant jurisdictional discovery, a "plaintiff must make a 'sufficient start' toward establishing jurisdiction[.]" *Doe v. Delaware State Police*, 939 F. Supp. 2d 313, 333 n.11 (S.D.N.Y. 2013) (citing *Manhattan Life Ins. Co. v. A.J. Stratton Syndicate*, 731 F. Supp. 587, 593 (S.D.N.Y. 1990)). Therefore, if Plaintiff's allegations are too conclusory, nonspecific, or otherwise inadequate, they will "not merit jurisdiction-related discovery." *Id.* (citing *Plunket v. Doyle*, No. 99-cv-11006 (KMW), 2001 WL 175252, at *4 (S.D.N.Y. Feb. 22, 2001). Similarly, a court will not grant jurisdictional discovery if a Plaintiff "has made no indication of a theory on which personal jurisdiction would be proper in this case other than those the Court has already found to be legally insufficient, nor explained how discovery would permit it to support any such theory if it did exist[.]" *Hitachi Data Sys. Credit Corp. v. Precision Discovery, Inc.*, 331 F. Supp. 3d 130, 147 n.3 (S.D.N.Y. 2018). Instead of making a sufficient start, Plaintiff has merely recycled the same allegations that were found insufficient in previous cases in this circuit. *See UBS II*, 882 F.3d at 343-45. Furthermore, Plaintiff does not point to any particular facts that it would hope to discover that would permit this Court to exercise jurisdiction. The most Plaintiff does is imply, through a parenthetical, that discovery is appropriate as it might allow Plaintiff to gauge the extent of parent companies' control over subsidiaries, without stating which relationships it would seek to probe nor how these would be sufficient to allow for the exercise of personal

jurisdiction. Pl. Consol. Opp. at 9.; Pl. Hermes Opp. at 11; Pl. Bank Austria Opp. at 4; Pl. PAI Opp. at 4. Even beyond that, Plaintiff does not advance any theory of jurisdiction that would overcome the absence of proximate causation between any of Defendants' actions and its alleged harm. Plaintiff has therefore neither made a sufficient start toward establishing jurisdiction, nor sufficiently indicated how discovery could remedy the problems identified by the Court.

Moreover, jurisdictional discovery would be futile because, as noted below, Plaintiff's claims are fatally deficient on independent grounds. *See SPV OSUS Ltd. v. AIA LLC*, 2016 WL 3039192, at *5 (proceeding to jurisdictional discovery was unnecessary because Plaintiff's claims were "fatally deficient on an independent ground"). For the reasons given in Section III(E), even if discovery were to reveal contacts with the forum that were substantive enough to confer personal jurisdiction on the Defendants, all of Plaintiff's claims warrant dismissal on the merits under Rule 12(b)(6). Given this, the Court concludes that it is unnecessary to proceed to jurisdictional discovery. Because Plaintiff has failed to make a sufficient start towards jurisdictional discovery and because discovery would be futile, the Court denies Plaintiff's request.

### E. Even Assuming Personal Jurisdiction, Plaintiff Has Failed to State a Claim Under Rule 12(b)(6)

In the alternative, even if Defendants' forum contacts were sufficient to warrant applying the lower but-for causation standard, Plaintiff's claims would still warrant dismissal not for lack of personal jurisdiction, but under Rule 12(b)(6) for failure to state a claim. As noted above, if "the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial ... it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts within the [forum] are not the proximate cause of the plaintiff's injury." *UBS II*, 882 F.3d at 344 (quoting *Chew*, 143 F.3d at 29). Assuming that these Defendants'

contacts are sufficient to warrant imposing a but-for causation standard, Plaintiff has arguably alleged sufficient facts to make a *prima facie* showing of personal jurisdiction. *Id.* at 346 (describing effectively identical theory of causation as "[a]t most . . . but-for causation"). Even so, however, the Court would grant Defendants' motion to dismiss under Rule 12(b)(6).

First, Plaintiff's aiding and abetting claims fail for lack of allegations that would establish proximate cause. Plaintiff brings state law claims for aiding and abetting a breach of fiduciary duty (Count One), Compl. ¶¶ 411-18, aiding and abetting fraud (Count Two), ¶¶ 419-26, and knowing participation in a breach of trust (Count Three), ¶¶ 427-38. As the Second Circuit noted in the *UBS II* action, Count Three is "essentially an aiding and abetting claim." 882 F.3d at 345. Each of these three claims requires Plaintiff "to allege that the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated." *Id.* (quoting *Cromer Fin. Ltd. v. Berger*, 137 F.Supp.2d 452, 470 (S.D.N.Y. 2001)). In other words, "the injury must be a direct or reasonably foreseeable result of the conduct." *Id.* (internal quotations omitted). As noted above in the Court's analysis of specific jurisdiction, Plaintiff's theories of causation are effectively identical to those expressly rejected by the Second Circuit in the *UBS II* action as too attenuated. 882 F.3d at 345-46. The Second Circuit held that lending assistance and support to the feeder funds was insufficient, as funneling money to Madoff Investments was "at most" but-for causation of harm to Optimal and "simply too attenuated to constitute proximate cause. *Id.* Similarly, allegations of lending Madoff Investments the "air of legitimacy" were insufficient, as Plaintiff does not sufficiently allege that Optimal was aware of Defendants' actions or "even knew of the feeder funds at issue," much less that Optimal *relied* upon them. *Id.* at 346. Finally, the Second Circuit held that Defendants' alleged failure to notify "the world at large and international investors in particular" was "unavailing because the [defendants] owed neither

[Optimal] nor SPV any fiduciary duty." *Id.* (citing *Lerner*, 459 F.3d at 295). Therefore, under *UBS II*, Plaintiff has failed to allege a necessary element of its aiding and abetting claims.

Second, Plaintiff has failed to defend or sufficiently allege its unjust enrichment claim (Count Four). Defendants argue that Plaintiff has failed to allege a substantial relationship between the opposing parties that would be sufficient to support such a claim. *See Carmona v. Spanish Broad. Sys., Inc.*, No. 08-cv-4475 (LAK), 2009 WL 890054, at *6 (S.D.N.Y. Mar. 30, 2009) (to sufficiently plead an unjust enrichment claim, Plaintiff must plead the existence of "direct dealings, or an actual substantive relationship, with [the Defendants]"). Plaintiff does not respond to this argument in its oppositions, Dkt. Nos. 81, 83-87, and has therefore waived it. *See, e.*g., *Kao,* 2018 WL 501609. And even if Plaintiff had not waived this argument, the Court agrees that Plaintiff has failed to sufficiently allege a substantial relationship between the parties. As the Court of Appeals of New York has explained, "there are no indicia of an enrichment that was unjust where the pleadings failed to indicate a relationship between the parties that could have caused reliance or inducement." *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 517 (2012) (quoting *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182-83 (2011)). Thus, if "the relationship between [the parties] is too attenuated because they simply had no dealings with each other," the claim should be dismissed. *Id.* Plaintiff's Complaint is devoid of any allegations of any such relationship between Optimal or Plaintiff and the Defendants, and therefore could not survive Defendants' 12(b)(6) motion.

## IV.   Conclusion

For the reasons given above, Defendants' motion to dismiss under Rule 12(b)(2) is hereby GRANTED in full as to all Defendants. In the alternative, the Court would grant Defendants' motion to dismiss under Rule 12(b)(6). This resolves docket item number 71.

Defendants' previous motion to dismiss, Dkt. No. 45, is hereby denied as moot. The Clerk of Court is directed to close the case.

       SO ORDERED.

Dated: March 30 , 2018
       New York, New York

                             ALISON J. NATHAN
                        United States District Judge